UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

COACH IP HOLDINGS, LLC, COACH                     Civil Action No. 23-cv-10612
SERVICES, INC., and TAPESTRY, INC.,

                    Plaintiffs,

      v.

ACS GROUP ACQUISITION LLC,

                    Defendants.

-----------------------------------------------------------x

# DEFENDANT ACS GROUP ACQUISITION LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER

**LAZARE POTTER GIACOVAS & MOYLE LLP**
747 Third Avenue, 16th Floor
New York, New York 10017
Telephone: (212) 758-9300
Facsimile: (212) 888-0919

*Attorneys for Defendant ACS Group Acquisition LLC*

## Table of Contents

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 2

LEGAL STANDARD........................................................................................................... 2

ARGUMENT ......................................................................................................................... 3

I.   COACH HAS NOT SUFFERED ANY IRREPARABLE INJURY AND MONEY
DAMAGES WILL SUFFICE TO MAKE IT WHOLE ....................................................... 3

   A.  Coach's Unreasonably Long Delay In Seeking Injunctive Relief Requires Denial
of Coach's Motion for a TRO ....................................................................................... 4

   B.  This Case is a Contract Dispute Not Trademark Infringement and Monetary
Damages Would Be Adequate to Compensate Coach Should It Eventually Prevail ...... 8

II.   COACH CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS
ON THE MERITS ............................................................................................................... 10

   A.  ACS Does Not Claim to Have Any Rights Greater Than Vinci Has Under
the License Agreement ................................................................................................ 10

   B.  Coach Cannot Assert Rights Under the Consent Agreement
and then Argue It Neither Applies to ACS Nor Remains In Effect............................. 11

   C.  Coach Cannot Establish Likelihood of Confusion When ACS's Use
Is Authorized by The Wind-Down Provisions of the License Agreement ................... 15

III.  THE BALANCING OF THE EQUITIES TILT HEAVILY IN ACS'S FAVOR............ 16

IV.  THE PROPOSED TRO IS OVERLY BROAD AND UNEFORCEABLE ..................... 16

CONCLUSION..................................................................................................................... 17

Table of Authorities

Page(s)

Cases

*Bell & Howell: Mamiya Co. v. Masel Supply Co.*,
    719 F.2d 42 (2d Cir. 1983).................................................................................... 3

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015).................................................................................. 2

*Chase Scientific Research v. NIA Group*,
    96 N.Y.2d 20, 725 N.Y.S.2d 592, 749 N.E.2d 161(2001)...................................... 12

*Christmas House USA, Inc. v. Christmasland Experience LLC*,
    No. 22 CV 7691 (GRB), 2022 WL 17852025 (E.D.N.Y. Dec. 22, 2022)................................ 7

*Church of Scientology [Int'l v. Elmira Mission of the Church of Scientology*,
    794 F.2d 38 (2d Cir.1986)................................................................................ 9, 10

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)............................................................................ 2, 4, 7

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)................................................................................. 2

*EBC I, Inc. v. Goldman Sachs & Co.*,
    7 A.D.3d 418, 777 N.Y.S.2d 440 (1st Dep't 2004) .............................................. 12

*Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*,
    No. 16 Civ. 5079 (JGK), 2016 WL 4367990 (S.D.N.Y. Aug. 12, 2016) ......................... 3

*Goat Fashion Ltd. v. 1661, Inc.*,
    No. 19 CIV. 11045 (PAE), 2020 WL 5758917 (S.D.N.Y. Sept. 28, 2020)...................... 3

*L & L Wings, Inc. v. Marco-Destin, Inc.*,
    676 F.Supp.2d 179 (S.D.N.Y. 2009)...................................................................... 3

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
    No. 11 CIV. 325 RJH, 2011 WL 1419612 (S.D.N.Y. Apr. 11, 2011)........................... 9

*Marks Org., Inc. v. Joles*,
    784 F. Supp. 2d 322 (S.D.N.Y. 2011)................................................................... 3

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)......................................................................................... 2

*Mendrzycki v. Cricchio*,
    58 A.D.3d 171, 868 N.Y.S.2d 107 (2d Dep't 2008) ........................................................... 12, 13

*New Look Party Ltd. v. Louise Paris Ltd.*,,
    No. 11 CIV. 6433 NRB, 2012 WL 251976 (S.D.N.Y. Jan. 11, 2012) ....................................... 3

*O & L Assocs. v. Del Conte*,
    601 F. Supp. 1463 (S.D.N.Y. 1985)...................................................................................... 17

