**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Coach IP Holdings, LLC, Coach Services, Inc., and Tapestry, Inc.**, | Civil Action No.:  1:23-cv-10612-LGS |
| Plaintiffs, | |
| v. | **SECOND AMENDED COMPLAINT** |
| **ACS Group Acquisitions LLC, Vinci Brands LLC, Onward Brands LLC, Charles Tebele, and Sam "Sonny" Haddad,** | |
| Defendants. | |

Plaintiffs Coach IP Holdings, LLC, Coach Services, Inc. and Tapestry, Inc. (collectively, "Coach") bring this action against Defendants ACS Group Acquisitions LLC ("ACS"),[1] Vinci Brands LLC, f/k/a Incipio, LLC ("Vinci"), Onward Brands LLC ("Onward"), Charles Tebele ("Tebele"), and Sam "Sonny" Haddad ("Haddad") for injunctive relief, declaratory relief, breach of contract, tortious interference, and damages based on trademark infringement, unfair competition and false advertising and other related claims.

## INTRODUCTION

1.     Vinci (and its predecessors and affiliates) was Coach's authorized licensee for COACH® branded tech accessories, such as phone cases and accessories pursuant to a certain license agreement, dated January 7, 2019, as subsequently amended, at ECF 19-1 (the "Coach License Agreement").

2.     The Coach License Agreement provided various, agreed-to limitations to Vinci's rights (and ACS's alleged, derivative rights), as well as the Lanham Act's protections over Coach's right to control use of its COACH® Marks (defined below).

---

[1]     A search has revealed a Delaware limited liability company registered to do business in New York under the name ACS Group Acquisition LLC (without an "s"). ACS's complaint in the Kate Spade Action (defined below) refers to ACS as "ACS Group Acquisitions LLC." Assuming ACS Group Acquisition LLC is the same entity as ACS Group Acquisitions LLC in the Kate Spade Action and/or assuming ACS Group Acquisition LLC is the proper name, this complaint is directed to both entities and the term "ACS" refers to both names.

3.      The Coach License Agreement expired by its terms on June 30, 2023.

4.      The Coach License Agreement provides Coach with absolute, sole discretion in deciding whether to exercise the right to, and enter, a renewal term with Vinci. Coach declined to renew the licensor-licensee relationship due to, among other things, Vinci's breaches of and default on the Coach License Agreement by its failure to pay royalties and other amounts due to Coach pursuant to the Coach License Agreement.

5.      On June 15, 2023, prior to the expiration of the Coach License Agreement, Coach issued to Vinci a Notice of Non-Payment documenting Vinci's default due to its "failure to pay all required Guaranteed Minimum Royalties ('GMR') and Image Fund Payments due under the License Agreement."

6.      Vinci did not cure its default within the period provided by the Coach License Agreement. Vinci also did not contest, or otherwise respond to, the June 15, 2023 Notice of Non-Payment.

7.      Coach promptly issued to Vinci a Notice of Expiration of License Agreement on July 1, 2023, following the Coach License Agreement's natural expiration on June 30, 2023 (the previous day).

8.      Vinci did not contest, or otherwise respond to, to the July 1, 2023 Notice of Expiration.

9.      On July 3, 2023, Coach issued to Vinci a Notice of Coach's Exercise of Rights, detailing various post-expiration obligations of Vinci under the Coach License Agreement including, for example and without limitation: (i) immediate cessation of use of the COACH® Marks (defined herein); (ii) immediate cessation of all sales of COACH® branded tech accessories through <Incipio.com> and all other sales channels owned, operated, or controlled by Vinci; (iii) timely fulfilment of non-cancelable Coach orders; (iv) immediate cancellation of all cancelable orders; (v) payment of all amounts due to Coach; (vi) timely delivery to Coach of Vinci's account list and inventory schedule; and (vii) immediate delivery to Coach of all works of authorship and other intellectual property.

2

10.     With respect to Vinci's immediate, post-expiration obligations listed at (i), (ii) and (vii) in Paragraph 9 of this Second Amended Complaint, the Notice of Coach's Exercise of Rights requested Vinci's confirmation and compliance by 5:00 p.m. on July 5, 2023.

11.     Vinci neither acknowledged nor confirmed, let alone complied with, those post-expiration obligations by 5:00 p.m. on July 5, 2023.

12.     With respect to Vinci's post-expiration obligations to timely deliver to Coach Vinci's account list and inventory schedule, as listed at (vi) in Paragraph 9 of this Second Amended Complaint, Vinci's compliance was required by the Coach License Agreement within thirty (30) days of the Notice of Expiration of License Agreement (i.e., on or before July 30, 2023).

13.     Vinci did not comply with those post-expiration obligations on or before July 30, 2023.

14.     With respect to Vinci's post-expiration obligation to pay all amounts due to Coach, as listed at (v) in Paragraph 9 of this Second Amended Complaint, Vinci was required by the Coach License Agreement to make a necessary payment to Coach within forty-five (45) days of the end of Coach's fiscal quarter (i.e., on or before August 15, 2023).

15.     Vinci did not comply with that post-expiration payment obligation on or before August 15, 2023, and as of this Second Amended Complaint still has not complied.

16.     Vinci did not respond to the July 3, 2023 Notice of Coach's Exercise of Rights.

17.     On August 17, 2023, notwithstanding Vinci's failures to meet its post-expiration compliance deadlines to-date, in an attempt to reach a resolution without a need to seek court intervention, Coach sent Vinci a letter detailing outstanding information and actions due from Vinci after expiration of the Coach License Agreement and requesting a response from Vinci by August 21, 2023.

18.     Following the Coach License Agreement's natural expiration on June 30, 2023, Coach discovered that Vinci was offering for sale "fifty-five (55) unauthorized COACH® branded items" on its Incipio.com website, documented the same in the aforementioned August 17, 2023 letter, and by that same letter demanded that Vinci "*immediately remove all such listings and*

3

*confirm in writing on or before August 21, 2023 and that no other sales are occurring, and that none will take place.*" (emphasis in original.)

19. On August 22, 2023, Vinci responded to confirm: "At the current time, all web listings and promotional materials have been removed from Vinci's web sites. We know of no other marketing or promotions that exist."

20. Vinci additionally confirmed that, as of August 22, 2023, "There are no open orders for Coach merchandise."

21. Vinci's August 22, 2023 letter further confirmed that "Vinci currently has no customers that can purchase Coach merchandise, therefore there is no [account information] list to provide."

22. After receiving Vinci's August 22, 2023 letter, Coach confirmed that the fifty-five (55) unauthorized COACH® branded items on Vinci's Incipio.com website has been removed.

23. Vinci has not only ignored its post-expiration obligations, but it has also, as set forth herein, improperly and without authorization used and continued to facilitate the unlawful use of COACH® Marks (defined herein).

24. Upon information and belief, ACS, by and through Tebele and Haddad, has used, at least, Vinci's website and Amazon.com storefront to – without authorization, permission, right, or license – advertise, promote, offer for sale, and sell COACH® branded tech accessories.

25. On November 8, 2023, by letter entitled "Enforcement Notice," ACS, by and through Tebele and Haddad, asserted an alleged security interest in the COACH® branded tech accessories in inventory of Vinci and in-process, non-cancelable orders of Vinci for COACH® branded tech accessories (collectively, the "Alleged Collateral").

26. On November 21, 2023, ACS, by and through Tebele and Haddad, sent Coach another letter entitled "Enforcement Notice" (together with the November 8, 2023 letter, the "November 2023 Letters"), enclosing a product list, purportedly representing the Alleged Collateral.

27. ACS asserts in the November 2023 Letters that it has the right to take possession

of, dispose of, and sell the Alleged Collateral – all of which actions are prohibited under both the plain terms of the Coach License Agreement. On information and belief, ACS seeks solely to maximize its profit on a loan to Vinci that ACS purchased for less than 2 cents on the dollar (despite the fact that the Coach License Agreement was set to expire mere weeks later), without regard to Coach's ongoing business or goodwill.

28.    ACS's repeated threats and actions to seize, take possession of, dispose of, and/or sell tech accessories bearing the COACH® Marks constitute imminent, impending, and/or current acts of trademark infringement, in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq*.

29.    ACS's threats and actions also establish that its infringement is imminent and impending, giving rise to a justiciable controversy between the parties, such that Coach seeks a declaration that: (i) ACS is *not* the legal successor to Siena Lending Group ("Siena") and its rights under the Licensor Consent Agreement dated November 23, 2021, between Coach, Vinci, and Siena (the "Siena Consent Agreement"), (ii) to the extent ACS can even assert any alleged rights, any interest in the COACH® branded tech accessories are subject to all restrictions and limitations imposed under the Coach License Agreement, including all post-termination restrictions, rights retained by Coach and applicable law (as explained below), (iii) accordingly, ACS has no right to seize, take possession of, dispose of, and/or sell the Alleged Collateral or to assert that it will do so, and (iv) any use, distribution, disposition, or sale of the COACH® branded tech accessories by ACS violates the Coach License Agreement, damages Coach and constitutes trademark infringement under the Lanham Act.

30.    Further, ACS's wrongful actions are preventing the Alleged Collateral and other inventory from being delivered to Coach and/or destroyed as specifically required by the Coach License Agreement.  Based on these facts, Coach is entitled to injunctive relief, enjoining ACS, Onward, Tebele, and Haddad from (among other things) acts of infringement and directing it to release any interest the Alleged Collateral and any other COACH® branded items so that they can be delivered to Coach and/or otherwise disposed of, as set forth below.

31.    Additionally, discovery in the related actions *Kate Spade LLC et al. v. Vinci Brands LLC et al.*, Case No. 1:23-cv-05409-LGS-VF ("KSNY Action") and *Vinci Brands LLC v. Kate Spade LLC et al.*, Case No 1:23-cv-05138-LGS-VF has revealed that prior to the expiration of the Coach License Agreement on June 30, 2023, Vinci concealed from Coach that the Coach License Agreement had automatically terminated for several reasons, including because: (i) Vinci's was unable to pay its debts generally as they become due; (ii) on February 10, 2023, Vinci defaulted on more than $1 million of debt secured by Coach's licensed merchandise; (iii) on March 3, 2023, Vinci discontinued a substantial portion of its business by transferring key duties and functions under the Coach License Agreement to a third party without approval; and (iv) on June 5, 2023, through a series of (unapproved) transaction between ACS, Vinci, Onward, Tebele, and Haddad, Vinci underwent a change of control, took corporation action in furtherance of ceasing its operations, and discontinued all or a substantial portion of its business operations.