*Pet Life, LLC v. KAS Pet, LLC*,
    No. 23CV4882GRBSIL, 2023 WL 5807769 (E.D.N.Y. Sept. 1, 2023).................................... 7

*Polaroid Corp. v. Polaroid Elecs., Corp.*,
    287 F.2d 492 (2d Cir. 1961)................................................................................................ 15

*R&G Brenner Income Tax Consultants v. Gilmartin*,
    166 A.D.3d 685, 89 N.Y.S.3d 85 (2d Dep't 2018) ................................................................ 12

*Regal Knitwear Co. v. N.L.R.B.*,
    324 U.S. 9, 65 S. Ct. 478, 89 L. Ed. 661 (1945) .................................................................. 17

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).............................................................................................. 2, 3

*Seidler v. Knopf*,
    186 A.D.3d 886 (2d 2020) ................................................................................................. 12

*Silber v. Barbara's Bakery, Inc.*,
    950 F. Supp. 2d 432 (E.D.N.Y. 2013) ................................................................................... 3

*Sperry Int'l Trade, Inc. v. Gov't of Israel*,
    670 F.2d 8 (2d Cir. 1982).................................................................................................... 3

*St. Lawrence Explosives Corp. v. Law Bros. Contr. Corp.*,
    170 A.D.2d 957, 566 N.Y.S.2d 127 (4th Dep't 1991) ........................................................... 12

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011).................................................................................... 4

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
    423 F.3d 137 (2d Cir. 2005)............................................................................................ 4, 7

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .............................................................................................................. 2

*Woodstock Ventures, LC v. Woodstock Roots LLC*,
    837 F. App'x 837 (2d Cir. 2021) .......................................................................................... 2

Rules

Fed. R. Civ. P. 65(d) ................................................................................................................ 16, 17

Other Authorities

Federal Practice and Procedure § 2948 (1973) ............................................................................ 3

UCC § 9-203 .............................................................................................................................. 10

## INTRODUCTION

This "emergency" application for a temporary restraining order is brought by Plaintiffs – the trademark owners of the "Coach" brand -- against Defendant ACS, the first-priority secured lender, seeking to enjoin ACS – and by extension Vinci -- from exercising any rights to sell Coach-branded goods that form part of the assets of ACS's borrower, Vinci Brands, Inc., and in which ACS holds a security interest.

As shown below, the requested application for a temporary restraining order should be denied for multiple reasons. First, Coach cannot show irreparable injury necessitating emergency relief. Coach delayed seeking any relief for at least five months. Indeed, Coach and its counsel have been well-aware that Vinci has post-expiration rights to sell Coach branded goods, and that ACS has been asserting its rights to seize and sell all assets of Vinci (which includes the Coach branded goods) since as early as July of 2023. Thus, Coach's application is far from an emergency. Second, Coach's action is nothing more than a contract dispute for which Coach can be made whole (if at all) through money damages. Third, as a secured lender, ACS is not seeking to exercise any rights greater than those granted to its debtor, but merely to facilitate the assertion of Vinci's contractual rights – rights that Coach has repeatedly acknowledged, in writing, after the expiration of the license. Fourth, under the terms of a certain consent agreement described herein, an agreement which Coach itself asserts rights under, ACS, as a successor in interest to the prior secured lender, also has post termination rights to sell the collateral. Additionally, the balance of the equities tip decidedly in ACS's favor because, if injunctive relief is granted, ACS (and Vinci) will lose the valuable Christmas selling season to monetize the collateral (in

accordance with agreements that Coach now simply ignores. For all of these reasons, the application should be denied in its entirety.

## FACTUAL BACKGROUND

The Court is respectfully referred to the Declaration of Charles Tebele, dated December 13, 2023, and the exhibits thereto, the letter dated December 13, 2023, from Michael Vatis, Esq. submitted on behalf of Vinci Brands, Inc. ("Vinci"), and the Declaration of Steven Latkovic, dated December 13, 2023, and exhibits thereto for a recitation of the facts relevant to the instant application.

## LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "Such relief should not be granted 'unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2021) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (italics in original). To obtain a preliminary injunction in the Second Circuit, a plaintiff must demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation...." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010), "that the balance of hardships 'tips in plaintiffs' favor,' and that the 'public interest would not be disserved by the issuance of a preliminary injunction.'" *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)). *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985).