32.    Based on these actions, Coach is entitled to damages from Vinci, ACS, Onward, Tebele, and Haddad and injunctive relief enjoining Vinci, ACS, Onward, Tebele, and Haddad from (among other things) acts of infringement, as set forth below.

## **PARTIES**

33.    Tapestry, Inc. is a Maryland corporation duly organized and existing under the laws of the State of Maryland with a place of business at 10 Hudson Yards, New York, New York 10001 ("Tapestry").

34.    Coach IP Holdings, LLC is a Delaware limited liability company duly organized and existing under the laws of the State of Delaware with a place of business at 10 Hudson Yards, New York, New York 10001, and is a wholly-owned subsidiary of Tapestry.

35.    Coach Services, Inc. is a Delaware limited liability company duly organized and existing under the laws of the State of Delaware with a place of business at 10 Hudson Yards, New York, New York 10001, and is a wholly-owned subsidiary of Tapestry.

36.    As ACS has alleged in its complaint in the Kate Spade Action[2] (defined below), ACS is a Delaware limited liability company with a principal place of business in New York, New York.

37.    Vinci is a limited liability company organized under the laws of the State of Delaware, and has two managers, Steve Latkovic, an individual domiciled in Ohio, and Glenn Pollack, an individual domiciled in Florida.

38.    Onward is a Delaware limited liability company with a principal place of business in New York, New York.

39.    Tebele is an individual who lives in New York, New York. Though an LLC, Tebele owns two-thirds of ACS and Onward. He also is managing member of ACS and the CEO of Onward.

40.    Haddad is an individual who lives in Brooklyn, New York. Though an LLC, Haddad owns one-third of ACS and Onward. Haddad also is a member of ACS and is a manager of Onward.

## JURISDICTION AND VENUE

41.    Under 28 U.S.C. §§ 1131 and 1138(a), this Court has original subject matter jurisdiction over Coach's First Cause of Action, Eighth Cause of Action, and Tenth Cause of Action for federal trademark infringements (including counterfeiting) under 15 U.S.C. §§ 1114 and 1117, and Second Cause of Action and Eleventh Cause of Action for federal unfair competition and false advertising under 15 U.S.C. § 1125(a), as well as Third Cause of Action and Ninth Cause of Action for declaratory judgments.

42.    Under 28 U.S.C. §§ 1338(b) and 1367(a), this Court has supplemental jurisdiction over Coach's Fourth Cause of Action for New York trademark infringement, Fifth Cause of Action and Twelfth Cause of Action for New York trademark dilution, Sixth Cause of Action and

---

[2]    On July 1, 2023, ACS filed a complaint in the Supreme Court of the State of New York, *ACS Group Acquisitions LLC v. Kate Spade LLC et al.*, Index No. 653181/2023, Justice Cohen (the "KSNY Action"), the details of which are set forth below. ACS voluntarily discontinued its suit on March 27, 2024 after its requests for a temporary restraining order preliminary injunction were denied.

Thirteenth Cause of Action for common law unfair competition, Seventh Cause of Action for breach of contract, and Fourteenth Cause of Action for tortious interference with contract, because those claims form part of the same case and controversy as Coach's federal claims and arise from a common nucleus of operative facts.

43. This Court has personal jurisdiction over Vinci because as a party to the Coach License Agreement, Vinci has submitted itself to the personal jurisdiction of this Court, pursuant to Section 20.3 of that Agreement.

44. This Court further has personal jurisdiction over Vinci because they regularly transact business in New York.

45. This Court has personal jurisdiction over ACS because they regularly transact business in New York.

46. The Court has personal jurisdiction over Onward because it is headquartered in New York, New York and because it regularly transacts business in the State of New York.

47. The Court has personal jurisdiction over Tebele because he is a resident of New York, New York, and because he regularly transacts business in the State of New York.

48. The Court has personal jurisdiction over Haddad because he is a resident of Brooklyn, New York and because he regularly transacts business in the State of New York.

49. Venue is proper in this judicial district under 28 U.S.C. 1391(b) and (c) because, on information and belief, a substantial part of the events giving rise to the claims occurred in this district.

**FACTS**

**A.  THE COACH BRAND**

42. Since its founding in New York City in 1941, Coach has grown from a family-run leathergoods company into the iconic global fashion and lifestyle COACH® brand known around the world for its craftsmanship high-quality handbags and lifestyle collections.

43.    Coach is a worldwide leader in, among other things, the design, marketing, and distribution of premium lifestyle products, including, without limitation, a full line of tech accessories, in addition to handbags, wallets, wristlets, footwear, eyewear, jewelry, watches, ready-to-wear and fragrances (collectively, the "Coach Goods").

44.    Coach first registered the COACH® mark in 1963. Coach now owns more than 51 registrations for its COACH® Marks at the U.S. Patent and Trademark Office alone, that are used by Coach, and its authorized licensees, and that consist of or include the word mark, COACH®, and/or the logo/design mark featuring a stylized letter "C", including for example the marks shown below:

COACH®

COACH NEW YORK®

 ®

 ®

(collectively, the "COACH® Marks").

45.    Coach's marketing efforts and sales success, combined with its close attention to the quality, design, and construction of its products, including its celebration of craft, its hometown of New York City, and the optimism of authentic American style, has resulted in the COACH® Marks becoming universally recognized and associated with a distinctive look, legacy of craft, and quality that points exclusively and unmistakably to Coach. By virtue of the extensive distribution and success of the Coach Goods and related services, the COACH® Marks are distinctive and famous.

46.    In part, Coach accomplishes its distribution of Coach Goods and related services through trademark licenses that it grants to third-party entities.  As relevant here, the licensed partners that produce licensed Coach Goods contract directly with product manufacturing facilities to produce licensed Coach Goods and also with customers, both distributors and retailers, to distribute and sell the licensed Coach Goods.

47.    Today, Coach offers numerous product categories in the United States and around the world, including tech accessories (including phone covers, audio, earbuds and headphones, charging devices and small speakers for home), as well as handbags; small leather goods; ready-to-wear apparel (including dresses, separates, jackets, outerwear, skirts and pants); wearable tech (smart watch straps); jewellery; watches; footwear; legwear; outerwear; hair accessories; and fragrances.

48.    Coach has succeeded in extending its brand into different product categories and consumer markets primarily through a number of licensing partnerships, including cobranding and/or product collaborations. For example, for a number of years, Vinci (and its predecessor, Incipio, LLC) were the Coach brand's license partner for tech accessories, including phone cases. That relationship ended on June 30, 2023, when the Coach License Agreement ended.

49.    Coach has received worldwide recognition and numerous accolades for its innovation and reach in product design and its successful marketing strategies. For example, Coach's creative director, Stuart Vevers, was awarded the Accessory Designer of the Year award by the Council of Fashion Designers of America and the Designer of the Year award by the American Apparel & Footwear Association (AAFA) for his work at Coach.

50.    Coach dedicates millions of dollars annually to market its Coach Goods, which includes the distribution of brand imagery in film and print, digital and social media, outdoor advertising, and at public relations efforts, fashion events, and presentations.

51.    Coach also invests in digital advertisements aimed at potential customers browsing third-party websites and maintains and operates Coach pages on all major social media platforms, including, Facebook, Instagram, TikTok, Pinterest, X (formerly Twitter), and YouTube. Coach

has amassed about 7 million followers on Instagram and over 8 million likes on Facebook. Additionally, Coach enjoys more than 94 million views of its YouTube content.

52.     Coach's business includes direct-to-consumer sales, through its own retail stores and its online store. Over the years, the number of visits to Coach's online store has grown into the millions.

53.     Coach's sales of products bearing the COACH® Marks have grown to billions of dollars. Sales of COACH® branded tech accessories—the products at issue here—are equally significant, selling millions annually.

54.     Coach also sells its products at numerous retail and outlet stores across the U.S. and its products are sold to in specialty stores and major department stores and Coach's third-party retailers sell COACH® branded merchandise in their retail locations and through their websites. Coach also sells its goods through ecommerce.

## B.  THE COACH® MARKS.

55.     Coach owns more than 51 registrations for its COACH® Marks at the U.S. Patent and Trademark Office alone.

56.     Many of Coach's federal registrations of the COACH® Marks are incontestable within the meaning of Section 15 of the Lanham Act, 15 U.S.C. § 1065.

57.     Coach's registrations for its COACH® Marks at the U.S. Patent and Trademark Office include, for example:

- Incontestable U.S. Trademark Registration No. 2088706 for COACH® in connection with, *inter alia*, "eyeglass cases, cellular phone cases, computer cases and computer accessory cases"; and

- U.S. Trademark Registration No. 5205421 for ⬚ ® in connection with "Carrying cases specially adapted for electronic equipment, namely, cell phones, laptops, portable electronic book readers, ear buds and portable media players; Computer mouse; Ear buds; Eyeglass chains and cords; Eyeglass frames;

11

Eyeglasses; Eyewear; Eyewear cases; Mouse pads; Protective covers and cases for cell phones, laptops and portable media players; Protective covers for electronic reading devices; Sunglasses; USB (universal serial bus) hardware."

58.     The COACH® Marks have been prominently and continuously used in Coach's sales and marketing of virtually all product categories, since the debut of its iconic handbags, including on product packaging and hangtags, throughout the <coach.com> website and associated social media accounts, and in connection with the products themselves, including on various tech accessories.

59.     Coach's widespread and continuous use of the COACH® Marks since for more than 75 years has made the COACH® Marks both synonymous with the brand and famous, in addition to conferring valuable common law rights upon Coach.

## C. COACH LICENSE AGREEMENT, ITS EXPIRATION, AND EFFECT OF TERMINATION PROVISIONS

60.     On or about January 7, 2019, Coach and Incipio, LLC ("Incipio") entered into the Coach License Agreement granting Incipio a "license solely to use the Licensed Mark(s) in the Territory as a trademark(s) in connection with the manufacture, advertising, merchandising, promotion, sale and distribution of Approved Licensed Merchandise to Approved Customers, subject to the terms set forth in *Schedule 1.3*." *See* Coach License Agreement, § 2.1(a) (emphasis in original); *see also id.*, Schedule 1.3 (concerning, *inter alia*, "Exclusive Product Categories" and "Non-Exclusive Product Categories").

61.     The Coach License Agreement remained in effect through June 30, 2023, and was amended a number of times, including: (i) on or about November 17, 2020 by a First Amendment to Coach License Agreement; and (ii) on or about September 17, 2021 by a Second Amendment to Coach License Agreement.