## **ARGUMENT**

I.    **COACH HAS NOT SUFFERED ANY IRREPARABLE INJURY AND MONEY DAMAGES WILL SUFFICE TO MAKE IT WHOLE:**

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction[.]" *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 CIV. 11045 (PAE), 2020 WL 5758917, at *4 (S.D.N.Y. Sept. 28, 2020) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2948 (1973)). In trademark cases, a plaintiff must make an independent showing of irreparable injury. *New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 CIV. 6433 NRB, 2012 WL 251976, at *10 (S.D.N.Y. Jan. 11, 2012); *see also Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, No. 16 Civ. 5079 (JGK), 2016 WL 4367990, at *3 (S.D.N.Y. Aug. 12, 2016). "Irreparable injury has been defined as harm where 'remedies available at law, such as monetary damages, are inadequate to compensate' the plaintiff." *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (quoting *Salinger*, 607 F.3d at 80). "'Thus, if it appears that the potential harm to the moving party is simply a monetary loss, the potential injury is normally not deemed irreparable and hence does not justify injunctive relief.'" *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (quoting *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982)).

Coach has failed to establish that it will suffer any irreparable injury should injunctive relief be denied. The only argument Coach makes on this point is that it is entitled to a presumption of irreparable harm because Vinci was Coach's Licensee, and any continued use after termination of the license establishes "likelihood of confusion…as a matter of law" (quoting *L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F.Supp.2d 179, 188 (S.D.N.Y. 2009)) (MOL, pp. 14-15; 20-21). This argument fails for two reasons. First, Coach's five-month delay in seeking injunctive relief

disproves any *rebuttable* presumption of irreparable harm Coach may have been entitled to. Second, under the License Agreement, Vinci's rights *and obligations* to use Coach's marks were not completely terminated when the License Agreement expired on its own terms. Thus, there has been no unlawful continued use by either Vinci or ACS as Vinci's secured lender, and therefore, no possibility for confusion. This case is a contract dispute, and Coach's potential losses can be compensated (if at all) through an award of money damages.

### A. Coach's Unreasonably Long Delay In Seeking Injunctive Relief Requires Denial of Coach's Motion for a TRO:

Although a "'plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury,'" this presumption is *only* available "as long as there has not been undue delay in bringing a claim." *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005). "[D]elay alone may justify denial of a preliminary injunction for trademark infringement." *Citibank,* 756 F.2d at 276.

Here, the timeline of events and the ongoing adversarial relationships between the relevant parties establish that Coach had notice of ACS's potential future seizure and sale of the Coach Goods as early as *July 1, 2023*, when ACS filed its complaint in New York Supreme Court against its sister company, Kate Spade and sought a TRO allowing it to seize and sell the Kate Spade trademarked goods that comprised part of Vinci's collateral (the "Collateral") (the "ACS Action") (Tebele Dec., ¶27).

On *August 14, 2023*, ACS then amended that complaint and added a claim for entitlement to the same Collateral based on the consent agreement between Kate Spade, Vinci and Siena (the "Kate Spade Consent Agreement")—the identical Kate Spade Consent Agreement that Coach now

claims (just as Kate Spade did) that ACS is not a party to (Ex. D). Coach even bases this argument partially on an admission counsel for ACS allegedly made during oral argument on the TRO before Justice Cohen *on July14, 2023*, about the applicability of *the Kate Spade Consent Agreement to ACS's claims* (MOL, pp. 15-17). As Kate Spade and Coach are owned by the same parent company (Tapestry), represented by the same counsel, and are even re-using the exact same motion papers (*see* p. 20 Section III, second paragraph where counsel neglected to change "KSNY" to "Coach"), it is undeniable that Coach was fully aware that ACS would take the same position regarding its rights as Vinci's secured lender in relation to the Coach Goods following receipt of Coach's July 3, 2023, Notice of Coach's Exercise of Rights letter.

Indeed, *in that **July 3, 2023, letter*** Coach expressly exercised its purported rights under the Coach Consent Agreement and declared that its exercise of these rights "supersedes the claimed rights of any other Vinci Party (or any other third party) under the Consent Agreement (or any other agreement or understanding without limitation)." (Ex. N, p. 3). It is unfathomable that Coach intended "any other third party" to refer to any one other than ACS *two days after* ACS filed suit against Kate Spade.

On ***August 17, 2023***, Coach was put on further notice when, two days after the oral argument before Justice Cohen on the preliminary injunction against Kate Spade and during which the Kate Spade Consent Agreement was addressed (MOL, p. 17)—Coach purportedly *for the first time* checked Vinci's website, incipio.com to find out if Vinci had followed its ***July 3*** instructions to remove the Coach Goods from the website. In its letter to Vinci dated August 17, 2023, among other demands of Vinci, Coach reported that it had found "fifty-five unauthorized COACH®-branded items listed for sale" and demanded their immediate removal (Ex. Q).