62.     In exchange for the right to use certain of the COACH® Marks, Incipio (and, then, Vinci), agreed to pay certain Guaranteed Minimum Royalties, Sales Royalties, and Image Fund

Payments (as those terms are defined in the Coach License Agreement, collectively, the "Required Fees"). *See* Coach License Agreement, §§ 7, 8, and 9; *see also id.*, Schedules 7.2, 8, and 9

63.    The Coach License Agreement expired by its terms on June 30, 2023.

64.    The Coach License Agreement provides Coach with absolute, sole discretion in deciding whether to exercise the right to, and enter, a renewal term with Vinci.  Coach declined to renew the Coach License Agreement.

65.    Coach promptly issued to Vinci a Notice of Expiration of License Agreement on July 1, 2023, following the Coach License Agreement's natural expiration on June 30, 2023 (the previous day).

66.    Vinci did not contest, or otherwise respond to, to the July 1, 2023 Notice of Expiration.

67.    On July 3, 2023, Coach issued to Vinci a Notice of Coach's Exercise of Rights, detailing various post-expiration obligations of Vinci under the Coach License Agreement including, for example and without limitation: (i) immediate cessation of use of the COACH® Marks (defined herein); (ii) immediate cessation of all sales of COACH® branded tech accessories through <Incipio.com> and all other sales channels owned, operated, or controlled by Vinci; and (iii) immediate delivery to Coach of all works of authorship and other intellectual property, requesting Vinci's confirmation and compliance by 5:00 p.m. on July 5, 2023.

68.    Vinci did not respond to the July 3, 2023 Notice of Coach's Exercise of Rights.

69.    As a result of the expiration of the Coach License Agreement on June 30, 2023, all of Vinci's rights (as well as those claiming derivative or other rights through Vinci, such as ACS, Tebele, and/or Haddad) to use the COACH® Marks terminated and reverted to Coach as Licensor, and, except for limited circumstances,[3] Vinci and all of its associated entities and individuals, including but not limited to ACS and Onward, were required to cease and permanently discontinue

---

[3]    Under the expired Coach License Agreement, Vinci had limited right post-expiration rights. *See* Coach License Agreement, §§ 11.1(b), 11.2; *see also id.*, § 4.4. That notwithstanding, because Vinci was in default under the Coach License Agreement as of at least June 15, 2023, since then they had *no right* to sell any inventory to customers. *See id.* § 11.3.

any use of the COACH® Marks in connection with manufacturing, advertising, promoting, offering to sell, selling, distributing, or dealing in or with Licensed Merchandise, *i.e.*, tech accessories. *See* Coach License Agreement, § 11.1(a).

70.    Coach made an election, subject to Coach's "Inventory Purchase Option" under the expired Coach License Agreement, to acquire certain products in Vinci's inventory. *See* Coach License Agreement, § 11.

71.    Vinci has failed to coordinate the delivery of those elected products to Coach.

## D.  VINCI'S DEFAULT ON AND BREACHES OF THE EXPIRED LICENSE AGREEMENT

72.    Vinci has been invoiced for, and has failed to pay to Coach, at least all required Guaranteed Minimum Royalties and Image Fund Payments due under the Coach License Agreement.

73.    Vinci also failed to pay to Coach the agreed-to payment due to Coach based upon the findings of the audit of Vinci conducted by Coach in 2022.

74.    Coach provided Vinci with notice of Vinci's failures to pay, and resulting default, in at least the June 15, 2023, Notice of Non-Payment.

75.    Vinci did not cure its default.

76.    On June 30, 2023, the Coach License Agreement between Coach and Vinci expired.

77.    On July 3, 2023, Coach sent Vinci a notice confirming and exercising Coach's rights upon the expiration of the Coach License Agreement. The Notice of Coach's Exercise of Rights instructs Vinci to cancel all cancellable orders for Licensed Merchandise as required by the Coach License Agreement. The Notice of Coach's Exercise of Rights also expressly confirmed Coach's option right to purchase Vinci's entire inventory of Licensed Merchandise (including as to any non-cancellable orders in process as of the date of termination) and put Vinci on further notice of its obligation to provide a schedule of its current inventory of Licensed Merchandise to Coach.

78.    The Notice of Coach's Exercise of Rights also demanded that Vinci pay all amounts

14

due (subject, potentially, to an offset of some amounts contingent upon Vinci's timely fulfilment of non-cancelable Coach orders – which orders Vinci did not fulfill) and return all works of authorship incorporating the Licensed Marks and Merchandise IP created under the Coach License Agreement to Coach by 5:00 PM on July 5, 2023 (except as strictly necessary to complete the non-cancelable Coach orders – which orders Vinci did not complete).

79.     Vinci did not comply and did not make the payments or return any items to Coach.[4]

80.     For example, as a result of the expiration of the Coach License Agreement on June 30, 2023, all of Vinci's rights to use the COACH® Marks terminated and reverted to Coach as Licensor, and, except for limited circumstances,[5] Vinci and all of its associated entities and individuals were required to cease and permanently discontinue any use of the COACH® Marks in connection with manufacturing, advertising, promoting, offering to sell, selling, distributing, or dealing in or with Licensed Merchandise, *i.e.*, tech accessories. *See* Coach License Agreement, § 11.1(a).

81.     Vinci has neither ceased nor permanently discontinued using the COACH® Marks as required by Section 11.1(a).

82.     By at least the June 15, 2023 Notice of Non-Payment, the July 1, 2023 Notice of Expiration of License Agreement, the July 3, 2023 Notice of Coach's Exercise of Rights, and the August 17, 2023 letter detailing outstanding information and actions due from Vinci after expiration of the Coach License Agreement, Coach has provided Vinci with ample notice of Vinci's default on and breaches of the expired Coach License Agreement.

83.     In addition to the expiration of the Coach License Agreement on June 30, 2023,

---

[4]    Coach requested that Vinci return the items using a file transfer upload link. Vinci never contacted Coach to obtain a file transfer upload link, as Coach inadvertently did not provide such a link contemporaneous with the July 3, 2023 Notice of Coach's Exercise of Rights. Coach subsequently provided a link with its August 17, 2023 letter confirming Outstanding Information & Actions Due from Vinci after Expiration of Coach License Agreement.

[5]    Under the expired License Agreement, Vinci has a limited right to complete the production of products that, as of the expiration date, were in process or for which non-cancelable written orders had been received. *See* Coach License Agreement, §§ 11.1(b), 11.2; *see also id.*, § 4.4. However, any such products are subject to Coach's "Inventory Purchase Option" which Coach has since elected to invoke. *See id.*, § 11.2.

Vinci's rights to use the COACH® Marks terminated and reverted to Coach before June 30, 2023, for several reasons, which Vinci concealed from Coach.

84. First, for much of 2022 and throughout 2023, Vinci was unable to pay its debts generally as they became due. As a result, the Coach License Agreement terminated automatically under Sections 3.2(b) and 3.4.

85. Second, on February 10, 2023, Vinci's lender, Siena Lending Group LLC ("Siena"), declared an event of default of its loan agreement with Vinci on obligations exceeding $1 million which were secured by interests in Coach Goods. After declaring an event of default, Siena exercised several default remedies under its Loan Agreement with Vinci, including sweeping Vinci's bank accounts, commencing a sale of Vinci's assets under Article 9 of the Uniform Commercial Code, and requiring Vinci to engage a financial consultant. Vinci did not notify Coach of its default to Siena or Siena's exercise of remedies in breach of Section 3.5(a) of the Coach License Agreement, and Coach did not agree to waive the default. As a result of Vinci's default to Siena, the Coach License Agreement terminated automatically under Sections 3.2(d) and 3.4. As a result of Vinci's default to Siena, Vinci also lost the right to sell licensed merchandise bearing the Coach marks under Section 3.5(a) at least as early as February 10, 2023 when Vinci received a default notice from Siena.

86. Third, on March 3, 2023, Vinci entered a Manufacturing and Distribution Agreement (the "MDA") with Superior Communications, Inc. ("Superior"), pursuant to which Vinci transitioned a significant portion of its duties under the Coach License Agreement to Superior, including product manufacturer oversight, inventory management, customer management, forecasting, shipping, logistics, and billing. Vinci did not disclose the scope of the functions and duties being transferred to Superior and did not seek or obtain Coach's approval for Superior to assume other responsibilities from Vinci under the Coach License Agreement, in breach of Section 2.3(b) of the Coach License Agreement. Vinci did not disclose the MDA to Coach at any time. By entering and implementing the MDA, Vinci discontinued a substantial portion of its business operations, which resulted in automatic termination of the Coach License

16

Agreement under Sections 3.2(b), 3.2(e), and 3.4.

87.    Fourth, on June 5, 2023 – less than one month before the Coach License Agreement was scheduled to expire—Vinci, Tebele, Haddad, and their companies ACS and Onward devised and entered into a web of connected transactions, through which Vinci transferred substantially all of its assets and ceased its business operations without Coach's knowledge or approval. Vinci remained Coach's licensee in name only, and the series of transactions resulted in a change in control and assignment prohibited by Section 2.3(b) of the Coach License Agreement. More specifically:

a. On June 5, 2023, Tebele and Haddad's company ACS purchased a loan facility from Monroe Capital Management Advisors, LLC ("Monroe"), under which Monroe had lent approximately $174 million to Vinci. On the same day that ACS acquired the Monroe loan, ACS exercised default remedies as Vinci's lender, including by having Haddad use a power of attorney on behalf of Vinci.

b. On June 5, 2023, Tebele and Haddad's company Onward purchased most of Vinci's assets pursuant to an Asset Purchase Agreement, leaving just Vinci's license agreements with Kate Spade and Coach and a few other assets in Vinci. Shortly thereafter, all of Vinci's employees transferred from Vinci to Onward.

c. On June 5, 2023, Vinci delegated its remaining business functions to Onward pursuant to a Sales Agency and Services Agreement (the "Services Agreement"). The Services Agreement was signed by Haddad on behalf of Vinci, as Vinci's attorney in fact, and Tebele on behalf of Onward. Through the Services Agreement, Vinci appointed Onward as its "exclusive service provider" and "exclusive sales agent," and transferred authority to Onward for sales, sourcing and logistics, warehousing and distribution, customer invoicing and collection, information technology, and back office and accounting for the unsold portion of Vinci's business.