Despite the fact that Coach claimed there were infringing goods on Vinci's website, Coach took no action. And for its part, Vinci ignored any claim of infringement. Instead, on ***August 22, 2023***, in response to the letter, Vinci informed Coach that to the extent that Coach requested certain intellectual property, such as tooling and molds, such intellectual property was subject to ACS's security interests as the senior secured lender and would not be released.

Following all these obvious indicators of ACS's intentions as Vinci's secured lender to seize Vinci's Collateral, Coach then knew *for certain* of ACS's intentions to seize and sell the Coach Goods by ***November 8, 2023***, when ACS served Coach with the Enforcement Letter (Ex. S). But it was another three weeks before Coach took *any* action to seek injunctive relief from any court. Moreover, when Coach finally did take any action to enjoin ACS from asserting its rights as Vinci's secured lender and successor-in-interest to the Consent Agreement, it did so by filing in New York Supreme Court—on a Friday night—when it knew full well its Trademark Infringement case *properly belonged in Federal Court*. Coach's forum shopping all but guaranteed at least an additional week-long (now two-week) delay in getting its motion for injunctive relief before any judge.

Coach's delay not only evidences that Coach has not suffered and will not suffer irreparable injury without injunctive relief, but it has caused injury to *both* Vinci and ACS. Had Coach sought injunctive relief against ACS when it first became aware that ACS was Vinci's secured lender and was going to aggressively pursue its rights to all of Vinci's Collateral, this issue would have been brought before the Court and decided well before the holiday shopping season went into full swing, rather than the week before Christmas. ACS should have then been able to sell the Coach Goods that Vinci had the post-expiration rights to produce and sell under Section 11 of the License Agreement during the busiest shopping season and recover some of its losses. As it stands now,

ACS will be lucky to catch the last few days before Christmas in which to sell *any* of the Coach Goods.

Courts in this District have consistently found similar delays warranted the denial of injunctive relief under similar circumstances. In *Christmas House USA, Inc. v. Christmasland Experience LLC*, No. 22 CV 7691 (GRB), 2022 WL 17852025, at *2 (E.D.N.Y. Dec. 22, 2022), a delay of just over a month in a seasonal business was found too long and a TRO and preliminary injunction were denied when the proposed injunction "would have effectively shut down defendants' operation days before Christmas, which the parties agreed represents an important period for the subject attractions." *See Pet Life, LLC v. KAS Pet, LLC*, No. 23CV4882GRBSIL, 2023 WL 5807769, at *4 (E.D.N.Y. Sept. 1, 2023) (plaintiff failed to seek injunctive relief for four months—injunction denied. "If defendants' use of Pet Life represented the existential threat plaintiff now describes, its counsel would have been inspired to come to court sooner"); *Citibank*, 756 F.2d at 276 ("Citibank did not seek the injunction until September 14—more than ten weeks after it learned directly of Citytrust's plans, and more than nine months after it received notice through the press that Citytrust intended to open a Long Island branch"); *Weight Watchers*, 423 F.3d at 144–45 ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction.").

We anticipate that Coach will argue that it sought emergency injunctive relief as soon as it found the alleged infringing products on Vinci's incipio.com website on November 30th (ECF # , ¶¶ 41-46), and after Vinci directed Coach to address the issue with ACS that same day (Tebele Dec., ). But as Coach's *August 17th letter* reflects, Coach had already checked the incipio.com website on August 17th and demanded that the fifty-five infringing Coach Goods be removed back then. Coach's decision to wait *until November 30th* to check the website *again* for any allegedly

infringing goods is unreasonable, and plainly shows that Coach did not consider ACS to be an "existential threat" to its trademark rights. *Pet Life, supra*.

In sum, the evidence shows that Coach was on notice that ACS intended to exercise its rights as Vinci's secured lender and as successor-in-interest to the Consent Agreement and would seek to seize and sell the Coach Goods *five months before it took any action* to protect its purported rights; it then waited *three weeks* after it learned *directly* of ACS's intentions; and then further slowed the entire process *by filing on a Friday night in the wrong court*. Coach's unreasonable delay should preclude any injunctive relief.