17

d. Through the June 5, 2023 transactions, Vinci took corporate action in furtherance of ceasing doing business as a going concern and discontinued a substantial portion of its business operations, which resulted in automatic termination of the Coach License Agreement under Sections 3.2(b), 3.2(e), and 3.4.

e. The June 5, 2023 transactions resulted in a change in control of Vinci, because they resulted in Tebele and Haddad taking control of Vinci through powers of attorney, ACS (which controlled Vinci's finances and inventory), and Onward (which controlled Vinci's operations). This resulted in automatic termination under Sections 3.2(f) and 3.4 of the Coach License Agreement.

88.   As a result of these automatic terminations of the Coach License Agreement, all of Vinci's rights to use the COACH® Marks terminated and reverted to Licensor, and, except for limited circumstances, Vinci and all of its associated entities and individuals were required to cease and permanently discontinue any use of the COACH® Marks in connection with manufacturing, advertising, promoting, offering to sell, selling, distributing, or dealing in or with licensed merchandise, i.e., tech accessories.

E. **VINCI HAS USED AND FACILITATED THE USE OF THE COACH® MARKS AFTER TERMINATION OF THE COACH LICENSE AGREEMENT AND ACS (AT TEBELE'S AND HADDAD'S DIRECTION) OFFERED FOR SALE AND SOLD COACH® BRANDED GOODS WITHOUT LICENSE OR AUTHORIZATION**

89.   As addressed previously, Coach by its August 17, 2023 letter documented Vinci's unlicensed, unapproved, and unauthorized offering for sale of "fifty-five (55) unauthorized COACH® branded items" on its Incipio.com website.

90.   Notwithstanding that ACS has no rights to use the COACH® Marks, ACS (at the direction of Tebele and Haddad) has used the COACH® Marks, without authorization, in connection with advertising, promoting, offering for sale, and selling COACH® branded tech accessories that it wrongly "seized" and/or "facilitated" from Vinci's inventory.

91.   Upon information and belief, beginning on or around at least November 30, 2023, ACS, Tebele, and Haddad without license, permission, approval, or other authorization, began

advertising, promoting, offering for sale, and selling COACH® branded tech accessories, *i.e.*, Infringing Products, at least through Vinci's website (https://incipio.com/).

92.    A review of Vinci's website (https://incipio.com/) indicated Infringing Products were being advertised for sale, and, upon information and belief, sold. The November 30, 2023 screenshot below reflects, on information and belief, ACS's COACH® branded storefront webpage on Vinci's website as of that date (https://incipio.com/pages/coach?_pos=31&_sid=ea1e470b1&_ss=r).



A November 30, 2023 review of Vinci's website (https://incipio.com/) indicated, on information and belief, that ACS, Tebele, and Haddad were using that website to advertise for sale, and, upon information and belief, sell, at least thirty (30) Infringing Products.[6]

93.    A November 30, 2023 search of Vinci's storefront at Amazon.com (https://www.amazon.com/stores/Incipio/Incipio/page/7CA997DC-6B66-40C3-BBA9-

---

[6]    The screenshots reflect that a search of Incipio.com for "coach" returned "31 Results." However, one (1) of the listed "31 Results" is a link to Vinci's COACH® branded storefront webpage ("[html-content] [html-content] [collection] Shop All https://incipio.com/collections/coach [html-content] [html-content] Continue reading" where the "Continue reading" links to https://incipio.com/pages/coach?_pos=31&_sid=ea1e470b1&_ss=r).

5702C8F7FF3F) for "coach" showed, on information and belief, that ACS, Tebele, and Haddad were using that storefront to advertise for sale, and, upon information and belief, sell Infringing Products.

94.     ACS, Tebele, and Haddad were, without authorization, advertising, promoting, offering for sale, and selling COACH® branded tech accessories, *i.e.*, Infringing Products, through identical channels of trade and in direct competition with authentic Coach goods.

95.     As a result, customers who encountered and purchased COACH® branded tech accessories were likely to and in fact were being confused about the source, origin, or sponsorship of ACS's unlicensed Infringing Products.

96.     By reason of ACS's, Tebele's, and Haddad's acts, Coach has and will continue to suffer damage to its business, reputation, goodwill, profits, and sales. Unless enjoined, ACS (by and though Tebele and Haddad) will continue to sell Infringing Products using the COACH® Marks without authorization, which will irreparably damage Coach.  Coach's remedies at law are not adequate to compensate Coach for all the resulting injuries caused by ACS, Tebele, and Haddad.

97.     The Court on December 15, 2023 entered an Order to Show Cause & Restraining Order barring ACS's unauthorized acts. (ECF No. 31.)

98.     As of the filing of this Second Amended Complaint, ACS, Tebele, and Haddad do not appear to be using Vinci's website and Amazon.com storefront to – without authorization, permission, right, or license – advertise, promote, offer for sale, and sell COACH® branded tech accessories.

99.     Both Tebele and Haddad, as ACS's owners and managers, personally took part in and directed ACS's unauthorized use of the COACH® Marks. As ACS has no employees, Tebele and Haddad made all decisions and took all actions for ACS, including ACS's decision to seize, market, and offer for sale Coach Goods without Coach's consent or authorization.

100.    At Tebele's and Haddad's direction, ACS seized Coach Goods without Coach's consent on numerous occasions, including on July 27, 2023, September 13, 2023, October 19,

20

2023, October 31, 2023, November 16, 2023, November 21, 2023, November 22, 2023, and November 29, 2023. Tebele personally approved ACS's seizure of Coach Goods on behalf of ACS and also on behalf of Vinci (through a power of attorney).

101. At Tebele's and Haddad's direction, ACS marketed and offered for sale Coach Goods without Coach's consent. For example, on January 19, 2024, Tebele, on behalf of ACS, sent a letter to Ross Stores, which stated that Vinci had surrendered Coach Goods to ACS to effect the sale of the goods to Ross Stores.

102. Upon information and belief, ACS, Tebele, and Haddad received and kept revenue from the unlicensed and unapproved sales of Coach Goods.

**F.    ONWARD, AT TEBELE'S AND HADDAD'S DIRECTION, USED COACH® MARKS WITHOUT COACH'S AUTHORIZATION.**

103. Section 2.3(b) of the Coach License Agreement provides that the Coach License Agreement is "strictly personal to Licensee," and may not be "transferred, assigned … or otherwise hypothecated or disposed of, either directly or indirectly, in whole or in part, by operation of law or otherwise … without the prior written approval of Licensor."

104. On June 5, 2023, through the Services Agreement, Vinci assigned, transferred, and otherwise hypothecated or disposed of its rights under the Coach License Agreement to Onward in breach of Section 2.3(b) of the Coach License Agreement—less than one month before the Coach License Agreement was scheduled to expire.

105. Tebele, Haddad, and Onward specifically concocted the Services Agreement to circumvent the Coach License Agreement's express prohibition on unapproved assignments and transfers. In an unavailing attempt to evade Section 2.3(b) of the Coach License Agreement, the Services Agreement states that Onward is merely Vinci's "agent" and an "intermediary" in transactions involving Coach Goods, Vinci "maintains all rights and obligations as a licensee," and Onward is not being given "the status of a licensee."

106. But the reality and effect of Services Agreement is clear: Vinci remained the licensee in name only, and Onward took over all or nearly all aspects of Vinci's performance under

21

the Coach License Agreement, including sales, sourcing, logistics, warehousing, distribution, customer invoicing, customer collection, back office services, and accounting.

107. Coach did not consent to the Services Agreement or the assignment and transfer of Vinci's rights under the Coach License Agreement to Onward.

108. Tebele and Haddad contrived and executed the Services Agreement because Kate Spade and Coach did not consent to Tebele and Haddad's takeover of Vinci and the Coach License Agreement or KSNY License Agreement (defined below). Before June 5, 2023, a representative of Tapestry had discussions with Tebele about a potential transaction between Tebele and Vinci, but did not approve such a transaction.

109. After June 5, 2023, Onward took over Vinci's obligations under the Coach License Agreement without Coach's consent and notwithstanding the fact that the Coach License Agreement would expire in mere weeks. After June 5, 2023, Onward marketed, offered for sale, and sold Coach Goods without Coach's consent. Onward's actions caused confusion in the marketplace about whether Onward held a license to use COACH® Marks. It did not.

110. Onward received and kept revenue from the unlicensed and unapproved sales of Coach Goods.

111. Both Tebele and Haddad, as the owners and managers of Onward, personally took part in and directed Onward's unauthorized use of the COACH® Marks, unauthorized supply of Coach Goods, unauthorized marketing and sale of Coach Goods. Onward actually sold and delivered Coach Goods to customers, including to Ross Stores, and while Onward has not disclosed the orders it fulfilled, discovery in the KSNY Action shows that Onward was attempting to fulfill orders of Coach Goods throughout 2023, including to iSure Technology Co. Ltd., Sasa Bella International Company, Ltd., Papermarket PTE Ltd., Vgadz Corporation Co., Ltd., Pacificomm., Appcessory Pte Ltd., Koan Co., Best Buy Canada, Blink24, Maclink PTE Ltd., TJ Maxx, nuTCS, Inc., Taoqu Digital Technology (Beijing) Co., HPS ICT INC., and IBeacon Inc.— without Coach's consent.

112.    Tebele testified during his deposition in the KSNY Action and Vinci Action that both he and Haddad, as Onward's owners, managed and were actively involved with Onward's actions to procure and sell Kate Spade Goods and, upon information and belief, Tebele and Haddad were actively involved with Onward's actions to procure and sell Coach Goods.

113.    Throughout 2023 and into 2024, at Tebele's and Haddad's direction, Onward acted as if Coach had authorized Vinci to assign the Coach License Agreement to Onward and granted it the right to sell Coach Goods, when, in fact, Onward had no such rights.

114.    Onward's actions, made at Tebele and Haddad's direction, resulted in Coach losing the ability to control its COACH® Marks because Onward oversaw the transportation, storage, marketing, and distribution of Coach Goods without Coach's consent, involvement, authorization, or knowledge.

115.    Onward did not report or pay Coach royalties for its sales of Coach Goods.

116.    Onward's actions, made at Tebele's and Haddad's direction, harmed Coach by causing Coach to sell less Coach Goods through its authorized channels and by causing confusion among ordinary consumers as to the source, sponsorship, affiliation, and approval of Coach Goods sold by Onward and Vinci.

## G. OVERVIEW OF PENDING STATE COURT LITIGATION INVOLVING ACS

117.    Issues about ACS's alleged rights have already been considered by a state court in another action, interpreting language under similar agreements. ACS voluntarily discontinued its suit on March 27, 2024.