## B. This Case is a Contract Dispute Not Trademark Infringement and Monetary Damages Would Be Adequate to Compensate Coach Should It Eventually Prevail:

In its argument on this key element of entitlement to injunctive relief, Coach merely argues that it is entitled to a rebuttable presumption of irreparable harm under the Lanham Act. It quotes from a whole host of cases that state this general evidentiary rule, and eventually lands on its chosen argument of likelihood of confusion for the basis of establishing its irreparable injury as a matter of law (MOL, pp. 20-21). According to Coach and the cases it relies upon, the mere fact that this case involves the alleged unsanctioned acts of a Licensee after the expiration of a License Agreement establishes Coach's irreparable harm. But the License Agreement did not immediately and absolutely cut off Vinci's rights *and obligations* to use the License at the expiration of the License Agreement. And the extent of the parties' rights and obligations are the heart of this dispute.

Section 11 of the License Agreement, entitled Effect of Expiration or Termination, sets forth the process by which the parties will wind down the business relationship and settle all remaining orders and outstanding payments (Ex. M, pp. 24-26). Under Section 11, each of the parties are required to take certain actions within set time limits to effect this orderly wind-down

of the business. Indeed, under its terms, Vinci is *required* to use the Coach mark to complete any outstanding orders and is also *entitled* to sell trademarked goods under certain circumstances. This is where the dispute between Coach and ACS lies. Coach disputes that ACS has a right to sell because it claims that *Vinci* has no right to sell; ACS and Vinci dispute Coach's claim to all the Coach Goods and its demand that Vinci destroy rather than give ACS the ability to sell what Coach doesn't want. Indeed, Coach *simultaneously* declared all of Vinci's rights to use of the license revoked, and then *ordered* Vinci to use the license to manufacture Coach Goods that had already been ordered and could not be cancelled *in the same July 3, letter* (Ex. P).

This case is not about the unlicensed use of a trademark after all rights have been revoked or otherwise terminated as Coach argues and the caselaw it relies on addresses. This is purely a contractual dispute involving rights and obligations *that continue under the license* until all the post-expiration provisions of Section 11 have been completed, and the parties' business relationship properly wound down based on a contractually mandated timeline. The current disagreement on how Section 11 should apply to the circumstances in which the parties find themselves, and the ultimate rights and obligations of the parties is a question of contract interpretation for the Court to decide. Any damages that may flow from that ultimate interpretation can be addressed through monetary relief.

In this way, this case is more akin to *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11 CIV. 325 RJH, 2011 WL 1419612, at *6 (S.D.N.Y. Apr. 11, 2011), wherein the Court found that because of the ongoing nature of the business relationship, "the harm claimed here is not that of a former licensee of a mark making completely unauthorized use of the mark as in *Church of Scientology [Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 42–44 (2d Cir.1986)]". Here, as in *Life Techs.*, the only claim that Coach may have against ACS is that Vinci is "allegedly

exceeding their authorized use of the mark rather than making completely unauthorized use of it." *Id.* Coach is not entitled to injunctive relief when ultimately, it can be made whole through money damages.

## II. COACH CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS:

Coach makes three arguments as to why it is likely to prevail on its trademark confusion and declaratory judgment claims against ACS. First, Coach argues that because under the UCC, Art. 9, ACS does not have any rights greater than its debtor, Vinci, it has no right to step into Vinci's shoes and assert its rights under the License Agreement. Second, Coach argues that ACS is not a "successor-in-interest" under the Consent Agreement as a matter of law, and even so, the Consent Agreement expired when Siena was paid in full. And finally, Coach argues that as a matter of law, it has established the likelihood of confusion of its customers. As explained below, each of these arguments must fail, and injunctive relief denied.

### A. ACS Does Not Claim to Have Any Rights Greater Than Vinci Has Under the License Agreement:

As a threshold matter, Coach's argument that ACS does not have a right to step into Vinci's shoes is based upon the erroneous premise that ACS is seeking to assert "greater rights than Vinci." This is false. To the contrary, ACS is *merely facilitating Vinci's ability to exercise **its** rights* under the License Agreement, rights that ACS holds as Vinci's secured Creditor. (Tebele Dec., ___). On August 17, 2023, Coach sent a letter Vinci requesting certain information from Vinci in connection with the disposition of the Collateral. (Tebele Dec., ¶44; Ex. Q). Vinci responded to that letter and provided the information that Coach requested. (Tebele Dec., ¶45; Ex. R). Entirely consistent with what Coach has already proposed to Vinci, ACS is ready, willing, and able to facilitate Vinci's performance under Section 11 and work with Coach in an orderly disposition of the Coach Goods.