118.    As noted above, on July 1, 2023, ACS filed the Kate Spade Action. In doing so, ACS made a series of factual misstatements, misconstrued and ignored a similar license agreement – namely the license agreement between Coach's affiliate, Kate Spade, LLC, and Vinci's predecessor, Incipio Technologies, Inc., entered into as of April 25, 2014, as amended (the "KSNY License Agreement" which is the subject of the Vinci Action and KSNY Action) – and misapplied the law. *See* Kate Spade Action, Complaint, ¶ 27 n.1.

119.    In the Kate Spade Action, ACS sought a declaration that ACS has "superior priority to seize, to take possession, to dispose of and to sell the" alleged collateral, which "includes the Licensed Merchandise and In Process Orders" and demanding injunctive relief against Kate Spade LLC, Coach Services, Inc., and Tapestry, Inc. ("KSNY").

120.    On July 24, 2023, the Kate Spade Action court *denied* ACS's request for a TRO at a hearing on the same date.

121.    On August 16, 2023, the Kate Spade Action court *denied* ACS's motion for preliminary injunction at a hearing on the same date, finding that as a result of KSNY's termination of the KSNY License Agreement, neither Vinci nor ACS had any right "to market or sell products bearing defendant's mark."  Kate Spade Action, Aug. 16, 2023 Hearing, 54:16-20.

122.    In denying ACS's motion for preliminary injunction at the August 16, 2023 hearing, the Kate Spade Action court also tacitly rejected ACS's arguments that it was a legal successor to Siena and the Siena Consent Agreement. *See generally*, *id*.

123.    The New York trial court has now *twice* held that ACS was a stranger to the KSNY License Agreement, and rejected ACS's argument that the Uniform Commercial Code gave ACS greater rights than Vinci with respect to the alleged collateral. Further, it rejected ACS's legal successor arguments when presented for the first time at the preliminary injunction hearing.

124.    On August 29, 2023, KSNY filed its Motion to Dismiss the Kate Spade Action.

125.    Among the bases of KSNY's Motion to Dismiss is that (i) ACS is prohibited, as a matter of law, from enforcing any alleged security interest in a licensee's alleged collateral under the KSNY License Agreement, which is similar in pertinent respects to the Coach License Agreement, and (ii) ACS is not a legal successor to Siena and has no rights in, to, or under the Siena Consent Agreement.

126.    ACS is similarly prohibited from enforcing any alleged security interest in Alleged Collateral under the expired Coach License Agreement.

127.    KSNY's Motion to Dismiss was dismissed as moot following the voluntary discontinuance of the Kate Spade Action.

**H.  OVERVIEW OF PENDING FEDERAL COURT LITIGATION INVOLVING ACS**

128.   Issues about ACS's alleged rights have also already been considered by the U.S. District Court for the Southern District of New York in another action, interpreting language under similar agreements.

129.   In response to ACS's assertion of alleged rights, on December 6, 2023 KSNY moved the U.S. District Court for the Southern District of New York for relief the KSNY Action. (*See* ECF Nos. 157, 159, 160 in the KSNY Action.)

130.   On December 7, 2023, Judge Schofield held a hearing on the Order to Show Cause for an Order of Contempt with a Temporary Restraining Order.

131.   At that hearing the Court issued an Order barring ACS's unauthorized acts, as documented by a written Temporary Restraining Order entered on December 11, 2023. (ECF 166 in the KSNY Action.)

**First Cause of Action (ACS, Tebele, and Haddad)**

(Federal Trademark Infringement under 15. U.S.C. § 1114)

132.   Coach realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

133.   The COACH® Marks are valid protectable trademarks.

134.   The COACH® Marks are distinctive and famous. A majority of the consuming public associate the COACH® Marks with a single source, Coach.

135.   It is undisputed that Coach owns the federal trademark registration for the COACH® Marks, which are prima facie evidence that the marks are valid and protectable.

136.   It is also undisputed that ACS has no ownership interest in any Coach trademarks and no license to sell any COACH® products.

137.   Likewise, it is undisputed that ACS, Tebele, and Haddad are not in privity with Coach, have no rights under the Coach License Agreement, and cannot assert any rights under the Coach License Agreement.

25

138. ACS asserts, including in its November 2023 Letters, that they have a right to take possession of, dispose of, and sell certain tech accessories bearing the COACH® Marks without Coach's license, consent or authorization.

139. ACS, Tebele, and Haddad have threatened to use and actually used the COACH® Marks without Coach's license, consent or authorization, including by seizing Coach Goods and offering Coach Goods for sale.

140. ACS, Tebele, and Haddad have threatened to use and actually used the COACH® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, in a manner that is likely to cause confusion with Coach's use of the COACH® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Coach.

141. ACS's, Tebele's, and Haddad's threatened and actual use of the COACH® Marks constitutes a reproduction, counterfeit, copy, or colorable imitation of Coach's use of the COACH® Marks.

142. ACS, Tebele, and Haddad have knowingly and willfully used the COACH® Marks to cause confusion, to cause mistake, or to deceive consumers.

143. Tebele and Haddad, as ACS's owners and managers, were personally involved with and directed all of ACS's acts of trademark infringement. Tebele and Haddad were the moving, active, conscious forces behind ACS's decision to seize Coach's Goods and offer Coach Goods for sale without Coach's consent.

144. Based on ACS's aforesaid acts, at the direction of Tebele and Haddad, ACS has publicly declared its intent to use COACH® Marks and has used COACH® Marks in commerce in an infringing manner.

145. By virtue of ACS's, Tebele's and Haddad's aforementioned acts, ACS, Tebele, and Haddad have committed and continue to commit acts of trademark infringement in violation of, *inter alia*, Section 32(1)(a), 15 U.S.C. § 1114(1)(a).

146.    These acts have caused damage and irreparable harm to Coach. Unless enjoined, these acts will cause further damage and irreparable harm to Coach and to the valuable goodwill symbolized by and associated with its distinctive COACH® Marks,

147.    Coach has no adequate remedy at law and will suffer irreparable injury if ACS, Tebele, and Haddad are allowed to wrongfully use Coach's COACH® Marks. Because of ACS's, Tebele's, and Haddad's infringement of the COACH® Marks, Coach is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117.

### Second Cause of Action (ACS, Tebele, and Haddad)

(Federal Unfair Competition and False Advertising under 15 U.S.C. § 1125(a))

148.    Coach realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

149.    ACS's (at the direction of Tebele and Haddad) unlicensed, unconsented to, and otherwise unauthorized imminent and impending and/or copying and use of the COACH® Marks in connection with their threatened possession, distribution, disposal, offer for sale, sale and/or provision of the Alleged Collateral and/or other Infringing Products constitutes a false and misleading designation of origin and a false and misleading representation of facts, which:

a.    is likely to and/or is in fact causing confusion, mistake, or deceiving consumers and the public as to the affiliation, connection, or association of ACS with Coach, or as to the origin, sponsorship, or approval of ACS's goods or commercial activities by Coach; and

b.    in any actual or planned commercial advertising or promotion, would and does misrepresent the nature, characteristics, or qualities of Coach's goods, services, or commercial activities.

150.    ACS has knowingly and willfully threatened to copy and use and/or actually copied and used the COACH® Marks to cause confusion, to cause mistake, or to deceive consumers.

27

151.    Tebele and Haddad, as ACS's owners and managers, were personally involved with and directed all of ACS's acts of unfair competition and false advertising. Tebele and Haddad were the moving, active, conscious forces behind ACS's unfair competition and false advertising.

152.    Based on ACS's aforesaid acts, at Tebele's and Haddad's direction, ACS has publicly declared its intent to copy and use COACH® Marks and, upon information and belief, ACS is has used the COACH® Marks in commerce.

153.    By virtue of ACS's imminent, impending, and/or copying and use of the COACH® Marks in commerce, confirmed by the acts hereinabove described, ACS, Tebele, and Haddad have committed acts of unfair competition and false advertising in violation of, *inter alia*, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

154.    ACS's, Tebele's, and Haddad's aforesaid acts of unfair competition and false advertising caused and, without the Court's December 15, 2023 Order to Show Cause & Restraining Order barring ACS's unauthorized acts (ECF 31), will continue unabated and continue to cause damage and irreparable harm to Coach, thereby causing further damage and irreparable harm to Coach and to the valuable goodwill symbolized by and associated with its distinctive COACH® Marks, unless enjoined and restrained by the Court.

155.    Coach has no adequate remedy at law and will suffer irreparable injury if ACS, Tebele and Haddad are allowed to continue to wrongfully use Coach's COACH® Marks.

156.    Because of ACS's, Tebele's, and Haddad's unfair competition and false advertising, including ACS's, Tebele's, and Haddad's willful and intentional conduct, Coach is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117.

### Third Cause of Action (ACS)

(Declaratory Judgment)

157.    Coach realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

28

158.    As explained above, the Coach License Agreement expired by its terms on June 30, 2023.

159.    Consequently, all of Vinci's rights to use the COACH® Marks terminated and reverted to Coach as Licensor, and, except for limited circumstances not pertinent here, Vinci and all of its associated entities and individuals, including but not limited to ACS, were required to cease and permanently discontinue any use of the COACH® Marks in connection with manufacturing, advertising, promoting, offering to sell, selling, distributing, or dealing in or with Licensed Merchandise, *i.e.*, tech accessories. *See* Coach License Agreement, § 11.1(a).

160.    ACS contends that it has the right to take possession of, sell, and dispose of Coach branded products in Vinci's possession or in process without regard to the fact that these actions are prohibited by the Coach License Agreement and applicable law, particularly given Coach's famous and incontestable trademark rights.

161.    ACS's contentions are wrong.

162.    As an initial matter, trademark licenses are personal to the licensee and are not assignable by the licensee absent express consent from the licensor, as a matter of federal law. As this Court recognized in the Kate Spade Action, "[KSNY] negotiated for very detailed and specific rights upon termination. And the notion that [KSNY's trademark] rights will be superseded by a credit relationship with which Kate Spade had nothing to do with seems . . . to be inequitable." Kate Spade Action, Sept. 20, 2023 Hearing, 58:14-18.

163.    Similarly, Coach negotiated very detailed and specific rights upon expiration of the Coach License Agreement, which cannot be superseded by any security interest ACS has in the Alleged Collateral.