10

Indeed, as Coach points out, under UCC § 9-203, ACS's security interest attached to *all* the rights Vinci has—no more and no less. ACS is in no way asserting greater rights than those conferred upon Vinci under the Coach License Agreement. What Coach is really arguing here, is the ultimate issue in this case: whether the expiration of the License Agreement completely extinguished Vinci's rights or if Vinci maintains the post-expiration rights conferred on it by Section 11. If Vinci maintains its post-expiration rights, then any actions taken by Vinci and/or ACS as Vinci's secured lender, in regards to the Coach Goods cannot be considered to infringe on Coach's trademark. Coach is *less* likely to succeed on its argument given the plain language of Section 11, and the continually contradictory positions Coach has taken in regards to Vinci's rights since it declared all Vinci's rights under the License Agreement extinguished, but in the same breath, demanded that Vinci fulfill its obligations under the License Agreement.

## B. Coach Cannot Assert Rights Under the Consent Agreement and then Argue It Neither Applies to ACS Nor Remains In Effect:

Coach next argues that ACS is not successor because (i) ACS's counsel allegedly "admitted" that ACS is not a successor to Siena under the Kate Spade Consent Agreement and Judge Cohen "tacitly rejected ACS's alternative 'successor theory'"; (ii) ACS does not meet the legal definition of "successor"; and (iii) ACS is not a party to the Coach Consent Agreement and/or such agreement is not in effect. These arguments are without merit.

### 1. Judge Cohen Did Not Reject the Successor Theory Nor Did ACS "Admit" That It Is Not a Successor to Siena

As an initial matter, Coach's assertion that Judge Cohen "tacitly rejected ACS's alternative 'successor theory'" and denied injunctive relief to ACS on this basis is false. The issue of whether ACS is a successor under the Kate Spade Consent Agreement was *not* before Judge Cohen on ACS's application for a TRO *or* preliminary injunction at all. As such, when the Court denied the

TRO, *it could not – and did not –* deny it on the grounds that ACS was not a successor to Siena.

Further, ACS's counsel made no "admissions." ACS filed an amended complaint that lodges an alternative claim for successor-in-interest that is now the operative pleading in the case, and entirely moots the earlier complaint. *See, e.g.*, *EBC I, Inc. v. Goldman Sachs & Co.*, 7 A.D.3d 418, 420, 777 N.Y.S.2d 440, 443 (1st Dep't 2004), *aff'd as modified,* 5 N.Y.3d 11, 832 N.E.2d 26 (2005) ("Concerning the malpractice cause of action, we find that investment bankers are professionals (*cf. Chase Scientific Research v. NIA Group,* 96 N.Y.2d 20, 29, 725 N.Y.S.2d 592, 749 N.E.2d 161[2001]), and that defendant's attorney did not concede on oral argument before the motion court that the malpractice claim and fiduciary breach claims are duplicative; in any event, alternative theories may be advanced in pleadings"); *see Seidler v. Knopf*, 186 A.D.3d 886, 888 (2d 2020), quoting *St. Lawrence Explosives Corp. v. Law Bros. Contr. Corp.,* 170 A.D.2d 957, 957, 566 N.Y.S.2d 127 (4th Dep't 1991) ("When an amended complaint has been served, it supersedes the original complaint and becomes the only complaint in the case," and "defendants' original answer has no effect and a new responsive pleading must be substituted for the original answer"); *R&G Brenner Income Tax Consultants v. Gilmartin,* 166 A.D.3d 685, 688, 89 N.Y.S.3d 85 (2d Dep't 2018), quoting *Mendrzycki v. Cricchio,* 58 A.D.3d 171, 175, 868 N.Y.S.2d 107 (2d Dep't 2008) ("Since an amended complaint supplants the original complaint, it would unduly prejudice a defendant if it were bound by an original answer when the original complaint has no legal effect").

   2.  ACS Is the Successor-In-Interest to Siena and Case-Mate

Coach's contention that ACS does not meet the legal definition of "successor" is baseless. There is ample evidence before this Court, and Judge Cohen in the ACS Action, that shows the

succession of interest in the loans to Vinci and how it is that ACS became the First Lien Holder, as successor-in-interest to Siena, Case-Mate, and Monroe.

Vinci entered into loan agreements with Siena, who was the then-first priority lienholder, and Monroe, the second priority lienholder. (Tebele Dec., ¶7). Both Siena and Monroe filed UCC liens. (Tebele Dec., ¶8; Exs. A and B). Siena and Monroe entered into an Intercreditor Agreement that, among other things, acknowledged that once Siena's loan was paid in full, Monroe would succeed as the first priority lienholder. (Tebele Dec., ¶9; Ex. C).