164.    Further, it is undisputed that Coach never consented to any assignment of the Coach License Agreement. It is further undisputed that Coach never granted ACS any contractual right to use or sell COACH® merchandise. Therefore, regardless of whatever security interest ACS allegedly has in Vinci's property, ACS has no rights in any of Coach's property, including Coach's trademarks, or any licenses to use them.

29

165.    In addition, ACS is falsely and baselessly representing itself as the legal successor to Siena and its rights in, to, and under the Siena Consent Agreement. ACS does not meet the legal definition of successor with regard to Siena's rights, and its contentions to the contrary are nonsensical and contradict both ACS's own admissions in the Kate Spade Action and the relevant documentary evidence.

166.    Further, any security interest that ACS has in the Alleged Collateral is subject in all respects to and limited to Vinci's rights in the Alleged Collateral as determined under the Coach License Agreement and applicable law.

167.    Because Vinci defaulted as set forth above and the Coach License Agreement expired (among other reasons), Vinci's rights in the licensed merchandise and in process orders, *i.e.*, the Alleged Collateral, have been substantially restricted and limited by operation of numerous provisions contained in the Coach License Agreement (examples of which are set forth above).

168.    Because (among other reasons) Vinci currently has no right to dispose of or sell any of the Alleged Collateral, ACS similarly has no such right.

169.    This Court determined in the Kate Spade Action that as a result of KSNY's termination of the KSNY License Agreement, neither Vinci nor ACS had any right "to market or sell products bearing defendant's mark." (Kate Spade Action, Sept. 20, 2023 Hearing, 54:16-20). The same conclusion applies here.

170.    Because the Coach License Agreement expired, neither Vinci nor ACS has any right to market or sell products bearing Coach's COACH® Marks.

171.    Accordingly, ACS does not have any license in any of the Alleged Collateral and has no right to seize, take possession of, dispose of, or sell any of the Alleged Collateral.

172.    ACS's assertion of the right to possess, sell, and dispose of the Alleged Collateral, including in its November 2023 Letters, despite applicable law and this Court's contrary decisions at ECF 31 and in the KSNY Action and the state Court's contrary decisions in the Kate Spade Action, constitutes a justiciable controversy between Coach and ACS.

173.    Coach thus seeks a declaration that (i) ACS is not the legal successor to Siena and its rights under the Siena Consent Agreement, (ii) ACS's security interest (if any) in the Alleged Collateral is subject in all respects to and limited to Vinci's rights in the Alleged Collateral as determined under the Coach License Agreement and applicable law, (iii) consequently, ACS does not have any license in the Alleged Collateral or any right to seize, take possession of, dispose of, or sell any of the Alleged Collateral or any other COACH® branded products, and (iv) therefore, ACS is unauthorized to copy or use, in any way, any of Coach's COACH® Marks.

174.    Coach seeks a further declaration that ACS's use, impending use, imminent use, and publicly documented intended use of Coach's COACH® Marks, including in connection with ACS's efforts to enforce its alleged rights in the Alleged Collateral, constitute intentional and willful trademark infringement, false designation of origin, unfair competition, false advertising, misappropriation and trademark dilution in violation of federal and New York law.

175.    By reason of the foregoing, Coach is entitled to injunctive relief against ACS, restraining ACS from (i) seizing, taking possession of, disposing of or selling, any COACH® branded products; and (ii) engaging in any other acts of trademark infringement against Coach.

### **Fourth Cause of Action (ACS)**

(New York Trademark Infringement, N.Y. Gen. Bus. Law § 360)

176.    Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

177.    The COACH® Marks are valid protectable trademarks under New York law (as well as under the Lanham Act).

178.    The COACH® Marks are distinctive and famous. A significant number of the consuming public associate the COACH® Marks with a single source, Coach.

179.    ACS's imminent and impending use and/or actual use of the COACH® Marks is without Coach's license, consent or authorization.

180.    ACS's imminent and impending use and/or actual use of the COACH® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, is in a manner

31

that is likely to cause confusion with Coach's use of the COACH® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Coach.

181. ACS's imminent and impending use and/or actual use of the COACH® Marks is a reproduction, counterfeit, copy, or colorable imitation of Coach's use of the COACH® Marks.

182. ACS's unlicensed, unconsented to, and otherwise unauthorized imminent and impending use and/or actual use of the COACH® Marks is likely to cause confusion, mistake, or deceit.

183. ACS's imminent and impending use and/or actual use of the COACH® Marks is a knowing and willful use of the COACH® Marks to cause confusion, to cause mistake, or to deceive consumers.

184. By virtue of ACS's acts hereinabove described, without the Court's December 15, 2023 Order to Show Cause & Restraining Order barring ACS's unauthorized acts (ECF 31), ACS will commit acts of trademark infringement in violation of N.Y. Gen. Bus. Law § 360.

185. ACS's aforesaid acts of trademark infringement caused and, without the Court's December 15, 2023 Order to Show Cause & Restraining Order barring ACS's unauthorized acts (ECF 31), will continue unabated and continue to cause damage and irreparable harm to Coach, thereby causing further damage and irreparable harm to Coach and to the valuable goodwill symbolized by and associated with its distinctive COACH® Marks, unless enjoined and restrained by the Court.

186. Coach has no adequate remedy at law and will suffer irreparable injury if ACS is allowed to wrongfully use Coach's COACH® Marks.

### <u>Fifth Cause of Action (ACS, Tebele, and Haddad)</u>

(New York Trademark Dilution, N.Y. Gen. Bus. Law § 360-L)

187. Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

188. The COACH® Marks are valid, protectable trademarks that are distinctive and have acquired further secondary meaning through widespread sales and marketing. A significant

number of the consuming public associate the COACH® Marks with a single source, Coach. Thus, the COACH® Marks are extremely strong marks.

189.    ACS's, Tebele's, and Haddad's imminent and impending use and/or actual use of the COACH® Marks is likely to impair the distinctiveness of the COACH® Marks because the ordinary consumer is likely to perceive the Alleged Collateral and/or other Infringing Products bearing the COACH® Marks as substantially similar to Coach's Authorized Products bearing the identical COACH® Marks.

190.    Accordingly, ACS, Tebele, and Haddad will and/or have violated New York General Business Law § 360-L, which states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

191.    Because of ACS's, Tebele's, and Haddad's imminent and impending and/or actual dilution of Coach's COACH® Marks, including Vinci's and Onward's willful and intentional conduct, Coach is entitled to injunctive relief under New York General Business Law § 360-L.

### Sixth Cause of Action (ACS, Tebele, and Haddad)

(Common Law Unfair Competition)

192.    Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

193.    ACS's, Tebele's, and Haddad's unlawful and unauthorized imminent and impending use and/or actual use and imitation of the COACH® Marks in connection with the sale, offering for sale, distribution, and advertising of competing, infringing tech accessories (*i.e.*, the Infringing Products), constitutes infringement, passing off, copying, imitation, and misappropriation of Coach's intellectual property, unjust enrichment, and unfair competition with

Coach in violation of Coach's rights under the common law of the State of New York and other states of the United States.

194.    ACS's, Tebele's, and Haddad's willful acts of misrepresentation, fraud, and deceit have unjustly enriched ACS, Tebele, and Haddad by exploiting Coach's reputation in the market, caused harm to Coach, and violated Coach's rights.

### Seventh Cause of Action (Vinci)

(Breach of Contract: §§ 2.3(b), 3.1(c), 3.2(b), 3.2(d), 3.2(f), 3.2(e), 3.4, 3.5, 7.2, 8.1, 8.2, 8.3, 9.1, 9.2, 10.3, 10.9, and 11 of the Coach License Agreement)

195.    Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

196.    The Coach License Agreement, including all amendments thereto, was a valid and enforceable contract at all relevant times hereto, and bound Vinci to its terms and conditions.

197.    Vinci has failed to perform its material obligations under Section 3.1(c) regarding cessation of use of the COACH® brand post-expiration.

198.    Vinci has failed to perform its material obligations under Sections 7.2, 8.1, 8.2, 8.3, 9.1, and 9.2 of the Coach License Agreement regarding payment of Required Fees by failing to make the payments on time and failing to cure when given the opportunity to do so pursuant to Section 3.2(a) of the Coach License Agreement.

199.    Vinci has failed to perform their material obligations under Section 10.3 of the Coach License Agreement regarding Vinci's agreed-to payment due to Coach based upon the findings of the audit of Vinci conducted by Coach in 2022.

200.    Vinci has failed to perform their material obligations under Section 11 of the Coach License Agreement regarding Vinci's post-expiration obligations.

201.    The Coach License Agreement automatically terminated on or around February 10, 2023 under Sections 3.2(d), 3.4, 3.5(a), and 10.9 because Vinci was in default on the loan from Siena ("Siena Loan") and failed to notify Coach.

202.    On February 10, 2023, Siena notified Vinci that Vinci was in default the Siena Loan with an outstanding amount of more than $1 million.

203.    Siena, approximately three months later, on May 11, 2023, noticed a sale of the "collateral" under the Siena Loan.

204.    The Siena Loan was secured (only with Coach's written consent and expressly subject to Coach's rights under the Siena Consent Agreement) by "Licensed Merchandise" (as defined in the Coach License Agreement).

205.    Upon information and belief, Vinci's default to Siena on the Siena Loan was neither cured nor waived.

206.    Under Section 3.2(d) of the License, Vinci's default on any obligation in excess of $1 million "secured by a security interest in any Licensed Merchandise" constitutes an event of default.

207.    Under Section 3.4 of the License, in such event of default, the License "will terminate automatically."

208.    Section 3.5(a) of the License further provides, in such event of default, that Licensee "no longer shall have the right to sell or otherwise transfer Licensed Merchandise or otherwise use the Licensed Mark(s)" absent both Licensee providing notice of the default and Licensor waiving its right of automatic termination.

209.    In accordance with the plain terms of the License, Vinci's default on the Siena Loan held by Siena resulted in the automatic termination of Vinci's license at least as early as February 10, 2023.

210.    And, in addition to the notice requirement of Section 3.5(a), Section 10.9 of the License (*inter alia*) required Vinci to notify Coach in writing of any notice of default on any debt secured by any of Vinci's assets.

211.    Vinci breached Section 2.3(b) of the Coach License Agreement by assigning, transferring, and otherwise hypothecating or disposing of, in whole or in part, the Coach License Agreement, through Vinci's MDA with Superior and Vinci's Services Agreement with Onward.

35

212.    The Coach License Agreement automatically terminated prior to 2023 under Sections 3.2(b) and 3.4 because Vinci was unable to pay its debts generally as they became due in 2022 and throughout 2023.