Subsequently, Siena, Vinci, and Coach entered into the Coach Consent Agreement that gives the first priority lien holder (which was Siena) the right to exercise certain rights in the event of a default by Vinci, subject only to Coach's repurchase rights. (Tebele Dec., ¶31; Ex. N). The Coach Consent Agreement makes clear that it is binding on Siena's "successors and assigns." (*Id.*)

Thereafter, Siena's loan was acquired by Case-Mate, Siena's UCC lien was assigned to Case-Mate, and Case-Mate stepped into the shoes of Siena as the first priority lienholder under the Intercreditor Agreement and the Consent Agreement. (Tebele Dec., ¶15; Ex. F). In a letter dated May 23, 2023, Case-Mate asserted its rights as the first-priority lienholder and "successor-in-interest to certain financing agreements" to which Siena was a party. (Tebele Dec., ¶16; Ex. G). Indeed, on June 2, 2023, Kate Spade expressly acknowledged that Case-Mate was the "successor-in-interest" to Siena under the Kate Spade License Agreement and the Kate Spade Consent Agreement. (Tebele Dec., ¶17; Ex. H).

Subsequently, Case-Mate's loan was paid in full, and it terminated its UCC lien. (Tebele Dec., ¶21; Ex. J). On June 5, 2023, Case-Mate – pursuant to its contractual obligations under the Intercreditor Agreement – gave notice to Vinci, Monroe, and Vinci's bank that its lien was extinguished and Monroe became the "controlling party" and first-priority lienholder. (Tebele

Dec., ¶23; Ex. K).  On the same day, June 5, 2023, ACS acquired the Monroe Loan.  (Tebele Dec., ¶18).  Monroe assigned its UCC lien to ACS, and ACS stepped into Monroe's shoes.  (Tebele Dec., ¶19; Ex. I).  As this evidence shows, ACS is the only secured creditor remaining, and has succeeded to all of Case-Mate's rights under the Intercreditor Agreement and the Coach Consent Agreement.

### 3. Coach Has Already Admitted By Its Own Assertion of Rights Under the Coach Consent Agreement That It Is Still In Effect

Finally, Coach argues that the Coach Consent Agreement is no longer in effect because Siena's rights under the Coach Consent Agreement terminated when its loan was paid in full by Case-Mate.  This argument, however, is belied by Coach's own actions in which it asserted rights under the agreement.

On July 3, 2023, Coach sent a notice to Vinci exercising certain rights, including the right to repurchase.  In paragraph 4 of the notice, Coach specifically noted that it was exercising repurchase rights under the Coach License Agreement *and* the Coach Consent Agreement:

> By selecting the Inventory Purchase Option **Coach also exercises its rights under Section 4 of the Licensor Consent Agreement dated November 23, 2021 ("Consent Agreement") between Coach, Vinci, and Siena Lending Group, LLC ("Siena"). Coach's exercise of its rights under** the Inventory Purchase Option and **the Consent Agreement supersedes the claimed rights of any other Vinci Party** (or any other third party) **under the Consent Agreement** (or any other agreement or understanding without limitation).

(Emphasis added).  (Tebele Dec., ¶33; Ex. P).  Coach should not be permitted to claim rights to the exclusion of everyone else under the Consent Agreement on July 3, 2023, and then come before this Court in December and argue that the Consent Agreement expired when Siena's loan was paid off *in May 2023*.

### C. Coach Cannot Establish Likelihood of Confusion When ACS's Use Is Authorized by The Wind-Down Provisions of the License Agreement:

As argued in Section I, B above, this is not a trademark infringement case, and neither Vinci or ACS have taken any action in regard to Coach's marks that they do not either have the right to, or more importantly, that Vinci had the *obligation to* under the License Agreement. Coach might dispute whether Vinci and/or ACS does have such rights, but that is the ultimate issue in this case. Moreover, Coach cannot in good faith argue that ACS had *no* obligation to take certain actions on Vinci's behalf; an obligation that *Coach itself demanded Vinci fulfill* when the License Agreement expired on July 1, 2023 (Ex. M).