213.    The Coach License Agreement automatically terminated on or around March 3, 2023 or, alternatively, on or around June 5, 2023, under Sections 3.2(b) and 3.5 because Vinci took corporate actions in furtherance of ceasing doing business as a going concern on or around those dates.

214.    The Coach License Agreement automatically terminated on or around March 3, 2023 or, alternatively, on or around June 5, 2023, under Sections 3.2(e) and 3.4 because Vinci discontinued a substantial portion of its business operations on or around those dates.

215.    The Coach License Agreement automatically terminated on or around June 5, 2023 under Sections 3.2(f) and 3.4 because Vinci sold substantially all of its assets and/or had a change of control, as the aggregate result of a series of transactions, on or around that date.

216.    As a result of Vinci's aforementioned breaches, Coach has sustained, and will continue to sustain, damages in an amount to be determined at trial, but not less than $1,200,000.00.

### Eighth Cause of Action (Vinci)

(Federal Trademark Infringement under 15. U.S.C. § 1114)

217.    Coach realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

218.    The COACH® Marks are valid protectable trademarks.

219.    The COACH® Marks are distinctive and famous. A majority of the consuming public associate the COACH® Marks with a single source, Coach.

220.    It is undisputed that Coach owns the federal trademark registration for the COACH® Marks, which are prima facie evidence that the marks are valid and protectable.

221.    It is also undisputed that Vinci has no ownership interest in any Coach trademarks and no license to sell any COACH® products.

36

222.    Vinci confirmed that, as of August 22, 2023, "There are no open orders for Coach merchandise."

223.    Vinci, by its August 22, 2023 letter, further confirmed that "Vinci currently has no customers that can purchase Coach merchandise, therefore there is no [account information] list to provide."

224.    Vinci is in default of the Coach License Agreement.

225.    As a result, to the extent Vinci asserts that it is permitted to make or fulfill sales of COACH® products under Section 11 of the Coach License Agreement, it had and has no orders, no customers, and no right or license to engage in any such sales or related activity.

226.    Vinci has threatened to use and/or has used the COACH® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, in a manner that is likely to cause confusion with Coach's use of the COACH® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Coach.

227.    Vinci's threatened use and/or actual use of the COACH® Marks constitutes a reproduction, counterfeit, copy, or colorable imitation of Coach's use of the COACH® Marks.

228.    Vinci's threatened use and/or actual use of the COACH® Marks is likely to cause confusion, mistake, or deceit.

229.    Vinci has knowingly and willfully threatened to use and/or actually used the COACH® Marks to cause confusion, to cause mistake, or to deceive consumers.

230.    Vinci has committed and continues to commit acts of trademark infringement in violation of, *inter alia*, Section 32(1)(a), 15 U.S.C. § 1114(1)(a).

231.    Vinci's aforesaid acts of trademark infringement caused damage and irreparable harm to Coach, and if they resume will cause further damage and irreparable harm to Coach and to the valuable goodwill symbolized by and associated with its distinctive COACH® Marks, unless enjoined and restrained by the Court.

232.    Coach has no adequate remedy at law and will suffer irreparable injury if Vinci is allowed to wrongfully use Coach's COACH® Marks. Because of Vinci's infringement of Coach's

COACH® Marks, including Vinci's actual willful and intentional conduct, Coach is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117.

### Ninth Cause of Action (Vinci)

(Declaratory Judgment)

233.    Coach realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

234.    As explained above, the Coach License Agreement expired by its terms on June 30, 2023.

235.    Consequently, all of Vinci's rights to use the COACH® Marks terminated and reverted to Coach as Licensor, and, except for limited circumstances not pertinent here, Vinci and all of its associated entities and individuals, including but not limited to ACS, were required to cease and permanently discontinue any use of the COACH® Marks in connection with manufacturing, advertising, promoting, offering to sell, selling, distributing, or dealing in or with Licensed Merchandise, *i.e.*, tech accessories. *See* Coach License Agreement, § 11.1(a).

236.    Vinci contends that it is entitled, under Section 11 of the Coach License Agreement, to at least make or fulfill sales of COACH® products.

237.    Vinci's contentions are wrong.

238.    Vinci confirmed that, as of August 22, 2023, "There are no open orders for Coach merchandise."

239.    Vinci, by its August 22, 2023 letter, further confirmed that "Vinci currently has no customers that can purchase Coach merchandise, therefore there is no [account information] list to provide."

240.    Vinci is in default of the Coach License Agreement.

241.    As a result, to the extent Vinci asserts that it is permitted to make or fulfill sales of COACH® products under Section 11 of the Coach License Agreement, it had and has no orders, no customers, and no right or license to engage in any such sales or related activity.

242.    Vinci has no right to dispose of or sell any COACH® products.

243.    Vinci's assertion of the right to sell and dispose of COACH® products, despite its admissions and defaults, constitutes a justiciable controversy between Coach and Vinci.

244.    Coach thus seeks a declaration that (i) Vinci is in default under the Coach License Agreement, (ii) Vinci has admitted that it has no "open orders" nor "customers" for COACH® products, (iii) the Coach License Agreement expired June 30, 2023, (iv) consequently, Vinci does not have any license to the COACH® Marks or in the COACH® products or any right to dispose of or sell any COACH® branded products, and (v) therefore, Vinci is unauthorized to copy or use, in any way, any of Coach's COACH® Marks.

245.    Coach seeks a further declaration that Vinci's use of Coach's COACH® Marks, constitutes intentional and willful trademark infringement in violation of federal law.

246.    By reason of the foregoing, Coach is entitled to injunctive relief against Vinci, restraining Vinci from (i) disposing of or selling any COACH® branded products; and (ii) engaging in any other acts of trademark infringement against Coach.

### **Tenth Cause of Action (Onward, Tebele, and Haddad)**

**(**Federal Trademark Infringement under 15 U.S.C. § 1114)

247.    Coach realleges and incorporates herein all allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

248.    The COACH® Marks are valid protectable trademarks.

249.    The COACH® Marks are distinctive and famous. A significant number of the consuming public associates the COACH® Marks with a single source, Coach.

250.    Onward has used the COACH® Marks without Coach's license, consent or authorization.

251.    Onward has used and continues to use the COACH® Marks, in connection with the sale, offering for sale, distribution, and advertising of goods, in a manner that is likely to cause and has actually caused confusion with Coach's use of the COACH® Marks among ordinary consumers as to the source, sponsorship, affiliation, or approval of Coach and Vinci's goods.

252.    Onward's use of the COACH® Marks is a reproduction, counterfeit, copy, or colorable imitation of Coach's use of the COACH® Marks.

253.    Onward's unlicensed, un-consented to, and otherwise unauthorized use of the COACH® Marks is likely to cause and is actually causing confusion, mistake, or deception.

254.    Onward, Tebele, and Haddad have knowingly and willfully used and continue to knowingly and willfully use the COACH® Marks to cause confusion, to cause mistake, or to deceive consumers.

255.    Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of trademark infringement. Tebele and Haddad were the moving, active, conscious forces behind the Services Agreement and Onward's unauthorized and unapproved actions to sell, offer for sale, distribute, and advertise Coach Goods.

256.    By virtue of Onward's, Tebele's, and Haddad's acts described above, Onward committed and continues to commit acts of trademark infringement in violation of, *inter alia,* Section 32(1)(a), 15 U.S.C. § 1114(1)(a).

257.    Onward's acts of trademark infringement, at Tebele's and Haddad's direction, caused and will continue to cause damage and irreparable harm to Coach, and are likely to continue unabated, thereby causing further damage and irreparable harm to Coach and to the valuable goodwill symbolized by and associated with its distinctive COACH® Marks, unless enjoined and restrained by the Court.

258.    Coach has no adequate remedy at law and will suffer irreparable injury if Onward, Tebele, and Haddad are allowed to continue to wrongfully use COACH® Marks.

259.    Because of Onward's Tebele's and Haddad's infringement of the COACH® Marks, including Onward's, Tebele's, and Haddad's willful and intentional conduct, Coach is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

**Eleventh Cause of Action (Onward, Tebele, and Haddad)**

(Federal Unfair Competition and False Advertising under 15 U.S.C. § 1125(a))

260.    Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

261.    Onward's unlicensed, unconsented to, and otherwise unauthorized copying and use of the COACH® Marks in connection with its advertising, marketing, promotion, offer, sale, and/or provision of its Coach Goods constitutes a false and misleading designation of origin and a false and misleading representation of facts, which:

   a.  is likely to and is in fact causing confusion, mistake, or deceiving consumers and the public as to the affiliation, connection, or association of Vinci with Coach, or as to the origin, sponsorship, or approval of Vinci's goods or commercial activities by Coach; and

   b.  in commercial advertising or promotion, misrepresent the nature, characteristics, or qualities of Coach's goods, services, or commercial activities.

262.    By virtue of Onward's acts described above, Onward committed and continues to commit acts of unfair competition and false advertising in violation of, *inter alia,* Section 43(a), 15 U.S.C. § 1125(a).

263.    Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of unfair competition and false advertising. Tebele and Haddad were the moving, active, conscious forces behind the Services Agreement and Onward's actions unfair competition and false advertising.

264.    Onward's, Tebele's, and Haddad's acts of unfair competition and false advertising caused and will continue to cause damage and irreparable harm to Coach, and are likely to continue unabated, thereby causing further damage and irreparable harm to Coach and to the valuable goodwill symbolized by and associated with its distinctive COACH® Marks, unless enjoined and restrained by the Court.

265.   Coach has no adequate remedy at law and will suffer irreparable injury if Onward, Tebele, and Haddad are allowed to continue to wrongfully the COACH® Marks.

266.   Because of Onward's, Tebele's, and Haddad's unfair competition and false advertising, including Onward's, Tebele's, and Haddad's willful and intentional conduct, Coach is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to Section 35, 15 U.S.C. § 1117.

### Twelfth Cause of Action (Onward, Tebele, and Haddad)

(New York Trademark Dilution, N.Y. Gen. Bus. Law § 360-L)

267.   Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

268.   The COACH® Marks are valid, protectable trademarks that are distinctive and have acquired further secondary meaning through widespread sales and marketing. A significant number of the consuming public associates the COACH® Marks with a single source, Coach. Thus, the COACH® Marks are extremely strong marks.