This case is a dispute between the parties to a License Agreement on how to wind down the parties' business relationship, and who owes which what amount of money. The Coach Goods are not counterfeit, as was the case in *HTT LLC v. Defendants listed in Schedule A*, 22-cv-4206, in which this Court heard and granted an *ex parte* TRO[1]—no one is standing on Canal Street selling "Coack" iPhone covers that are going to break in a day, for $2. Indeed, ACS has no intention of selling any of the Coach Goods to any customer that is not on Coach's own Approved Customer list. All the Coach Goods were, and are being manufactured to Coach specifications and in full compliance with the License Agreement and its wind-down provisions of Section 11. As such, there can be no likelihood of confusion here. Indeed, Coach only gives lip service to the *Polaroid* factors in its papers in attempting to establish *actual* confusion (MOL, p. 14-15).[2] Coach clearly recognizes there can be no confusion if ACS is selling Coach Goods according to its, and Vinci's plain contractual obligations.

---

[1] Nor is there any allegation of any danger that ACS might be secreting profits as there were in that case.
[2] *Polaroid Corp. v. Polaroid Elecs., Corp.*, 287 F.2d 492 (2d Cir. 1961) *cert denied*, 368 U.S. 820 (1961).

All of the actions taken, not taken, demanded and/or refused by the parties are governed by the terms of Section 11 of the License Agreement (and, by Coach's own exercise of its provisions, Section 4 of the Consent Agreement). And any and all remedies available to the parties are established by those same provisions. Coach's attempt to turn this case into anything other than a contract dispute should be rejected.

## III.   THE BALANCING OF THE EQUITIES TILT HEAVILY IN ACS'S FAVOR:

As argued in Section I, A, above, Coach's delay has already caused ACS damage by precluding ACS from exercising its contractual rights to sell the Coach Goods during the holiday retail season. This is exacerbated by the fact that Coach is seeking an order from the Court requiring ACS to destroy the Coach Goods ACS is asserting a contractual right to sell, and which Coach does not want. Moreover, under the terms of Section 11, Vinci and ACS only have a four-month window in which to sell those goods. That window opened the beginning of November, based on the timing of Coach's formal exercising of its Inventory Purchase Option by letter dated October 25, 2023, and will close at the end of February 2024. ACS's best opportunity for recovering some of its damages by selling the Coach Goods it claims entitlement to is occurring right now. If the TRO is granted, not only will Vinci be stripped of its rights under Section 11 without any opportunity to object, but ACS will lose the entire holiday retail season and will be irreparably harmed by having to try to sell in the two slowest retail months of the year, if not required to destroy the goods altogether.

## IV.   THE PROPOSED TRO IS OVERLY BROAD AND UNEFORCEABLE:

Under Fed. R. Civ. P. 65(d)(2), the only parties that can be bound by a TRO or injunction are: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." However, in its proposed TRO, Coach asks this Court to bind "ACS, its

16

officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, lenders, creditors, and those in privity with ACS, and those persons in active concert or participation with any of them". This language goes far beyond the Rule and serves no other purpose but to intimidate ACS's business relations.

"While an injunction is not invalid simply because its terms purport to broaden its scope beyond that defined in the Rules, there is no justification for using such terms when, as it appears in this case, the only effect they are likely to have is to threaten those who are not subject to the command of the Court." *O & L Assocs. v. Del Conte*, 601 F. Supp. 1463, 1465 (S.D.N.Y. 1985) (citing *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 15, 65 S. Ct. 478, 482, 89 L. Ed. 661 (1945). Indeed, "[e]nforcement orders are issued to effectuate the purposes of the Act, not for the entrapment of parties, and courts no less than parties desire to avoid unwitting contempts as well as to punish deliberate ones." *Regal Knitwear*, at 15. At the very least, the language of the Order should be made to conform to that of Rule 65(d).

## CONCLUSION

WHEREFORE, Defendant, ACS Group Acquisition LLC respectfully requests that this Court deny Plaintiff's motion for a Temporary Restraining Order and Preliminary Injunction and return this case to Judge Schofield for further proceedings.

Dated:  December 13, 2023
      New York, New York

                              LAZARE POTTER GIACOVAS &
                              MOYLE LLP

                        By: _____ s/ Lainie E. Cohen_____
                              Robert A. Giacovas
                              Lainie E. Cohen
                              Anna Pia D. Felix
                              Christina Dellaporte
                     747 Third Avenue, 16th Floor

New York, New York 10017
Telephone: (212) 758-9300
Facsimile: (212) 888-0919
rgiacovas@lpgmlaw.com
lcohen@lpgmlaw.com
afelix@lpgmlaw.com
cdellaporte@lpgmlaw.com

*Attorneys for Defendant ACS Group Acquisition
LLC*