269.   Onward's, Tebele's, and Haddad's use of the COACH® Marks is likely to impair the distinctiveness of the COACH® Marks because the ordinary consumer is likely to perceive Onward's infringing products bearing the COACH® Marks as substantially similar to Coach's authorized products cases bearing the identical COACH® Marks.

270.   Accordingly, Onward, Tebele, and Haddad have violated New York General Business Law § 360-L, which states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

271.   Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of trademark dilution. Tebele and Haddad were the moving,

active, conscious forces behind the Services Agreement and Onward's unauthorized and unapproved actions to sell, offer for sale, distribute, and advertise Coach Goods.

272.    Because of Onward's, Tebele's, and Haddad's dilution of the COACH® Marks, including Onward's, Tebele's, and Haddad's willful and intentional conduct, Coach is entitled to injunctive relief under New York General Business Law § 360-L.

### Thirteenth Cause of Action (Onward, Tebele, and Haddad)

(Common Law Unfair Competition)

273.    Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

274.    Onward's, Tebele's, and Haddad's unlawful and unauthorized use and imitation of the COACH® Marks in connection with the sale, offering for sale, distribution, and advertising of competing, infringing tech accessories, constitutes infringement, passing off, copying, imitation, and misappropriation of Coach's intellectual property, unjust enrichment of Onward, Tebele, and Haddad, and unfair competition with Coach in violation of Coach's rights under the common law of the State of New York and other states of the United States.

275.    Tebele and Haddad, as Onward's owners and managers, were personally involved with and directed all of Onward's acts of unfair competition. Tebele and Haddad were the moving, active, conscious forces behind the Services Agreement and Onward's unauthorized and unapproved actions to sell, offer for sale, distribute, and advertise Coach Goods.

276.    Onward's, Tebele's, and Haddad's willful acts of misrepresentation, fraud, and deception have unjustly enriched Onward, Tebele, and Haddad by exploiting Coach's reputation in the market, caused harm to Coach, and violated Coach's rights.

### Fourteenth Cause of Action (Onward)

(Tortious Interference with Contract)

277.    Coach realleges and incorporates herein the allegations contained in the foregoing and following paragraphs of this Second Amended Complaint as if fully set forth herein.

43

278.    The Coach License Agreement, including all amendments thereto, was, prior to its termination and/or expiration, a valid and enforceable contract.

279.    Section 2.3(b) of the License Agreement states that it is strictly personal to Licensee and cannot "be transferred, assigned, pledged, sold, mortgaged, sublicensed, or otherwise hypothecated or disposed of, either directly or indirectly, in whole or in part, by operation of law otherwise (collectively 'transfer') to any Person without the prior written approval of Licensor."

280.    Prior to June 5, 2023, Onward had knowledge of the Coach License Agreement, including the fact that License Agreement could not be assigned or transferred without Kate Spade's prior written approval. Upon information and belief, Haddad and Tebele were provided a copy of the Coach License Agreement when conducting diligence on Vinci in the lead up to the June 5, 2023 transactions.

281.    Onward entered the Services Agreement, which had the effect of assigning, transferring, and otherwise hypothecating or disposing of the Coach Licensee Agreement, in whole or in part, from Vinci to Onward.

282.    Onward intentionally caused Vinci to breach Section 2.3(b) of the Coach License Agreement by causing it to assign, transfer, or otherwise hypothecate or dispose of the Coach License Agreement, in whole or in part, without Coach's approval. Onward's principals, Tebele and Haddad, designed the June 5, 2023 transactions with the intent of attempting to circumvent the Coach License Agreement's express prohibition of unapproved assignments and transfers.

283.    Onward's tortious interference with the Coach License Agreement was without justification. Onward, Tebele, and Haddad had no legitimate reason for the Services Agreement, and solely executed it in an unlawful attempt to circumvent the Coach License Agreement's express prohibition on unapproved assignments and transfers.

284.    As a result of Onward's tortious interference with the Coach License Agreement, Coach has suffered damages in an amount to be proven at trial.

**Jury Demand**

Pursuant to Rule 38(b) of the Fed. R. Civ. P., Plaintiffs Coach IP Holdings, LLC, Coach Services, Inc. and Tapestry, Inc. request a jury trial of all issues that may be tried to a jury in this action.

**Prayer for Relief**

Plaintiffs Coach IP Holdings, LLC, Coach Services, Inc. and Tapestry, Inc. thus pray for an Order and Judgment:

a.      Entering a temporary, preliminary, and permanent injunction enjoining ACS, Vinci, Onward, Tebele, and Haddad, their respective officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, lenders, creditors, and those in privity with ACS, Vinci, Onward, Tebele, and/or Haddad, and those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, from manufacturing, marketing, distributing, or selling phone cases or other tech accessories using the COACH® Marks, or any other products that use, imitate, or copy any of the COACH® Marks;

b.      Entering a temporary, preliminary, and permanent injunction enjoining ACS, Vinci, Onward, Tebele, and Haddad, as well as their respective officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, lenders, creditors, and those in privity with ACS, Vinci, Onward, Tebele, and/or Haddad, and those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, from directly or indirectly falsely stating (in writing, verbally, or otherwise) to suppliers, factory manufacturers, distributors, and/or customers that ACS, Vinci, Onward, Tebele, and/or Haddad is authorized to produce, manufacture, advertise, distribute, offer for sale, or sell Infringing Products or any other product bearing the COACH® Marks;

c.      Declaring that (i) ACS is not the legal successor to Siena and its rights under the Siena Consent Agreement, (ii) ACS's security interest (if any) in the Alleged Collateral is

45

subject in all respects to and limited to Vinci's rights in the Alleged Collateral as determined under the Coach License Agreement and applicable law, (iii) consequently, ACS does not have any license in the Alleged Collateral or any right to seize, take possession of, dispose of, or sell any of the Alleged Collateral or any other Coach branded products, and (iv) therefore, ACS is unauthorized to copy or use, in any way, any of Coach's COACH® Marks;

d.    Declaring that ACS's use, impending use, imminent use, and documented intended use of Coach's COACH® Marks, including in connection with ACS's efforts to enforce its alleged rights in the Alleged Collateral, constitute intentional and willful trademark infringement, false designation of origin, unfair competition, false advertising, misappropriation and trademark dilution in violation of federal and New York law;

e.    Declaring that (i) Vinci is in default under the Coach License Agreement, (ii) Vinci has admitted that it has no "open orders" nor "customers" for COACH® products, (iii) the Coach License Agreement expired June 30, 2023, (iv) consequently, Vinci does not have any license to the COACH® Marks or in the COACH® products or any right to dispose of or sell any COACH® branded products, and (v) therefore, Vinci is unauthorized to copy or use, in any way, any of Coach's COACH® Marks;

f.    Declaring that Vinci's, ACS's, Onward's, Tebele's, and Haddad's use of Coach's COACH® Marks constitutes intentional and willful trademark infringement in violation of federal law;

g.    Directing Vinci and ACS to file with this Court and serve on Coach's counsel of record within 30 calendar days after service of an injunction, a report under oath setting forth in detail the manner and form in which Vinci and ACS have complied with the injunction;

h.    Directing that (i) all point-of-sale materials, labels, signs, boxes, prints, catalogues, line sheets, marketing materials, internet web pages, metatags, packages, papers, other trade dress, and advertisements in the possession of control of ACS, Tebele, Haddad, and/or Vinci comprising or bearing images, illustrations, or representations of the Infringing Products, the COACH® Marks, or the Coach name be delivered to Coach's counsel in accordance with written

46

instructions from Coach; (ii) ACS, Tebele, Haddad, and/or Vinci each disclose the identities of the vendors, manufacturers, distributors, suppliers, retailers, and e-commerce partners (if any) of the Infringing Products; and (iii) all Infringing Products be delivered to Coach in accordance with written instructions from Coach;

i.      Ordering an accounting of ACS's, Tebele's, and Haddad's profits (if any) arising from ACS's, Tebele's, and Haddad's unfair competition and trademark infringement;

j.      Ordering an accounting of Vinci's profits (if any) arising from Vinci's trademark infringement;

k.      Ordering an accounting of Onward's profits (if any) arising from Onward's, Tebele's, and Haddad's trademark infringement;

l.      Ordering an award of ACS's, Tebele's, and/or Haddad's profits (if any) to Coach, including disclosure of the number of Infringing Products sold and an accounting of the gross revenue derived from sale of the Infringing Products;

m.      Ordering an award of Vinci's profits (if any) to Coach, including disclosure of the number of Infringing Products sold and an accounting of the gross revenue derived from sale of the Infringing Products;

n.      Ordering an award of Onward's, Tebele's, and/or Haddad's profits (if any) to Coach, including disclosure of the number of Infringing Products sold and an accounting of the gross revenue derived from sale of the Infringing Products;

o.      Ordering an award of damages to Coach;

p.      Ordering an award of treble the actual damages awarded for use of a counterfeit mark pursuant to 15 U.S.C. § 1117(b). Coach reserves the right to elect, any time before final judgment, statutory damages under 15 U.S.C. § 1117(c) in lieu of actual damages and profits;

q.      In the alternative to actual damages and profits, ordering an award of statutory damages in an amount of not more than $2,000,000 per counterfeit mark per type of services and/or goods sold or offered for sale by ACS, Onward, Tebele, Haddad and/or Vinci;

47

48

r.       Ordering pre-judgment and post-judgment interest on the above damage awards;

s.       Ordering payment of all amounts due under the Coach License Agreement;

t.       Ordering an award of costs and reasonable attorneys' fees and expenses incurred by Coach in connection with this action; and,

u.       Ordering such other and further relief that this Court may deem just.

48

Dated:  New York, New York
       October 23, 2024

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:    */s/ Timothy R. Beyer*
       Christine Cesare
       Bret Ruber
       Jane Ernst
       1290 Avenue of the Americas
       New York, NY 10104
       T: (212) 541-2000
       E: cbcesare@bclplaw.com
       E: bret.ruber@bclplaw.com
       E: jane.ernst@bclplaw.com

       Timothy R. Beyer (*pro hac vice*)
       Adam B. Stern
       1700 Lincoln Street, Suite 4100
       Denver, CO 80203-4541
       T: (303) 866-0481
       E: tim.beyer@bclplaw.com
       E: adam.stern@bclplaw.com

       Nicholas Bedo (*pro hac vice*)
       One Atlantic Center, 14th Floor
       1201 W. Peachtree Street, N.W.,
       Ste. 1400
       Atlanta, GA 30309
       T: (404) 572-6670
       E: nick.bedo@bclplaw.com

       *Attorneys for Plaintiffs*