**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
COACH IP HOLDINGS, LLC, et al.,

                                Plaintiffs,

                  -against-

ACS GROUP ACQUISITION LLC, et al.,

                                Defendants.
-------------------------------------------------------------------X
VINCI BRANDS LLC,

                          Counterclaim Plaintiff,

                  -against-

COACH SERVICES, INC., et al.,

                          Counterclaim Defendants.
-------------------------------------------------------------------X

**23-CV-10612 (LGS) (VF)**

**OPINION & ORDER**

**VALERIE FIGUEREDO, United States Magistrate Judge**

      Plaintiffs Coach IP Holdings, LLC, Coach Services, Inc., and Tapestry, Inc. (together, "Coach"), commenced this action on December 1, 2023, in the Supreme Court of the State of New York against ACS Group Acquisitions LLC ("ACS") for violations of the Lanham Act and related state-law claims arising out of the termination of a license agreement between Coach and Vinci Brands LLC ("Vinci"). See ECF No. 1 at ¶¶ 1, 3-4.[1] On December 5, 2023, the state action was removed to this Court. See id.

---

[1] Unless otherwise noted, citations to documents on ECF are to the electronic docket in Coach IP Holdings, LLC, et al. v. ACS Group Acquisition LLC, et al., No. 23-CV-10612 (LGS) (VF).

Since removal, on December 19, 2023, Coach amended its complaint to add Vinci as a defendant. See ECF No. 35. On February 3, 2024, Vinci answered the amended complaint and asserted counterclaims against Coach. See ECF No. 51. On March 25, 2024, Vinci filed an amended answer to Coach's amended complaint, adding Case-Mate, Inc. ("Case-Mate") as a counterclaim defendant. See ECF No. 74. On June 21, 2024, Vinci filed a second amended answer. See ECF No. 103 (the "June 2024 Answer"). On August 2, 2024, Case-Mate moved to dismiss Vinci's amended counterclaims. ECF No. 125.

On September 10, 2024, while Case-Mate's motion to dismiss was pending, Coach moved to amend its amended complaint (ECF No. 147), and the motion was granted on October 22, 2024 (ECF No. 164). On October 23, 2024, Coach filed its second amended complaint. See ECF No. 165. On November 22, 2024, Vinci filed its answer to Coach's second amended complaint. See ECF No. 173 (the "November 2024 Answer").

On June 11, 2025, the Honorable Lorna G. Schofield granted Case-Mate's pending motion to dismiss on personal jurisdiction grounds. ECF No. 202. On June 25, 2025, Vinci filed a motion to amend its November 2024 Answer "(a) to correct certain jurisdictional allegations that were mistakenly omitted," "(b) to join Keshav Mehta, Steve Marzio, Shashi Reddy, Tua Pham, Kristen Roney, Charlotte Warshaw, and Jackee de Lagarde as permissive counterclaim defendants," and "(c) to assert additional claims against all existing and proposed counterclaim defendants." ECF No. 207. For the reasons stated herein, the motion for leave to amend is **GRANTED** in part and **DENIED** in part.

### BACKGROUND[2]

This dispute arises out of the termination of a license agreement between Coach and Vinci, through which Vinci served as an authorized licensee for Coach-branded tech accessories (the "Vinci-Coach License Agreement"). See ECF No. 165 at ¶¶ 1-4. While this case has been pending, two other related cases involving Vinci have moved forward: Vinci Brands LLC v. Coach Services, Inc., et al., No. 23-CV-5138 (the "Vinci Action") and Kate Spade LLC v. Vinci Brands, LLC, No. 23-CV-5409 (the "Kate Spade Action," and together with Vinci Action, the "Related Actions"). Of relevance here, in the Vinci Action, the Court, in denying in part Kate Spade's motion to dismiss, determined that Vinci had sufficiently pled that Kate Spade tortiously interfered with Vinci's contracts with its customers and suppliers (Vinci Action, ECF No. 920 at 13-15[3]) and that Vinci had sufficiently pled that Kate Spade fraudulently induced Vinci to prepare for a phone launch despite knowing that Kate Spade would not continue with Vinci as a licensee (id. at 15-21).

Vinci's June 2024 Answer in this case asserted eight counterclaims: a breach of contract claim against Coach in Count I based on the Vinci-Coach License Agreement (ECF No. 103 at Counterclaims ¶¶ 89-95); a breach of contract claim in Count II against Coach based on its cancelation of non-cancelable orders (id. at Counterclaims ¶¶ 96-101); a claim for declaratory judgment in Count III against Coach, seeking a declaration that Coach must renegotiate the royalty terms under the Vinci-Coach License Agreement (id. at Counterclaims ¶¶ 102-110); a

---

[2] The Court presumes the parties' familiarity with the relevant factual and procedural background of this case. The background information recounted herein is limited to that which is relevant to the instant motion.

[3] All page references to docket entries correspond to the stamped-ECF pagination in those documents.

claim for tortious interference in Count IV, alleging that Coach interfered with Vinci's contracts with its customers and suppliers (id. at Counterclaims ¶¶ 111-120); a claim for tortious interference in Count V, alleging that Coach interfered with Vinci's business relationships (id. at Counterclaims ¶¶ 121-129); a claim for tortious interference in Count VI against Case-Mate, alleging that Case-Mate interfered with the Vinci-Coach License Agreement (id. at Counterclaims ¶¶ 130-139); a claim for tortious interference in Count VII against Case-Mate, alleging that Case-Mate interfered with Vinci's supplier and customer contracts (id. at Counterclaims ¶¶ 140-148); and a claim for tortious interference in Count VIII against Case-Mate, alleging that Case-Mate interfered with Vinci's business relationships (id. at Counterclaims ¶¶ 149-157). On July 12, 2024, Coach moved to dismiss Vinci's amended counterclaims. ECF No. 113. On August 2, 2024, Case-Mate moved to dismiss the counterclaims asserted against it based on lack of personal jurisdiction or, in the alternative, for failure to state a claim. ECF No. 125.

Before the two motions to dismiss were decided, Vinci filed its November 2024 Answer. See ECF No. 173. Vinci's November 2024 Answer asserted six counterclaims: a breach of contract claim against Coach in Count I based on the Vinci-Coach License Agreement (id. at Counterclaims ¶¶ 77-83); a breach of contract claim in Count II against Coach based on its cancelation of non-cancelable orders (id. at Counterclaims ¶¶ 84-89); a claim for declaratory judgment in Count III against Coach, seeking a declaration that Coach must renegotiate the royalty terms under the Vinci-Coach License Agreement (id. at Counterclaims ¶¶ 90-98); a claim for tortious interference in Count IV against Case-Mate, alleging that Case-Mate interfered with the Vinci-Coach License Agreement (id. at Counterclaims ¶¶ 99-105); a claim for tortious interference in Count V against Case-Mate, alleging that Case-Mate interfered with Vinci's

4

supplier and customer contracts (id. at Counterclaims ¶¶ 106-113); and a claim for tortious interference in Count VI against Case-Mate, alleging that Case-Mate interfered with Vinci's business relationships (id. at Counterclaims ¶¶ 114-122). The November 2024 Answer omitted the tortious interference claims against Coach previously pled in the June 2024 Answer.

With the parties' agreement, Judge Schofield construed Coach's and Case-Mate's motions to dismiss the June 2024 Answer to apply to the November 2024 Answer. ECF No. 202 at 1; ECF No. 215 at 1. On June 11, 2025, Judge Schofield granted Case-Mate's motion to dismiss, concluding that Vinci had not alleged that Case-Mate had sufficient contact with New York to establish personal jurisdiction. ECF No. 202 at 3-4. On July 10, 2025, the Court granted in part Coach's motion to dismiss, dismissing the declaratory judgment claim in Count III. ECF No. 215 at 8-9. As it concerned the claims in Counts I and II, for breach of contract, the Court denied Coach's motion to dismiss. Id. at 9.

Vinci now seeks leave to file an amended answer for four reasons. See ECF No. 207; ECF No. 209. First, Vinci seeks to add factual allegations concerning Case-Mate's contacts with New York, in order to establish the Court's personal jurisdiction over Case-Mate. ECF No. 209 at 8-9. According to Vinci, these allegations were in the June 2024 Answer but were "mistakenly omitted" from the November 2024 Answer. Id. at 4-5. Second, Vinci seeks to add five employees of Case-Mate—Keshav Mehta, Steve Marzio, Shashi Reddy, Tua Pham, and Kristen Roney (collectively, the "Individual Case-Mate Defendants")—and two employees of Coach—Charlotte Warshaw and Jackee de Lagarde (collectively, the "Individual Coach Defendants")—as permissive counterclaim defendants and add claims against them. Id. at 5. Third, Vinci seeks to add two tortious interference claims against Coach that Vinci had previously asserted in its June 2024 Answer (Counts IV and V) but which Vinci mistakenly omitted from its November

2024 Answer. Id. at 5-6; see ECF No. 103 at ¶¶ 111-29. Finally, Vinci seeks to add additional

claims, including misappropriation of trade secrets under the Defend Trade Secrets Act

("DTSA") and common law, a breach of contract claim against Case-Mate, and fraud claims.

Both Coach and Case-Mate oppose any amendment. See ECF Nos. 220, 225. On August

8, 2025, Vinci filed a reply brief in further support of its motion. ECF No. 235. At the Court's

request, Vinci filed an additional letter on October 31, 2025 (ECF No. 247), addressing certain

questions posed by the Court in an order dated October 15, 2025 (ECF No. 243). On January 9,

2026, the Court scheduled a conference to discuss Vinci's motion. ECF No. 265. After the

conference, on January 21, 2026, Vinci filed a letter in further support of its motion. ECF No.

268. On January 28, 2026, Case-Mate filed a letter in opposition. ECF No. 272.

## LEGAL STANDARD

Federal Rule of Civil Procedure 15 provides that leave to amend before trial should be

"freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).[4] The standard under Rule

15(a), although liberal, allows motions for leave to amend to be denied where the court finds

"undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . ,

futility of amendment, etc." See Foman v. Davis, 371 U.S. 178, 182 (1962); see also McCarthy

---

[4] Although "the Federal Rules of Civil Procedure do not provide clear guidance as to whether and/or when a [d]efendant can assert a new counterclaim or defense in an amended pleading as a matter of right," Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C., No. 17-CV-8528 (PGG), 2022 WL 836890, at *6 (S.D.N.Y. Mar. 21, 2022) (internal quotation marks and citation omitted), courts in this District routinely apply Rule 15 when considering motions to amend an answer and counterclaims. See, e.g., Stone v. Sutton View Cap., LLC, No. 17-CV-1574 (VEC), 2017 WL 6311692, at *2 (S.D.N.Y. Dec. 8, 2017) ("Rule 15 is now the sole rule governing amendment of a pleading to add a counterclaim."); Hadassah v. Hadassah Acad. Coll., No. 19-CV-8953 (JPO), 2021 WL 4459121, at *4 (S.D.N.Y. Sept. 29, 2021) (analyzing motion to amend answer and counterclaims under Rule 15).

v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (stating that "a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party"). "[I]t is within the sound discretion of the court whether to grant leave to amend." John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994) (citation omitted).

**DISCUSSION**

Case-Mate and Coach argue that they will be unduly prejudiced if Vinci is permitted to amend its answer, that the amendment was made in bad faith, and that Vinci unduly delayed in seeking to amend. None of these arguments has merit.

A. Undue Delay, Bad Faith, and Prejudice

Case-Mate argues that Vinci was not diligent in seeking to amend its answer because the information relied on by Vinci has been in its possession, through discovery obtained in the Related Actions, for months. ECF No. 225 at 11-12. Relatedly, Coach argues that the amendment is brought in bad faith because Vinci seeks to add parties and claims based on facts Vinci has known for months and therefore the amendments are not based on recently learned facts. ECF No. 220 at 11-12.

As an initial matter, it is permissible for a party to seek to add additional facts to its pleading where it learned those facts through discovery in a related action. See, e.g., Hadassah, 2021 WL 4459121, at *3 (reasonable for defendant "to assert a belated counterclaim" based on "facts that [d]efendant learned during discovery") (internal quotation marks and citation omitted); Willton NC NY, LLC v. MH I Inv. LLC, No. 24-CV-5526 (AT) (JW), 2025 WL 2056019, at *1 (S.D.N.Y. July 23, 2025) (granting motion to amend "based on facts learned in discovery"); cf. Billard v. Rockwell Int'l Corp., 683 F.2d 51, 57 (2d Cir. 1982) (affirming denial of leave to amend where plaintiffs "had access to full discovery" in a related case but failed to

support their fraud allegations). Moreover, Vinci sought to amend its answer while discovery in this case was open. Although discovery in the Related Actions closed, fact discovery in this action closed on March 16, 2026,[5] and expert discovery does not close until June 22, 2026. ECF No. 246 at 1-2. Courts in this District routinely permit amendment where, as here, amendment is made while discovery remains open. See, e.g., A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87 F. Supp. 2d 281, 299-300 (S.D.N.Y. 2000) (granting motion to amend counterclaims where "[n]o trial date has yet been set, nor has discovery been completed"); Sanderson v. Leg Apparel LLC, No. 19-CV-8423 (GHW), 2020 WL 7342742, at *13 (S.D.N.Y. Dec. 14, 2020) (granting leave to amend to add new defendant where "[t]here were months remaining in discovery when Plaintiff filed his motion, no motion for summary judgment has been filed, and no trial date has been set"); Bryant v. Carlisle Carrier Corp., No. 13-CV-578 (JG), 2014 WL 712592, at *2 (E.D.N.Y. Feb. 25, 2014) (granting motion to amend answer and counterclaims because "[t]his is not an instance of a motion to amend a pleading on the eve of trial; no trial date has yet been set and the parties have still not completed expert discovery"). And, the parties agreed to use discovery in the Related Actions to "target discovery in this case at issues unique to this case." ECF No. 106 at 16.

For its part, Case-Mate argues that Vinci's motion is brought in bad faith because Vinci "waited to seek leave to amend until after the Court had already granted Case-Mate's motion to dismiss." ECF No. 225 at 21. But Vinci told Case-Mate and Coach on May 12, 2025, before any decision on the motion to dismiss, that it intended to move to amend. ECF No. 204 at 3. The

---

[5] On March 16, 2026, the Court granted the parties' joint request for a "limited extension of [ ] fact discovery until April 15, 2026" to take seven depositions. ECF No. 290. The parties did not request an accompanying extension of the expert discovery deadline.

motion to dismiss was granted on June 11, 2025 (ECF No. 202), and Vinci filed the instant motion on June 25, 2025 (ECF No. 207). "Bad faith exists where counsel conveyed a misleading impression that claims were fixed or where the earlier decision not to plead additional allegations was a tactical one." AT&T Corp. v. Atos IT Sols. & Servs., Inc., 714 F. Supp. 3d 310, 340 (S.D.N.Y. 2024) (internal citation and quotation omitted). From the representations of Vinci's former counsel, it appears that part of the reason Vinci seeks to amend now is that it discovered that its prior counsel inadvertently omitted from the November 2024 Answer factual allegations and claims that had been included in Vinci's June 2024 Answer and which Vinci did not want to drop. See ECF No. 208 at ¶ 13; ECF No. 209 at 4-5. In short, Vinci's conduct here is a far cry from the kind of tactics that courts have concluded constitute bad faith. Compare AT&T Corp., 714 F. Supp. 3d at 340-41 (finding no bad faith where defendant had additional allegations earlier although "could and should have communicated earlier about its intention to file for leave to amend") with Davis v. Sedgwick Claims Mgmt. Servs. Inc., No. 21-CV-7090 (PGG) (BCM), 2023 WL 6150009, at *19 (S.D.N.Y. Aug. 30, 2023), adopted sub nom. by, Davis v. Sedgwick Claim Mgmt. Servs., Inc., 2023 WL 6141170 (S.D.N.Y. Sept. 20, 2023) (denying motion to amend and finding bad faith where "[n]ot only does the newly-minted allegation smack of litigation gamesmanship; it is directly contradictory to those made in [plaintiff's] prior pleadings, and thus subject to striking as false and sham") (internal quotation marks and citation omitted).

Next, Coach and Case-Mate argue that amendment would be unduly prejudicial because adding new claims and defendants will require additional discovery and further delay resolution of the case. See ECF No. 220 at 10-14; ECF No. 225 at 18-20. An amendment may be prejudicial where it would "'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'"

9

Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) (quoting Block v. First Blood

Assocs., 988 F.2d 344, 350 (2d Cir. 1993)). Neither factor is present here.

As already discussed, discovery in this matter remains open, no trial date has been set,

and the case is not at a posture where the parties are ready to submit dispositive motions. Case-

Mate has not responded to Vinci's counterclaims beyond its motion to dismiss. And for Coach,

who has responded to Vinci's counterclaims, the "burden of undertaking discovery, standing

alone, does not suffice to warrant denial of a motion to amend a pleading." See A.V. by Versace,

Inc., 87 F. Supp. 2d at 299 (quoting United States v. Cont'l Ill. Nat'l Bank & Trust Co., 889 F.2d

1248, 1255 (2d Cir. 1989)).

In any case, it is not apparent that amendment would require significant additional

discovery beyond that which the parties have already exchanged in the Related Actions or in this

case. Indeed, Coach and Case-Mate acknowledge that Vinci is seeking to amend with factual

allegations *learned from* discovery in the Related Actions. Simply put, Vinci seeks to add facts

already known to all the parties. For example, the counterclaims that Vinci seeks to add stem

from the same core factual allegations that have been known to Coach and Case-Mate since

Vinci filed its first counterclaims in February 2024, further undermining any claim of prejudice

if amendment were granted. See Lema v. Fitzcon Constr./Ren Corp., No. 20-CV-2311 (MKB),

2022 WL 1321596, at *4 (E.D.N.Y. May 3, 2022) (reasoning that where "new factual

allegations" would have been known to defendant, "there is no risk of unfair surprise or undue

prejudice"); JPMorgan Chase Bank, N.A. v. IDW Grp., No. 08-CV-9116 (PGG), 2009 WL

10

1357946, at *4-5 (S.D.N.Y. May 12, 2009) (allowing amendment to add claims and new defendant where new claims rested on the same allegations as then-operative complaint).

Finally, neither Coach nor Case-Mate dispute that Vinci would be permitted to commence a new action to assert its claims, even if the instant motion to amend were denied, and then move to transfer and consolidate the new case with this matter. ECF No. 209 at 9; ECF No. 235 at 8-9. But such a result is wholly inefficient, would undoubtedly delay resolution of this case, and would be a waste of judicial resources. Judicial economy weighs strongly in favor of permitting Vinci leave to amend, particularly because discovery only recently closed and amendment would not be unduly prejudicial. See, e.g., Kannuu Pty Ltd. v. Samsung Elecs. Co., No. 19-CV-4297 (ER), 2025 WL 2145556, at *9 (S.D.N.Y. July 29, 2025) (reasoning that denial of leave to amend "would [ ] generate additional inefficiencies through the multiplication of proceedings" and thus "judicial efficiency" weighs in favor of granting leave); Willton NC NY, LLC, 2025 WL 2056019, at *1 (granting motion to amend, in part, to "bring all related claims against all related parties in one forum to preserve judicial and party resources").

It is well established in this Circuit that "[m]ere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." Newman Cap. LLC v. Priv. Cap. Grp., Inc., No. 22-CV-663 (VSB), 2025 WL 945851, at *2 (S.D.N.Y. Mar. 28, 2025) (citation omitted, alteration in original). There is no evidence of bad faith or undue prejudice here, such that the existence of any delay by Vinci, by itself, does not suffice to deny amendment.

B. Futility

"A proposed amendment to a pleading is deemed to be futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis."

11

Kirk v. Heppt, 423 F. Supp. 2d 147, 149 (S.D.N.Y. 2006). "The Court [ ] reviews the proposed amendments for futility pursuant to Rule 12(b)[.]" Joinnides v. Floral Park-Bellerose Union Sch. Dist., No. 12-CV-5682 (JS) (AKT), 2015 WL 1476422, at *15 (E.D.N.Y. Mar. 31, 2015).

### 1. *Personal Jurisdiction*

"[T]o exercise personal jurisdiction over a defendant, a district court must possess a statutory basis for doing so." Troma Ent., Inc. v. Centennial Pictures Inc., 729 F.3d 215, 218 (2d Cir. 2013). When determining whether such authority exists, a court typically consults "the law of the state in which [it] is located—here, New York." Id. (internal quotation marks and citation omitted). In addition to identifying a statutory authority, a plaintiff must also demonstrate that the exercise of personal jurisdiction over the defendant would comport with due process. Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 35 (2d Cir. 2010). A component of that analysis is to "determine whether [the] defendant has sufficient minimum contacts with the forum." See Waldman v. Palestine Liberation Org., 835 F.3d 317, 331 (2d Cir. 2016). "Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction—minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotation marks and citation omitted). Additionally, the lawsuit "must arise out of contacts that the defendant *himself* creates with the forum." Walden v. Fiore, 571 U.S. 277, 284 (2014) (internal quotation marks and citation omitted, emphasis in original). This means that the "analysis looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there." Id. at 285.

12

a. Case-Mate

Case-Mate argues that Vinci's motion to amend is futile because Vinci cannot establish facts supporting the Court's personal jurisdiction over Case-Mate.[6] ECF No. 225 at 12-18. In granting Case-Mate's motion to dismiss for lack of personal jurisdiction based on Vinci's November 2024 Answer, Judge Schofield determined that the answer "contain[ed] no actual, non-conclusory factual allegations showing that Case-Mate transacted business in New York," such as Case-Mate selling or shipping products to New York customers; Case-Mate sending communications to New York to further its licensing relationship with Coach; or Case-Mate interfering with Vinci's sales to New York customers or business prospects with New York customers. See ECF No. 202 at 3. Judge Schofield noted that although Vinci's June 2024 Answer had allegations that "Case-Mate employees traveled to New York City to discuss and negotiate a License Agreement with Coach, and that Case-Mate directs its business to and in New York via its website case-mate.com and by selling its merchandise in physical stores in

---

[6] Vinci argues that Case-Mate has waived any objection to personal jurisdiction based on Case-Mate's activity in the Vinci Action, including Case-Mate answering Vinci's complaint, filing counterclaims against Vinci, and requesting leave to move for summary judgment. ECF No. 235 at 11-12. In its answer, Case-Mate admitted it waived personal jurisdiction in only the Vinci Action, but "denie[d] that it is subject to general jurisdiction in New York." Vinci Action, ECF No. 766 at ¶ 37. This is insufficient to constitute waiver in this action. See, e.g., China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc., 882 F. Supp. 2d 579, 591 (S.D.N.Y. 2012) (finding no waiver of jurisdiction where party "included its jurisdictional objection in its answer"); Hiscox Ins. Co. v. Bordenave, No. 18-CV-10222 (PAE), 2019 WL 2616338, at *6 (S.D.N.Y. June 26, 2019) (no waiver of personal jurisdiction where defendant was "actively litigating" an underlying action in the same court, because "[d]efendants did not bring either action"). In any case, Vinci has established that the Court has personal jurisdiction over Case-Mate for the reasons discussed herein.

New York," the November 2024 Answer omitted those allegations. Id. (internal quotations omitted).

Now, Vinci alleges that this Court has personal jurisdiction over Case-Mate pursuant to C.P.L.R. §§ 301 and 302 because "Case-Mate is party to a license agreement" with Coach and the license agreement is governed by New York law. ECF No. 207-2 at Counterclaims ¶ 16. Vinci further alleges that Case-Mate "purposely avails itself to New York by . . . directing regular[ ] marketing and selling substantial numbers of products to New York State residents via its website case-mate.com and by selling its merchandise wholesale to physical stores located in New York State." Id. Additionally, Vinci alleges that its "claims asserted against Case-Mate arise from the business it has transacted and does transact in New York," and that Case-Mate's alleged tortious activity occurred in New York. Id. at Counterclaims ¶ 17.

Case-Mate argues that Vinci has waived any argument for jurisdiction under C.P.L.R. §§ 302(a)(2) and 302(a)(3), because Vinci did not previously assert jurisdiction under those provisions. ECF No. 225 at 14. But Case-Mate cites no case that finds waiver where a party is amending its pleading to add allegations to support a new basis for personal jurisdiction, as Vinci seeks to do here. Nor did Judge Schofield find that Vinci waived its ability to assert personal jurisdiction under C.P.L.R. §§ 302(a)(2) and 302(a)(3). Judge Schofield noted that Vinci's November 2024 Answer "broadly alleges jurisdiction under [C.P.L.R.] sections 301 and 302" (ECF No. 202 at 2), but that Vinci "argued" for personal jurisdiction under C.P.L.R. § 302(a)(1) (id.). Courts regularly permit plaintiffs to amend their complaints to adequately allege personal jurisdiction. Allianz Glob. Invs. GmbH v. Bank of Am. Corp., 473 F. Supp. 3d 361, 365 (S.D.N.Y. 2020), objections overruled by, No. 18-CV-10364 (LGS), 2020 WL 4927575 (S.D.N.Y. Aug. 21, 2020) (granting plaintiff's request to amend complaint to "cure pleading

14

deficiencies relating to personal jurisdiction" and collecting cases). Vinci has added back C.P.L.R. § 302 in its proposed amended answer (ECF No. 207-2 at Counterclaims ¶ 13), and Vinci argues for jurisdiction based on C.P.L.R. § 302 in its papers in support of its amended answer (ECF No. 235 at 11).

Vinci has alleged sufficient facts to establish personal jurisdiction over Case-Mate under C.P.L.R. § 302(a)(1). Personal jurisdiction under C.P.L.R. § 302(a)(1) requires that the "nondomiciliary must transact business within the state; and second, the claim against the nondomiciliary must arise out of that business activity." Mantello v. Hall, 947 F. Supp. 92, 99 (S.D.N.Y. 1996) (internal quotation marks and citation omitted). "Proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." Eades v. Kennedy, PC L. Offs., 799 F.3d 161, 168 (2d Cir. 2015) (citations and alteration omitted).

First, Vinci alleges that Case-Mate has a contractual relationship with Coach, which has its principal place of business in New York and is a "New York business corporation." ECF No. 207-2 at Counterclaims ¶¶ 4, 13, 16. Vinci also alleges that Case-Mate has a contractual relationship with Kate Spade, a New York business corporation, pursuant to which Case-Mate is the exclusive licensee for Kate Spade-branded mobile phone cases. Id. at Counterclaims ¶ 16. Both of the licensing agreements with Case-Mate are governed by New York law. Id. at Counterclaims ¶¶ 16, 32. Vinci further alleges that Case-Mate purposely avails itself of New York because it sells products to New York residents through its website and sells merchandise wholesale to physical stores located in New York and distributors within New York. Id. at Counterclaims ¶ 16.

15

Second, the counterclaims asserted by Vinci arise out of Case-Mate's business in New York. To "arise from" a transaction, "there must be an articulable nexus or substantial relationship between the business transaction and the claim asserted." Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 339 (2012) (internal citation and quotation marks omitted). "New York's highest court has 'consistently held that causation is not required, and that the inquiry under the statute is relatively permissive.'" Italian Exhibition Grp. USA, Inc. v. Bartolozzi, No. 23-CV-4417 (AS), 2024 WL 291224, at *2 (S.D.N.Y. Jan. 25, 2024) (quoting id. at 339). "At a minimum, there must be a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." Id. (internal quotation marks and citation omitted). "In applying this 'permissive' standard, 'it is appropriate to view a business transaction through a broader lens when determining whether a plaintiff's claim arises from that transaction so as to confer personal jurisdiction over a defendant.'" Id. (quoting Wilson v. Dantas, 128 A.D.3d 176, 186 (1st Dep't 2015)).

Such an articulable nexus exists here. As it concern's Vinci's counterclaims for tortious interference, Vinci alleges that Case-Mate's negotiation and ultimate agreement with Coach interfered with the Vinci-Coach License Agreement and with Vinci's contracts with its suppliers and customers. See ECF No. 207-2 at Counterclaims ¶¶ 227-28, 240-41, 253, 256. Vinci further alleges that some of Case-Mate's sales in New York would have been sales made by Vinci but for Case-Mate's wrongful conduct. Id. at Counterclaims ¶ 16. Vinci also alleges that Case-Mate, without legitimate justification and for the purpose of destroying Vinci's business, induced Coach to breach its obligations under the Vinci-Coach License Agreement and also improperly communicated with Vinci's customers and suppliers that Vinci was no longer an authorized licensee, interfering with Vinci's contractual relationships. Id. at Counterclaims ¶¶ 227, 230,

16

240-41. According to Vinci, Case-Mate "threatened [Vinci's] suppliers and customers with legal repercussions if they continued to work with Vinci," including customers that have their principal office in New York. Id. at Counterclaims ¶¶ 186-87. Likewise, in support of its claims for misappropriation of trade secrets, Vinci alleges that Case-Mate misappropriated Vinci's confidential information and used that information to negotiate and consummate Case-Mate's license agreement with Coach, and to wrongfully interfere with Vinci's customers and suppliers. Id. at Counterclaims ¶ 343. Finally, for Vinci's fraud claim, Vinci alleges that Case-Mate failed to disclose that it was negotiating a license agreement with Coach and misled Vinci into disclosing its confidential information under the false pretense that Case-Mate would acquire Vinci. Id. at Counterclaims ¶¶ 384-387.

In short, there is a sufficient nexus between Case-Mate's New York transaction—namely, the license agreement between Case-Mate and Coach—such that Vinci's claims cannot be considered "unmoored" from that transaction. See Italian Exhibition Grp. USA, Inc., 2024 WL 291224, at *2. Collectively, Vinci's allegations suffice to adequately plead that the Court has personal jurisdiction over Case-Mate under C.P.L.R. § 302(a)(1). See, e.g., Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc., No. 25-CV-6936 (RA), 2025 WL 3442819, at *7 (S.D.N.Y. Dec. 1, 2025) (finding personal jurisdiction established where "[t]here is an 'articulable nexus' between [defendant's] business transaction—the provision of insurance services to a New York-based entity—and the [tortious interference] claim asserted against [defendant], which is sufficient for jurisdiction under § 302(a)(1)"); Knocking Inc. v. Carter, No. 24-CV-9020 (VEC), 2025 WL 2257434, at *3 (S.D.N.Y. Aug. 7, 2025) (finding personal jurisdiction under C.P.L.R. § 302(a)(1) where defendants "knowingly solicited and entered into business agreements with companies that operate in New York" and plaintiff's DTSA claim had

a "substantial relationship" to New York because defendants "misappropriated [p]laintiff's trade secrets when soliciting business from [p]laintiff's partners").

Additionally, exercising personal jurisdiction over Case-Mate comports with due process. "Ordinarily, [ ] if jurisdiction is proper under the [C.P.L.R.], due process will be satisfied because [C.P.L.R.] § 302 does not reach as far as the constitution permits." Topps Co. v. Gerrit J. Verburg Co., 961 F. Supp. 88, 90 (S.D.N.Y. 1997). "The due process analysis contains two parts: the minimum contacts inquiry and the reasonableness inquiry." 101 McMurray, LLC v. Porter, No. 10-CV-9037 (CS), 2012 WL 997001, at *5 (S.D.N.Y. Mar. 26, 2012) (internal quotation marks and citations omitted). Beginning with minimum contacts, Vinci alleges that Case-Mate sells its merchandise to physical stores and distributors in New York. ECF No. 207-2 at Counterclaims ¶ 16. This is sufficient to establish minimum contacts. See, e.g., Label Health, LLC v. Haywire Consulting, Inc., No. 12-CV-05640 (VSB) (SDA), 2021 WL 2269885, at *2 (S.D.N.Y. Apr. 30, 2021), adopted by, 2021 WL 2269819 (S.D.N.Y. June 3, 2021) ("[S]ince [d]efendants contracted to supply goods into the State of New York, personal jurisdiction exists over them."); Carr-Stock v. Orthotic Rehab. Prods., Inc., 832 F. Supp. 2d 229, 238 (W.D.N.Y. 2011) (finding minimum contacts satisfied where "[d]efendant has contacts with New York through its sales to customers and suppliers in New York").

Further, the exercise of personal jurisdiction is reasonable here. Among the factors that courts consider in assessing whether it is reasonable to exercise personal jurisdiction are the "burden that the exercise of jurisdiction will impose on the defendant"; "the plaintiff's interest in obtaining convenient and effective relief"; and "the interests of the forum state in adjudicating the case." Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-CV-1318

18

(GBD) (BCM), 2017 WL 825482, at \*16 (S.D.N.Y. Mar. 2, 2017) (citation omitted). All of those factors weigh in favor of exercising personal jurisdiction.

Case-Mate is already a defendant in two actions in this Court, arising out of negotiations with Kate Spade over a license agreement. Although the claims here arise from the negotiations of a separate license agreement with Coach, the parties have agreed to use discovery from the Related Actions in this case, demonstrating that all three cases overlap. The Court is familiar with the parties and the claims, having supervised discovery for over two years. Judicial economy thus favors having this case also heard in this Court. Additionally, Vinci's interest in obtaining efficient relief weighs in favor of exercising jurisdiction because the claims against Case-Mate are inextricably bound with Vinci's claims against Coach. In short, exercising personal jurisdiction over Case-Mate does not offend due process.

b.   The Individual Case-Mate Defendants

Vinci asserts that it has personal jurisdiction over the Individual Case-Mate Defendants under C.P.L.R. §§ 301 and 302. ECF No. 207-2 at Counterclaims ¶¶ 18-22. Case-Mate disagrees. ECF No. 225 at 14-16. As explained below, Vinci has failed to establish personal jurisdiction over the Individual Case-Mate Defendants.

C.P.L.R. § 301

Beginning with C.P.L.R. § 301, that provision provides that a court may exercise general personal jurisdiction over a defendant "if he is domiciled in New York, served with process in New York, or continuously and systematically does business in New York." Jonas v. Est. of Leven, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015). To do business in New York, an individual must be "engaged in such a continuous and systematic course of doing business here as to warrant a finding of [his] presence in this jurisdiction." Johnson v. Stop & Shop Supermarket Co., LLC, No. 22-CV-9691 (KMK), 2024 WL 1217074, at \*6 (S.D.N.Y. Mar. 21, 2024)

19

(internal quotation marks and citation omitted). "New York courts have interpreted N.Y. C.P.L.R. § 301 to require that the defendant 'be present in New York not occasionally or casually, but with a fair measure of permanence and continuity.'" Id. (quoting Patel v. Patel, 497 F. Supp. 2d 419, 245 (E.D.N.Y. 2007)).

Vinci does not make any allegation that the Individual Case-Mate Defendants (Mehta, Marzio, Reddy, Pham, and Roney) live in New York (ECF No. 207-2 at Counterclaims ¶¶ 18-22 (stating that the Individual Case-Mate Defendants "regularly *travel*[] to New York")); there is no indication that they were individually served with process in New York (see, e.g., ECF Nos. 89, 112); and Vinci makes no allegation to support a finding that they are engaged in such "continuous and systematic" activity in New York as to "warrant a finding of [their] presence" in New York. Johnson, 2024 WL 1217074, at *6 (internal quotation marks and citation omitted). The Individual Case-Mate Defendants are therefore not subject to general jurisdiction under C.P.L.R. § 301. Consequently, Vinci must establish personal jurisdiction over these defendants under New York's long-arm statute, C.P.L.R. § 302.

C.P.L.R. § 302(a)(1)

Beginning with C.P.L.R. § 302(a)(1), a court may exercise specific personal jurisdiction over a non-domiciliary "who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1). "A non-domiciliary can be said to transact business within the meaning of section 302(a)(1) if the non-domiciliary seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship." GPC3 I, LLC v. Javarone, No. 25-CV-60 (GHW), 2025 WL 2879538, at *9 (S.D.N.Y. Oct. 8, 2025) (internal quotation marks, alterations, and citation omitted).

"To have 'transacted business' under CPLR § 302(a)(1), a defendant must have engaged in such a continuous and systematic course of doing business in New York as to warrant a finding of its presence in the jurisdiction." Zama Cap. Advisors LP v. Universal Ent. Corp., No. 24-CV-1577 (MKV), 2025 WL 968783, at *14 (S.D.N.Y. Mar. 31, 2025) (citing Dardana Ltd. v. Yuganskneftegaz, 317 F.3d 202, 205 n.9 (2d Cir. 2003)). "Because § 302(a) is a so-called single act statute, even a single purposeful transaction conducted in New York can give rise to specific jurisdiction, as long as the plaintiff's claims raised have a substantial relationship to the transaction." Wallace Church & Co. Inc. v. Wyattzier, LLC, No. 20-CV-1914 (CM), 2020 WL 4369850, at *6 (S.D.N.Y. July 30, 2020) (internal quotation marks and citation omitted). But "[n]ot all purposeful activity" will suffice to constitute a "transaction of business" under C.P.L.R. § 302(a)(1). Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 62 (2d Cir. 2012) (explaining that telephoning a single order to New York asking for shipment of goods to another state or "the transitory presence of a corporate official" in New York does not support personal jurisdiction under C.P.L.R. § 302(a)(1)). "Although it is impossible to precisely fix those acts that constitute a transaction of business . . . it is the quality of the defendants' New York contacts that is the primary consideration." Id. (citation omitted).

Additionally, to satisfy C.P.L.R. § 302(a)(1), the plaintiff's claims must arise from the business transaction, which occurs when "there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Id. at 66 (citation omitted). "[J]urisdiction is not justified [under N.Y. C.P.L.R. § 302(a)(1)] where the relationship between the claim and transaction is too attenuated." Johnson v. Ward, 4 N.Y.3d 516, 520 (2005).

Vinci alleges that on April 26, 2023, Marzio and Roney met Warshaw and de Lagarde "in New York City to discuss terms of the license" between Case-Mate and Coach. ECF No. 207-2 at Counterclaims ¶¶ 57, 94. Case-Mate concedes that Roney and Marzio travelled to New York, but Case-Mate argues that the meeting was to discuss an agreement with Kate Spade, not Coach. ECF No. 225 at 15-16; ECF No. 272 at 4. Based on discovery obtained in the related Vinci Action, no witness has testified that any Coach representative or employee was present at that April 2023 meeting. ECF No. 272 at 4. Instead, Marzio, Roney, and de Lagarde all testified that Kate Spade executives attended the meeting, and the meeting was to discuss the Kate Spade license. ECF No. 226-1 at 4, 9-13, 18-19. Additionally, both de Lagarde and Marzio provided sworn testimony that the slide presentation prepared by Case-Mate for the meeting focused solely on Kate Spade. See ECF No. 272 at 4; see also ECF No. 272-1 at ¶¶ 6-8.[7]

For example, in the deposition of Steve Marzio, taken in the related Vinci Action, Marzio testified that "Kate Spade asked if we would come . . . to New York" because "they were actively looking for a new licensee." ECF No. 226-1 at 9. He further testified that he believed the April 2023 meeting was their first in-person meeting (id. at 14), and that after the meeting, Case-Mate sent Kate Spade a presentation "to try to obtain a license from Kate Spade for Case-Mate" (id. at 15). Marzio also submitted a sworn declaration regarding the April 2023 meeting, stating

_____

[7] In assessing whether Vinci has alleged personal jurisdiction, the Court may rely on documentation outside of the pleadings in resolving any factual issues. Klonis v. Nat'l Bank of Greece, S.A., 492 F. Supp. 2d 293, 298-99 (S.D.N.Y. 2007) ("Because the question of personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . all pertinent documentation submitted by the parties may be considered in deciding the motion.") (internal quotation marks and citation omitted). In furtherance of its arguments, Case-Mate submitted sworn declarations from Marzio, Reddy, Mehta, and Pham (ECF Nos. 272-1 to 272-4), and Vinci submitted deposition testimony from Marzio, de Lagarde, and Roney obtained in the Related Actions (ECF No. 226-1).

that "[t]here were no representatives present from [Coach]," the "only people present were from either Case-Mate or Kate Spade," "Coach was not discussed or mentioned" at the meeting, the slide deck presented by Marzio and Roney at the meeting did not mention Coach, and "nor was the slide deck directed at Coach." ECF No. 272-1 at ¶¶ 6-8. What's more, Roney testified in her deposition that she understood that Kate Spade at the April meeting was "doing diligence to determine a new partner" for a licensing relationship. ECF No. 226-1 at 20-21. Further, de Lagarde, the Vice President of Licensing for Kate Spade, testified that Case-Mate submitted a business framework to Kate Spade after the meeting, and that she sent Case-Mate a term sheet template for Case-Mate to complete.[8] Id. at 6-7.

Vinci alleges that Marzio and Roney sent e-mails and text messages to de Lagarde and Warshaw after the April 26, 2023 meeting—between May 2023 and June 2023—to continue negotiations of the license agreement. Beginning with Roney, there are text messages between Roney and Warshaw from May through June 2023 discussing the license agreement with Coach. See, e.g., ECF No. 221-2 at 9 (text message about Coach from May 22, 2023); id. at 12 (text message about Coach from June 1, 2023). But even so, there is no indication that the Coach license was discussed at the April meeting in New York, and there is no evidence or allegation that Roney traveled to New York for any other meeting with Coach to discuss the Coach license

---

[8] Coach and Kate Spade are owned by the same parent, Tapestry, Inc., making them "sibling brands." Fed. Trade Comm'n v. Tapestry, Inc., 755 F. Supp. 3d 386, 477 (S.D.N.Y. 2024); see also ECF No. 207-2 at Counterclaims ¶ 51 (noting Tapestry is the parent company of Coach). But the two are separate and distinct legal entities. Vinci has cited to no case that would permit a finding of personal jurisdiction over individuals, where the alleged nexus to New York concerns a meeting to discuss a contractual relationship with a sibling corporation. See In re Steinmetz, No. 20-MC-212 (AJN), 2022 WL 170851, at *6 (S.D.N.Y. Jan. 19, 2022) (declining to find personal jurisdiction over affiliated company where plaintiff "provides no authority for the proposition that personal jurisdiction may be exercised over a respondent based on the forum contacts of an affiliated company").

agreement. Further, Vinci's allegations that Marzio communicated with Warshaw and de Lagarde about the Coach license agreement are insufficient to establish personal jurisdiction, because there is no evidence that Marzio came to New York to discuss or negotiate the agreement with Coach. See Suntree Int'l Corp v. Rossi, No. 19-CV-3845 (NG) (RLM), 2021 WL 5701407, at *5 (E.D.N.Y. Jan. 22, 2021) ("Courts in New York, however, have consistently held that telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction [under C.P.L.R. § 302(a)(1)].") (internal quotation marks and citation omitted); Sandoval v. Abaco Club on Winding Bay, 507 F. Supp. 2d 312, 316-17 (S.D.N.Y. 2007) (declining to find personal jurisdiction under C.P.L.R. § 302(a)(1) over individual defendant where "a small number of telephone conversations regarding the contract negotiation did take place between the Bahamas and New York").

Turning to Mehta, Reddy, and Pham, Vinci claims that "upon information and belief, [Mehta, Reddy, and Pham] regularly travel[ ] to New York State, and [Mehta, Reddy, and Pham] wrongfully obtained Vinci Confidential Information from the Coach Parties during no less than one such visit to New York[.]" ECF No. 207-2 at Counterclaims ¶¶ 18, 20-21. Ostensibly, the "one such visit" refers to the April 2023 meeting in New York that Marzio and Roney attended. But Case-Mate has put forth evidence, through the deposition testimony of Marzio and Roney obtained in the related Vinci Action and declarations from Marzio, Reddy, Mehta, and Pham that only Marzio and Roney attended that meeting; Mehta, Reddy, and Pham did not attend. See, e.g., ECF No. 226-1 at 19 (Roney deposition testimony that only herself and Marzio attended the April 2023 meeting in New York); id. at 13 (Marzio deposition testimony showing a calendar entry for the April 2023 meeting and the entry only included Marzio and Roney as the attendees

for Case-Mate); ECF No. 272-1 at ¶ 4 (Marzio declaration stating that only he and Roney attended the meeting on behalf of Case-Mate); ECF No. 272-2 at ¶ 2 (Reddy declaration stating that he was not at the April 2023 meeting in New York); ECF No. 272-3 at ¶ 2 (Mehta declaration stating the same); ECF No. 272-4 at ¶ 2 (Pham declaration stating the same).

Additionally, unlike Vinci's allegations concerning Marzio and Roney, Vinci does not allege that Mehta, Reddy, or Pham were personally involved in the negotiation of Case-Mate's license agreement with Coach. Instead, Vinci's allegations as to Mehta, Reddy, and Pham in its proposed amended answer all involve those individuals assessing the due diligence of Vinci's assets. ECF No. 207-2 at Counterclaims ¶¶ 107, 110-11, 114, 139-40. More specifically, Vinci alleges that Mehta, Reddy, and Pham used the information they obtained through due diligence of Vinci to lowball Case-Mate's offer to purchase Vinci's assets. Id. at Counterclaims ¶ 129. Regardless, even if Mehta, Pham, and Reddy had attended the April 2023 meeting and were involved in the negotiation of the license that followed that meeting, the meeting and the negotiations with *Kate Spade* would be insufficient to confer personal jurisdiction under C.P.L.R. § 302(a)(1) because Vinci's claims here pertain to a license agreement with *Coach*, and not Kate Spade.

In a supplemental submission to the Court (ECF No. 268), Vinci argues that Mehta, Reddy, and Pham supervised Marzio's and Roney's efforts to interfere with the Vinci-Coach License Agreement, relying on a WhatsApp conversation between Mehta, Pham, Reddy, and Marzio where those individuals allegedly discussed the Vinci-Coach License Agreement (ECF No. 268-1). But the references to Coach in the WhatsApp conversation all occurred in August 2023, *after* the license agreement between Vinci and Coach expired, and *after* Case-Mate had entered into its own license agreement with Coach. ECF No. 272 at 4. The messages in the

25

WhatsApp conversation prior to August 2023 all concern the negotiations with Kate Spade about the Kate Spade license agreement. See, e.g., ECF No. 268-1 at 3, 5, 10, 15, 21-22, 28, 31-32, 36-37, 41, 60, 66, 67, 84, 91, 100-07. And as Case-Mate points out, when the individuals involved in the conversation wanted to refer to Coach, they did so explicitly, undermining Vinci's attempt to suggest that references to Kate Spade in those communications also necessarily included an implied reference to Coach. See, e.g., id. at 63 ("Fact of the day. Brand search rank on Amazon: Coach 2,186 Kate Spade 3,365 Pelican 11,143 Casemate 194,999[.]"); id. at 111 ("First sell some [C]oach."); id. at 112 ("Focus on Coach and KS please."); id. at 124 ("[O]nce we have clarity on KS and Coach restructuring[.]"); id. at 131 ("There is a ks/coach gift exchange[.]").

Vinci also points to the fact that Pham "executed" the Case-Mate Coach license agreement, an agreement which is governed by New York law. ECF No. 268 at 2-3. Pham, who is the Chief Financial Officer of Case-Mate, signed the license agreement on behalf of Case-Mate. ECF No. 140-1 at 39. But Vinci, as Judge Schofield already determined, "is not a third-party beneficiary to that agreement and cannot enforce it." ECF No. 202 at 3. Moreover, the mere execution of an agreement, particularly where there is no indication that its execution took place in New York, is insufficient to confer personal jurisdiction under C.P.L.R. § 302(a)(1). See, e.g., Berkshire Cap. Grp., LLC v. Palmet Ventures, LLC, 307 F. App'x 479, 480 (2d Cir. 2008) (summary order) ("[B]oth this Court and the New York Court of Appeals have held that the execution of a contract in New York, by itself, is inadequate to sustain jurisdiction [under C.P.L.R. § 302(a)(1)]."); Orchard Yarn & Thread Co., Inc. v. Schaub, No. 17-CV-2477 (JMF), 2018 WL 2694433, at *1-2 (S.D.N.Y. June 5, 2018) (finding no personal jurisdiction under C.P.L.R. § 302(a)(1) over California resident where "there is no allegation that the contract was

negotiated or executed by [defendant] in New York or that she visited New York for the purpose of meeting with parties to the contract").

Finally, Vinci argues that Marzio, Mehta, Pham, and Reddy "shared in the decision making with respect to all Case-Mate decisions, including those concerning its scheme to acquire, and then leverage, the Siena loan."[9] ECF No. 268 at 4. But Vinci's reliance on the Siena loan agreement is misplaced, as it concerns Vinci's tortious interference and fraud claims. See Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 255 (S.D.N.Y. 2003) (declining to find jurisdiction under C.P.L.R. § 302(a)(1) where plaintiff's claims did not arise from loan agreement). Vinci's tortious interference claim alleges that Case-Mate interfered with the Vinci-Coach license agreement, and also interfered with Vinci's customers, suppliers, and prospective business advantage, by telling Vinci's customers that Case-Mate was the exclusive licensor of Coach products. Vinci's fraud claim also is not premised on the Siena loan agreement. There, Vinci alleges that Marzio, Mehta, Pham, and Reddy used Vinci's confidential information to assist Coach in replacing Vinci as the licensee in time for the iPhone 15 launch. Vinci also does not allege a breach of the Siena loan agreement. In short, these claims have nothing to do with the Siena loan agreement, the business transaction that would purportedly support jurisdiction under C.P.L.R. § 302(a)(1). See Wallace Church & Co., 2020 WL 4369850, at *6 (noting that even a "single purposeful transaction" in New York can establish jurisdiction "as long as the plaintiff's claims raised have a substantial relationship to the transaction") (citation and internal quotation marks omitted).

---

[9] Siena was Vinci's senior secured creditor. ECF No. 207-2 at Counterclaims ¶ 130. Case-Mate purchased Siena's debts on May 16, 2023. Id. at Counterclaims ¶¶ 134-35.

As it concerns Vinci's misappropriation of trade secrets claim, Vinci alleges that the Individual Case-Mate Defendants wrongfully obtained Vinci's confidential information to acquire Vinci's senior secured debt (the Siena loan) and wrongfully coerce Vinci to obtain a "lowball offer" for its assets. ECF No. 207-2 at Counterclaims ¶¶ 343, 370. Vinci contends that Marzio, Mehta, Pham, and Reddy were actively involved in structuring the terms of the acquisition of the Siena loan. ECF No. 268 at 3-4. But although this claim involves conduct related to the Siena loan, there is no connection to New York. Case-Mate acquired the Siena loan from Vinci, a company organized in Delaware. The confidential information underlying this claim was shared by Vinci, not a New York-based entity, with individuals at Case-Mate, a Georgia-based company. Further, the Siena loan agreement "did not cause or further the alleged misappropriation except to the extent that it was a link in the chain of events leading to the claim for which relief is sought." Balmuccino, LLC v. Starbucks Corp., No. 24-CV-6214 (KPF), 2025 WL 2695551, at *9 (S.D.N.Y. Sept. 22, 2025) (declining to find personal jurisdiction for misappropriation of trade secrets claim where "there are no allegations that tie the acts of misappropriation, beyond the discussed meeting in New York, to this forum"). Vinci points to the fact that the Siena loan is "governed by New York law" and was financed by a New York-based bank. ECF No. 268 at 2-4. But Case-Mate is not a counterparty to the Siena loan; it simply purchased the loan from Vinci. And even if Case-Mate were a party to the loan agreement, a choice of law clause alone "is not sufficient in and of itself to sustain jurisdiction" under C.P.L.R. § 302(a)(1). See Berkshire Capital Group, LLC v. Palmet Ventures, LLC, No. 06-CV-13009 (PAC), 2007 WL 2757116, at *4 (S.D.N.Y. Sept. 21, 2007), aff'd by, 307 Fed. Appx. at 479.

In sum, Vinci has not shown that the Court has personal jurisdiction over the Individual Case-Mate Defendants under C.P.L.R. § 302(a)(1).

C.P.L.R. § 302(a)(2)

Vinci also cannot establish personal jurisdiction over the Individual Case-Mate Defendants pursuant to C.P.L.R. § 302(a)(2), which confers personal jurisdiction over those who "commit[ ] a tortious act within the state." C.P.L.R. § 302(a)(2). "As the Second Circuit has explained, '[C.P.L.R.] § 302(a)(2) reaches only tortious acts performed by a defendant who was *physically present* in New York when he performed the wrongful act.'" Sigma Lithium Corp. v. Gardner, No. 23-CV-7403 (DEH), 2025 WL 1268311, at *6 (S.D.N.Y. May 1, 2025) (quoting Bensusan Rest. Corp. v. King, 126 F.3d 25, 28 (2d Cir. 1997)) (emphasis in original); accord Edwardo v. Roman Cath. Bishop of Providence, 66 F.4th 69, 75 (2d Cir. 2023); Japan Press Serv., Inc. v. Japan Press Serv., Inc., No. 11-CV-5875 (SJF) (ETB), 2013 WL 80181, at *9 (E.D.N.Y. Jan. 2, 2013) ("Since plaintiff has not alleged any tortious act committed by defendant while it was physically present in New York, Section 302(a)(2) does not confer personal jurisdiction over defendant in this action."). Here, Vinci has not plausibly alleged that any of the Individual Case-Mate Defendants committed a wrongful act while physically present in New York.

Beginning with Vinci's claims against Marzio and Roney, those claims—tortious interference with the Vinci-Coach License Agreement, tortious interference with Vinci's suppliers and customers, tortious interference with Vinci's prospective business advantage, and fraud—are premised on the negotiation and ultimate consummation of Case-Mate's license agreement with Coach. But Vinci has not alleged that Marzio or Roney took any wrongful act in furtherance of these claims in New York. First, and as already discussed, the April 2023 meeting

29

that Marzio and Roney attended was with Kate Spade and concerned a different license agreement.

Second, for each of Vinci's claims, Vinci has not adequately pled that any of the Individual Case-Mate Defendants interfered with Vinci's contractual relations while physically present in New York. Vinci itself is a limited liability company organized under the state of Delaware, and its two members are domiciled in Ohio and Florida. ECF No. 207-2 at Counterclaims ¶ 3. Vinci alleges that some of Case-Mate's sales in New York would have been sales made by Vinci but for Coach's and Case-Mate's wrongful conduct (id. at Counterclaims ¶ 16), and that some of its customers are in New York and Case-Mate wrongfully interfered with those customer relationships (id. at Counterclaims ¶¶ 186-87). But an alleged injury in New York is insufficient to confer jurisdiction pursuant C.P.L.R. § 302(a)(2). See, e.g., Bensusan Rest. Corp., 126 F.3d at 29 (declining to find personal jurisdiction because "[e]ven if [plaintiff] suffered injury in New York, that does not establish a tortious act in the state of New York within the meaning of § 302(a)(2)").

In support of its misappropriation of trade secrets claims, Vinci alleges that during the visit to New York, "Roney and Marzio wrongfully obtained from Warshaw Vinci [c]onfidential [i]nformation." ECF No. 207-2 at Counterclaims ¶ 94. But Marzio's and Roney's wrongful act was not receiving the confidential information; it was their use of Vinci's confidential information. See United Realty Advisors, LP v. Verschleiser, No. 14-CV-5903 (JGK), 2022 WL 17250107, at *2 (S.D.N.Y. Nov. 25, 2022), aff'd by, No. 22-3235, 2024 WL 4380274 (2d Cir. Oct. 3, 2024) ("Under New York law, a claim exists for trade secret misappropriation once the defendant has used the trade secret in breach of an agreement, confidence, [or] duty[.]") (internal quotation marks and citation omitted, cleaned up). And Vinci does not allege that Marzio or

Roney *used* the trade secrets or confidential information in New York. See Darby Drug Co. v. Zlotnick, 573 F. Supp. 661, 663 (E.D.N.Y. 1983) ("[W]e hold that the complaint fails to allege a tortious act within the state under § 302(a)(2) since it does not claim unauthorized use of the mailing lists by [defendant] in New York."); V Cars, LLC v. Israel Corp., 902 F. Supp. 2d 349, 365 (S.D.N.Y. 2012) (finding no jurisdiction under C.P.L.R. § 302(a)(2) where the misappropriation of trade secrets "was not committed in New York but rather in China, where the trade secret information was allegedly used in connection with the newly formed joint venture").

Vinci also alleges that "[Mehta, Reddy, and Pham] wrongfully obtained Vinci Confidential Information from the Coach Parties during no less than one such visit to New York." ECF No. 207-2 at Counterclaims ¶¶ 18, 20-21. As discussed, Mehta, Reddy, and Pham were not present at the April 2023 meeting. And Case-Mate has put forth sworn declarations from Mehta, Pham, and Reddy that they never traveled to New York for any business related to Kate Spade or Coach. ECF No. 272-2 at ¶ 4; ECF No. 272-3 at ¶ 4; ECF No. 272-4 at ¶ 4.

In short, there is no personal jurisdiction under C.P.L.R. § 302(a)(2) because there are no plausible allegations that any of the Individual Case-Mate Defendants committed a wrongful act while physically in New York. See, e.g., Suber v. VVP Servs., LLC, No. 21-2649, 2023 WL 115631, at *4 (2d Cir. Jan. 10, 2023) ("Because Defendants did not commit any alleged torts *against [Plaintiff]* while Defendants were physically present in New York, section 302(a)(2) is not a basis for personal jurisdiction.") (emphasis in original); 777388 Ontario Ltd. v. Lencore Acoustics Corp., 142 F. Supp. 2d 309, 322 (E.D.N.Y. 2001) (finding no personal jurisdiction pursuant to C.P.L.R. § 302(a)(2) where "all of the activities that are alleged in connection with this [fraud] claim are alleged to have occurred outside of New York").

C.P.L.R. § 302(a)(3)

Finally, Vinci has not demonstrated that personal jurisdiction exists over the Individual Case-Mate Defendants under C.P.L.R. § 302(a)(3), which establishes personal jurisdiction over out-of-state defendants whose torts cause an in-state injury. Under that provision, personal jurisdiction is established where a defendant "commits a tortious act without the state causing injury to person or property within the state[.]" C.P.L.R. § 302(a)(3). To determine whether the injury occurred within the state, courts employ a "situs-of-injury-test to determine where the original event which caused the injury occurred." Wang v. Laview Eagle Eye Tech. Inc., No. 24-CV-1822 (NSR), 2025 WL 2371222, at *7 (S.D.N.Y. Aug. 14, 2025) (internal quotation marks and citations omitted). "Under C.P.L.R. 302(a)(3), the site of a commercial injury is not where the economic loss is felt, but where the critical events associated with the dispute took place." JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found., 828 F. App'x 740, 744 (2d Cir. 2020) (summary order) (internal quotation marks and citation omitted). "In this context, then, New York-based injury means the loss of New York-based customers or accounts or some other similar harm to in-state business." Id. (explaining that "a lost sale anywhere in the world" does not suffice to establish jurisdiction simply because the "injured company resides" in New York).

Beginning with Vinci's fraud claim against Marzio, Mehta, Reddy, and Pham, "a number of courts in the Second Circuit have determined that a plaintiff's reliance in New York on defendant's misrepresentation fixes the situs of the injury in New York." Seiden v. Schwartz, Levitsky, & Feldman LLP, No. 16-CV-5666 (RA), 2017 WL 2591785, at *4 (S.D.N.Y. June 14, 2017) (internal quotation marks and citation omitted). Here, there are no allegations that Marzio, Mehta, Reddy, or Pham made fraudulent representations to Vinci while in New York. There are also no allegations that Vinci, a company organized under the state of Delaware and with members domiciled in Ohio and Florida, relied on any alleged fraudulent representations in New

32

York. See, e.g., id. (finding no personal jurisdiction under C.P.L.R. § 302(a)(3) where plaintiff failed to allege that it relied on any misrepresentation made in New York); Aaacon Auto Transp., Inc. v. Barnes, 603 F. Supp. 1347, 1349-50 (S.D.N.Y. 1985) (finding no personal jurisdiction under C.P.L.R. § 302(a)(3) where there "is no indication whether [defendant's] allegedly fraudulent representations . . . were made to [plaintiff] in New York or whether [plaintiff] relied upon them in New York").

For Vinci's tortious interference and misappropriation of trade secrets claims, courts have "generally linked the injury to the place where sales or customers are lost." JAPNA, Inc. v. SELFX Innovations Inc., No. 22-CV-10753 (ALC) (RWL), 2024 WL 1250269, at *5 (S.D.N.Y. Mar. 22, 2024) (citation omitted); JCorps Int'l, Inc., 828 F. App'x at 745-46 (considering lost customers or business in New York for establishing jurisdiction under § 302(a)(3) for claim of misappropriation of proprietary information). "Numerous Federal courts applying the [C.P.L.R.] have likewise held that, lost sales or customers can satisfy the 'injury within New York' requirement under [C.P.L.R. § 302(a)(3)], but those lost sales must be in the New York market, and those lost customers must be New York customers." Park W. Galleries, Inc. v. Franks, No. 12-CV-3007 (CM), 2012 WL 2367040, at *4 (S.D.N.Y. June 20, 2012) (quoting Darby Trading Inc. v. Shell Intern. Trading and Shipping Co. Ltd., 568 F. Supp. 2d 329, 336-37 (S.D.N.Y. 2008)). "Alleging *specific* lost sales or lost customers [that are] within the New York market establishes injury for purposes of § 302(a)(3)." Cont'l Indus. Grp., Inc. v. Mehmet Altunkilic, No. 14-CV-790 (AT), 2016 WL 11796844, *7 (S.D.N.Y. Apr. 6, 2016) (internal quotation marks and citation omitted, emphasis added). "[A] lack of specificity" as to the lost customers or sales will "render[ ] the[ ] conclusory allegations futile." JCorps Int'l, Inc., 828 F. App'x at 745 (citation omitted). Simply put, "both the identity of and importance of the lost New York

33

participants are key components of the C.P.L.R. 302(a)(3) analysis." Id. "Conclusory allegations that a plaintiff 'lost potential sales and customers in New York' are not enough to plead adequately that defendant caused injury to plaintiff within the state as § 302(a)(3) requires." Casper Sleep Inc. v. Level Sleep LLC, No. 18-CV-10863 (DAB), 2019 WL 8333741, at *3 (S.D.N.Y. Nov. 7, 2019) (quoting Indelible Media Corp. v. Meat & Potatoes, Inc., No. 12-CV-0978 (GBD), 2012 WL 3893523, at *5 (S.D.N.Y. Sept. 7, 2012)).

For example, courts have found personal jurisdiction under C.P.L.R. § 302(a)(3) where plaintiff provided "extensive examples" regarding defendant's tortious interference through a "cyber-smear campaign," which "cause[d] thirty-four of [p]laintiff's customers in New York to breach their agreements with [p]laintiff by, for example, demanding refunds for paintings already purchased." Park W. Galleries, Inc., 2012 WL 2367040, at *1, 4. As another example, a court found personal jurisdiction under C.P.L.R. § 302(a)(3) where the plaintiff alleged that the individual defendant "direct[ed] at least one New York-based customer to remit payment to [another defendant] and a different New York-based individual to return a fabricated work to [the other defendant], rather than [plaintiff], [which] caused a tortious injury in New York." LaChapelle v. Torres, 1 F. Supp. 3d 163, 172-73 (S.D.N.Y. 2014). And courts have found personal jurisdiction under C.P.L.R. § 302(a)(3) for claims of tortious interference and misappropriation of confidential information, where although plaintiff did not work on the third-party's New York-based site, they saw those sites "as prospective business opportunities from a long-time customer." Am. Integrated Sec. Grp., Inc. v. Terra Sound Tech. LLC, No. 22-CV-2773 (AMD) (MMH), 2023 WL 6308014, at *2 (E.D.N.Y. Sept. 28, 2023) (internal quotation marks omitted). To support that there was a New York based injury, "[plaintiff] specifically allege[d]

34

how its New York business was threatened, supported by declarations about [its customer's] New York operations[.]" Id. at *7.

Vinci alleges that "[s]ome of Case-Mate's sales in New York would have been sales made by Vinci but for Coach and Case-Mate's wrongful conduct." ECF No. 207-2 at Counterclaims ¶ 16. But Vinci does not identify specific New York sales that it lost to Case-Mate. JCorps Int'l, Inc., 828 F. App'x at 745 (affirming district court's finding of no jurisdiction under C.P.L.R. § 302(a)(3) because allegation that defendants "used information stolen from [plaintiff] to target [plaintiff's participants] in New York" was conclusory) (internal quotation marks omitted); Indelible Media Corp., 2012 WL 3893523, at *5 (finding no jurisdiction under C.P.L.R. § 302(a)(3) because allegation that plaintiff "lost potential sales and customers in New York" was conclusory).

Additionally, Vinci alleges that Case-Mate "threatened suppliers and customers with legal repercussions if they continued to work with Vinci," and that "[m]any such Vinci[ ] customers, including but not limited to Verizon Communications Inc., maintain their principal offices in New York State." ECF No. 207-2 at Counterclaims ¶¶ 186-87. But Vinci does not allege that it lost Verizon as a customer to Case-Mate. Nor does Vinci identify another New York customer it allegedly lost to Case-Mate. Additionally, Vinci does not allege that Marzio, Roney, Mehta, Reddy, or Pham had any involvement with the communication to Verizon or any other Vinci customer. See JCorps Int'l, Inc., 828 F. App'x at 744 (affirming district court's finding of lack of personal jurisdiction under CPLR § 302(a)(3) where plaintiff did not "indicate *how* the [d]efendants' actions caused [plaintiff] to lose those New York-based participants, *who* those participants were, *when* the harm occurred, the *significance* of those participants to [plaintiff's] operations, or even *why* this New York-based harm would have been foreseeable to

35

[d]efendants at all") (emphasis in original); Wise/Contact US Optical Corp. v. Ifcher, No. 92-CV-4312 (PNL), 1993 WL 258708, at *3 (S.D.N.Y. July 7, 1993) (concluding that "plaintiff has not made a showing of injury in New York State sufficient to sustain jurisdiction under New York [C.P.L.R.] § 302(a)(3)" where plaintiff "makes no allegations, for example, that [defendants] have solicited specific customers of [plaintiff]" and "although plaintiff alleges that [defendant] is now selling to two [of plaintiff's] customers, plaintiff has not made any showing that these sales have caused it injury or that solicitation by [defendant] is responsible for these sales"); Elcan Indus., Inc. v. Cuccolini, S.R.L., No. 13-CV-4058 (GBD) (DF), 2014 WL 1173343, at *6 (S.D.N.Y. Mar. 21, 2014) (finding "[p]laintiff has not alleged that it suffered any cognizable injury in New York giving rise to jurisdiction over [defendants] under [C.P.L.R.] § 302(a)(3)" where plaintiff alleged that defendants "injured the relationships between [plaintiff] and [its] customers by causing those customers to withdraw their business from [plaintiff]") (internal quotation marks and citation omitted); Homeschool Buyers Club, Inc. v. Brave Writer, LLC, No. 19-CV-6046 (VSB), 2020 WL 1166053, at *6 (S.D.N.Y. Mar. 11, 2020) (declining to find personal jurisdiction where plaintiff alleges "a belief that its customer base is in jeopardy" because "more substantiated and specific allegations of injury are required to exercise personal jurisdiction under section 302(a)(3)").

Having failed to establish that these out-of-state defendants caused an in-state injury, Vinci has not demonstrated that the Court has jurisdiction under C.P.L.R. § 302(a)(3). See Paterno v. Laser Spine Inst., 112 A.D.3d 34, 44 (2d Dep't 2013), aff'd, 24 N.Y.3d 370 (2014) (explaining that because "the injury did not occur in New York, it is not necessary to consider the additional criteria of CPLR 302(a)(3)(i) and (ii)"). Consequently, because Vinci has not alleged the existence of personal jurisdiction over the Individual Case-Mate Defendants, any

claims against those individuals is futile. Any dismissal, however, is without prejudice. Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 126 (2d Cir. 2022) ("A dismissal for lack of jurisdiction must be without prejudice rather than with prejudice.") (citation omitted).

2. *Counterclaim 4: Case-Mate's Tortious Interference with the Vinci-Coach License Agreement*

To state a claim of tortious interference with contract, a party must allege "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (internal quotation marks and citation omitted).

Vinci bases its tortious interference claim on four actions by Case-Mate: (1) inducing Coach to inform Vinci's suppliers and customers that Vinci had breached the Vinci-Coach License Agreement (ECF No. 207-2 at Counterclaims ¶ 227); (2) inducing Coach to tell Vinci's customers that Case-Mate was the "exclusive" authorized licensee for Coach (id. at Counterclaims ¶ 228); (3) inducing Coach to interfere with Vinci's vendors by sending Vinci's trade secrets to Coach (id. at Counterclaims ¶ 229); and (4) inducing Coach to disclose Vinci's trade secrets to Case-Mate (id. at Counterclaims ¶ 230).

Case-Mate argues that Vinci has not alleged that Case-Mate knew the specific terms of the Vinci-Coach License Agreement. ECF No. 225 at 16-17. A defendant must "have some knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required." Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc., No. 20-CV-78 (PAE), 2021 WL 1199430, at *8 (S.D.N.Y. Mar. 30, 2021) (citation omitted). Vinci alleges that Marzio received the Vinci-Coach License Agreement on May 17, 2023 (ECF No.

207-2 at Counterclaims ¶ 112), and that "Case-Mate insisted that Coach not permit Vinci to fully exercise its rights under the License Agreement to produce and sell certain Coach merchandise even after the expiration of Vinci's License Agreement" (id. at Counterclaims ¶ 180). This is sufficient to allege that Case-Mate knew of Vinci's post-termination rights under the license agreement. See, e.g., SLS Brands, LLC v. Authentic Brands Grp., LLC, No. 19-CV-8115 (JPO), 2021 WL 396641, at *3 (S.D.N.Y. Feb. 4, 2021) (finding it "plausible to infer" that third party had some knowledge of agreement, "given that it was actively working alongside [defendants] to replace [plaintiff]"); State St. Glob. Advisors Tr. Co. v. Visbal, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020) (holding knowledge requirement met where e-mail suggested that defendant reviewed agreement containing provision that was breached).

Case-Mate argues that Vinci has not plausibly alleged that Coach breached the Vinci-Coach License Agreement. ECF No. 225 at 16. But Judge Schofield already determined that Vinci had sufficiently pled breach of the license agreement by Coach. ECF No. 215 at 6-7. Additionally, Vinci has pending claims against Case-Mate in the Vinci Action, including (as relevant here) tortious interference with the Vinci-Coach License Agreement (Vinci Action, ECF No. 568 at ¶¶ 375-85), breach of the Confidentiality Agreements (id. at ¶¶ 414-23), tortious interference with Vinci's contracts (id. at ¶¶ 434-43), tortious interference with prospective business advantage (id. at ¶¶ 454-63), and fraud (id. at ¶¶ 464-70). Case-Mate did not move to dismiss the claims in the Vinci Action, choosing instead to answer Vinci's claims. See Vinci Action, ECF No. 766.

In sum, Vinci has adequately pled a tortious interference claim against Case-Mate based on the Vinci-Coach License Agreement.

3. *Counterclaim 4: Individual Case-Mate Defendants' Tortious Interference with the Vinci-Coach License Agreement*

For the reasons discussed above, there is no personal jurisdiction over the Individual Case-Mate Defendants. However, in the interest of completeness, I address whether Vinci's claims against the Individual Case-Mate Defendants are futile.[10]

As discussed, to plead a claim for tortious interference with contract, Vinci must allege that the individual defendants had knowledge of Vinci-Coach License Agreement, and the individual defendants intentionally procured breach of the contract without justification. Kirch, 449 F.3d at 401 (2d Cir. 2006). However, "[a] corporate director or officer may be only held liable for tortious interference with contract where he or she acts for personal, rather than the corporate interests." Fifth App, LLC v. Alpha Modus Ventures, LLC, No. 22-CV-06607 (DG) (PK), 2024 WL 4145225, at *13 (E.D.N.Y. Aug. 29, 2024) (internal quotation marks and citation omitted); Craig v. First Web Bill, Inc., No. 04-CV-1012 (DGT), 2004 WL 2700128, at *10 (E.D.N.Y. Nov. 29, 2004) (declining to find individual defendant liable for tortious interference where "there is no indication that such action furthered any personal interest of [defendant] himself"). "New York courts have construed personal gain to mean that the challenged acts were undertaken with malice and were calculated to impair the plaintiff's business for the personal profit of the individual defendant." Id. (internal quotation marks, alterations, and citation omitted). "Such claims are subject to a heightened pleading standard, which requires that a complaint contain allegations that the acts of the corporate officers or directors were done with the motive for personal gain as distinguished from gain to their corporations, and that the acts

---

[10] Case-Mate does not argue that Vinci's amended counterclaims as they concern the Individual Case-Mate Defendants are futile. Instead, Case-Mate has only a general argument that Vinci engaged in improper group pleading for its fraud claim. See ECF No. 225 at 16-18.

were performed with malice and calculated to impair the plaintiff's business for the defendant's profit." Id. (internal quotation marks, alterations, and citation omitted). Here, Vinci has not alleged that any of the Individual Case-Mate Defendants acted for personal gain.

All of the Individual Case-Mate Defendants are corporate officers. ECF No. 207-2 at Counterclaims ¶¶ 8-11 (alleging Mehta, Marzio, Reddy, and Pham are principals of Case-Mate); Vinci Action, ECF No. 568 at ¶ 119 (noting Roney is Vice President of Business Development at Case-Mate); see also VR Optics, LLC v. Peloton Interactive, Inc., No. 16-CV-6392 (JPO), 2017 WL 3600427, at *6 (S.D.N.Y. Aug. 18, 2017) (analyzing whether principals of company were shielded by corporate officer immunity); In re JWP Inc. Sec. Litig., 928 F. Supp. 1239, 1263 (S.D.N.Y. 1996), as clarified (June 12, 1996) (analyzing whether company's executive vice president was not immune from liability as a corporate officer).

In its proposed amended answer, Vinci does not allege that any Individual Case-Mate Defendant interfered with the Vinci-Coach license agreement for personal, rather than corporate, interests. Instead, in a letter to the Court, Vinci states that "Pham, Mehta, Marzio, and Reddy, as Case-Mate equity holders, were undoubtedly motivated by personal gain by virtue of their equity interests in, and distributions from, Case-Mate." ECF No. 247 at 8. As an initial matter, this contention is silent as to Roney, and in any case, it cannot be considered because it is not in Vinci's pleading. See, e.g. Suarez v. New York City Dep't of Hum. Res. Admin., No. 09-CV-8417 (WHP), 2011 WL 1405041, at *7 (S.D.N.Y. Mar. 24, 2011) ("The Court will not consider allegations outside the Complaint.").

Regardless, even if examined, the allegation that Pham, Mehta, Marzio, and Reddy were motivated by their equity interest in Case-Mate is insufficient to plausibly allege that they acted out of their own personal gain. In cases where courts have found that an officer acted out of their

own personal gain, exposing them to liability for tortious interference, the officer's financial interests diverted from those of the corporation and the officer was directly benefited as a result. See, e.g., Clean Coal Techs., Inc. v. Leidos, Inc., 377 F. Supp. 3d 303, 321 (S.D.N.Y. 2019) (finding corporate officer not shielded from liability where officer "chose to sabotage the [agreement] in the face of [plaintiff's] refusal to provide releases for his restricted stock or to provide him a $70,000 payment"); Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc., No. 16-CV-470 (ADS) (AYS), 2016 WL 6238528, at *11 (E.D.N.Y. Oct. 24, 2016) (finding complaint stated plausible tortious interference claim where CEO removed transfer agent in violation of promissory note and complaint alleged that CEO was "driven by a desire to preserve the value of his own personal assets" and "not for the benefit of [the borrower]") (internal citations omitted); Island Two LLC v. Island One, Inc., No. 13-CV-02121 (LGS), 2013 WL 5380216, at *3 (S.D.N.Y. Sept. 26, 2013) (finding individual defendant, who was the officer of both defendant company and principal member of another company, not immune from liability as an officer where he sought "to personally profit by gaining the Advisor Fee for his company" by inducing the other company to breach agreement); Friedman v. Wahrsager, 848 F. Supp. 2d 278, 298 (E.D.N.Y. 2012) (officers were not immune from liability for tortious interference claim when they "used their position as officers of [one company] to diminish the customer and revenue base of that company in an effort to bolster the profit of their own company"); Cohen v. Davis, 926 F. Supp. 399, 405 (S.D.N.Y. 1996) (individual defendants not shielded where plaintiff "claims that the defendants caused her termination to serve their own self-interest because they wanted to prevent her from revealing possible financial improprieties"); cf. Hirsch v. Food Res., Inc., 24 A.D.3d 293, 296-97 (1st Dep't 2005) (dismissing tortious interference claim against corporate officer because "as holder of 83 ⅓ % of [defendant corporation's] shares, he was also acting as

an owner with an economic interest; absent allegations of malice or fraudulent or illegal means, no liability lies against him").

Thus, even if Vinci's contention concerning the equity interest of these individuals was in the proposed amended answer, it would not save the claim as against Pham, Mehta, Reddy, and Marzio. And as to Roney, Vinci's evidence does not suggest that she also received a distribution from Case-Mate. There thus is no evidence of any personal gain as to her.

Additionally, as it concerns Mehta, Pham, and Reddy, even if they were not shielded from liability by virtue of their roles as corporate officers, Vinci has not alleged that any of these individuals took any action to induce a breach of the Coach-Vinci License Agreement. Vinci does not allege that Mehta, Pham, and Reddy were involved in the negotiations of the License Agreement between Coach and Case-Mate (like Marzio and Roney), and Vinci does not allege that they took actions, such as sending confidential information to Coach, that led to Coach's breach of the License Agreement (as they allege with Marzio and Roney). See, e.g., Vekaria v. Mthree Corp. Consulting, Ltd., No. 22-CV-3197 (JPC), 2024 WL 4337542, at *14 (S.D.N.Y. Sept. 27, 2024) (dismissing tortious interference claim as to certain defendants where plaintiff made no "plausible indication as to what direct actions these parties took to interfere with the [relevant agreement] and how any such interference was the but-for cause of [party to the agreement's] alleged breach"); Four Finger Art Factory, Inc. v. Dinicola, No. 99-CV-1259 (JGK), 2000 WL 145466, at *6 (S.D.N.Y. Feb. 9, 2000) (dismissing a tortious interference claim where the complaint contained "no specific allegations of actions taken by any specific defendant that caused the breach of the . . . contract").

In short, even if the Court has personal jurisdiction over the Individual Case-Mate Defendants, Vinci has not plausibly alleged a claim of tortious interference with the Vinci-Coach License Agreement.

4. *Counterclaims 5 and 7: Coach's and Case-Mate's Tortious Interference with Vinci's Contracts with its Customers and Suppliers*

Vinci also asserts a tortious interference claim against Coach and Case-Mate for their alleged interference with Vinci's contracts with its customers and suppliers. As it concerns Coach, Vinci alleges that Coach interfered with Vinci's contracts with its suppliers and customers by disseminating false information about Vinci's authority and ability to produce and sell Coach-branded merchandise. ECF No. 207-2 at Counterclaims ¶ 268. Coach and Kate Spade are owned by the same parent, Tapestry, Inc., making them "sibling brands." Fed. Trade Comm'n v. Tapestry, Inc., 755 F. Supp. 3d 386, 477 (S.D.N.Y. 2024); see also ECF No. 207-2 at Counterclaims ¶ 51 (noting Tapestry is the parent company of Coach). And in the related Kate Spade Action commenced by Vinci, Vinci asserted a nearly identical tortious interference with contract claim against Kate Spade based on nearly identical factual allegations involving Kate Spade, Coach's sister corporation. Compare Vinci Action, ECF No. 568 at ¶¶ 424-433 with ECF No. 207-2 at Counterclaims ¶¶ 265-76. In that case, the Court determined that Vinci's allegations adequately asserted a tortious interference claim. Vinci Action, ECF No. 920 at 13-15. And the allegations concerning Kate Spade's communications with Vinci's customers in that Related Action are nearly identical to the allegations asserted here involving Coach. Compare Vinci Action, ECF No. 568 at ¶ 260 with ECF No. 207-2 at Counterclaims ¶¶ 172-73. Thus, the same result follows here.

Coach nevertheless argues that Vinci has not identified specific communications or specific suppliers or contracts that Coach allegedly interfered with. ECF No. 220 at 16. Both

arguments are belied by the allegations in the proposed amended answer. First, the amended answer identifies specific communications by Coach that underlie this claim. Vinci points to a July 25, 2023 letter of authorization from Coach, which Vinci alleges was sent to its suppliers and caused them not to complete Vinci's orders. ECF No. 207-2 at Counterclaims ¶¶ 172, 175. Second, Vinci has identified retailers and distributors who cancelled their orders, including SoftBank Corp., FOX.Inc, Pacificomm, CellnetNZ, Best Buy Canada, Dongguan Salmon Electronic Technology Co., Ltd., and Chunlam Group Co., Ltd. Id. at Counterclaims ¶¶ 169, 188; cf. Flash Elecs., Inc. v. Universal Music & Video Distribution Corp., 312 F. Supp. 2d 379, 406 (E.D.N.Y. 2004) (dismissing tortious interference claim where plaintiff provided "no information about the identity of *any* of these retailer-customers and . . . no sense of how many of them terminated their contracts") (emphasis added).

Coach also argues that Vinci has not "plausibly establish[ed]" that Coach "purposefully induced any actual breach of a specific contract with Vinci" and that Vinci has not demonstrated that the breach would have occurred but-for Coach's conduct. ECF No. 220 at 18. But Vinci has done both. Vinci alleges that as of June 30, 2023, Vinci had "written orders from retailers and distributors for Coach-branded phone accessories including orders to be sold as part of the Fall 2023 new iPhone 15 launch." ECF No. 207-2 at Counterclaims ¶ 169. Vinci alleges that it worked with Coach to prepare for the iPhone 15 launch (id. at Counterclaims ¶ 60), receiving written orders from customers and placing orders with suppliers (id. at Counterclaims ¶ 61), and that "Coach itself had submitted written orders to Vinci for Coach-branded photo accessories" (id. at Counterclaims ¶ 170). Despite this, Vinci alleges that Coach's July 25, 2023 communication "informed all of Vinci's suppliers and customers" that they could not fulfill orders other than those "expressly authorized in writing by Coach." Id. at Counterclaims ¶ 173.

44

Because of this interference, "Vinci was unable to complete written customer orders and produce and [sic] in-process orders [from] suppliers." Id. at Counterclaims ¶ 175. Vinci alleges that had it known that Coach was negotiating with Case-Mate, Vinci would not have expended resources in preparing and soliciting orders for the iPhone 15 launch. Id. at Counterclaims ¶¶ 61-62.

Coach also argues that Vinci has failed to specifically plead whether the written orders with its customers were non-cancelable. ECF No. 220 at 16-17. Parties have been allowed to pursue claims based on cancelable contracts "where the defendants used wrongful conduct, like fraudulent representations or threats, in order to procure the third party's breach." GateGuard, Inc. v. Amazon.com Inc., No. 21-CV-9321 (JGK), 2023 WL 2051739, at *10 (S.D.N.Y. Feb. 16, 2023) (internal quotation marks and citation omitted). Vinci alleges such wrongful conduct here, by asserting that Coach told Vinci's suppliers, customers, and distributors that as of June 30, 2023, Vinci no longer had the right to sell or complete manufacturing of Coach merchandise, despite Vinci having such a right. ECF No. 207-2 at Counterclaims ¶¶ 171-75.

In any event, whether the orders were noncancelable is a defense Coach and Case-Mate can raise, but it is not a basis to conclude at the pleading stage that the claims are futile. Mediterranean Shipping Co., (USA) v. Scanfreight Lines, Inc., No. 98-CV-6852 (KNF), 2000 WL 1159283, at *3 (S.D.N.Y. Aug. 15, 2000) ("On a motion for leave to amend, the court need not finally determine the merits of a proposed claim or defense, but merely satisfy itself that it is colorable and not frivolous.") (citation omitted); see also Neat-N-Tidy Co. v. Tradepower (Holdings) Ltd., No. 91-CV-51 (SWK), 1993 WL 179109, at *5 n.4 (S.D.N.Y. May 24, 1993).

Coach and Case-Mate also argue that their conduct was justified to protect their economic interests. ECF No. 220 at 18-19, 21; ECF No. 126 at 17-19. Specifically, Case-Mate argues that it acted "in furtherance of its legitimate business interests by notifying customers and

suppliers" that it now had the exclusive license to sell Coach products. ECF No. 126 at 17. Vinci alleges that Case-Mate sent dozens of communications to Vinci's customers and suppliers informing them that Case-Mate was now an exclusive licensee to manufacture and produce Coach products in June 2023. ECF No. 207-2 at Counterclaims ¶ 178. At that time, Vinci alleges that it remained the licensee for Coach products, and Case-Mate did not have a license agreement with Coach. Id. at Counterclaims ¶ 179. Case-Mate knew that Vinci had a license to supply such products but nonetheless pushed Coach to prevent Vinci from exercising its post-termination rights under the license agreement. Id. at Counterclaims ¶¶ 180-81. Coach, for its part, claims that "any communications to the marketplace that Vinci no longer had the right to exploit Coach's trademarks were manifestly justifiable to protect Coach's intellectual property rights." ECF No. 220 at 19. But this justification argument is a defense that "create[s] factual disputes that are not appropriate" when determining futility. Total Asset Recovery Servs. v. Huddleston Cap. Partners VIII LLC, No. 21-CV-2466 (ALC), 2022 WL 1052683, at *5 n.6 (S.D.N.Y. Apr. 4, 2022).

Finally, Vinci alleges that Case-Mate induced Vinci's customers and suppliers to breach their contracts with Vinci by using Vinci's customer lists and database of written orders to contact vendors to "appropriate[e] those vendors and solicit[ ] information from them," as well as telling Vinci suppliers and customers that Vinci could not fulfill their orders, "pressuring" Vinci's suppliers and customers to stop working with Vinci. ECF No. 207-2 at Counterclaims ¶¶ 150, 180-82, 186, 190, 193-94. Case-Mate argues that Vinci has not alleged that Case-Mate knew the specific terms of Vinci's contracts with its suppliers and customers or the specific contractual terms those suppliers and customers breached. ECF No. 126 at 17. Coach similarly argues that "at no point does Vinci allege that any one of those entities breached a specific

46

contractual term." ECF No. 220 at 16. But Vinci is "not required to prove that [Case-Mate or Coach] had perfect or precise knowledge of the terms and conditions of the contracts in issue;" Vinci need only show that Case-Mate and Coach had "knowledge of the *existence* of the contract[.]" See Don King Prods., Inc. v. Douglas, 742 F. Supp. 741, 775 (S.D.N.Y.), on reargument, 742 F. Supp. 786 (S.D.N.Y. 1990) (internal quotation marks, citations, and alterations omitted) (emphasis in original). Vinci alleges such knowledge. Vinci contends that Case-Mate had Vinci's list of vendors, as well as Vinci's database of written orders from those vendors. ECF No. 207-2 at Counterclaims ¶¶ 148-50, 194. Vinci also alleges that Coach was soliciting Vinci's customer and supplier contacts through June 8, 2023 (id. at Counterclaims ¶ 100), and that Coach received Vinci's schedule of "inventory in process" by August 22, 2023 (id. at Counterclaims ¶ 168). Thus, Vinci has alleged that Case-Mate and Coach knew that Vinci's customers and suppliers were in contractual relationships with Vinci involving Vinci's license agreement with Coach.

For these reasons, Vinci has plausibly alleged a tortious interference claim against Coach and Case-Mate.

5. *Counterclaim 5: Individual Case-Mate Defendants' Tortious Interference with Vinci's Supplier and Customer Contracts*

Vinci alleges that the Individual Case-Mate Defendants "had knowledge of Vinci's contracts with its suppliers and customers (retailers and distributors)" and that the Individual Case-Mate Defendants induced Vinci's suppliers and customers to breach their contracts by falsely informing Vinci customers by letter dated July 25, 2023, that Case-Mate was the exclusive authorized licensee. ECF No. 207-2 at Counterclaims ¶¶ 238, 240-241. Because this tortious interference claim is another species of Vinci's tortious interference with contract claim in Counterclaim 4, here too, the Individual Case-Mate Defendants are shielded from liability as

47

corporate officers. Thus, even if the Court had personal jurisdiction, Vinci has not plausibly alleged a claim as to them.

6. *Counterclaims 6, 8, and 9: Coach's, Case-Mate's, and Individual Coach and Case-Mate Defendants' Tortious Interference with Vinci's Prospective Business Advantage*

"To prevail on a claim for tortious interference with business relations, [Vinci] must establish that (1) [it] had a business relationship with a third party; (2) the [Defendants] knew of that relationship and intentionally interfered with it; (3) the [defendants] conduct amounted to 'wrongful means;' and (4) the interference caused injury to the business relationship." Semple v. Eyeblaster, Inc., No. 08-CV-9004 (HB), 2009 WL 2709281, at *3 (S.D.N.Y. Aug. 27, 2009). "The defendant must target some activities toward the third party and convince the third party not to enter into a business relationship with the plaintiff." In re Refco Inc. Sec. Litig., 826 F. Supp. 2d 478, 520 (S.D.N.Y. 2011). "[T]he wrongful conduct that is relevant is that which was directed not at the plaintiff, but at the third party with whom plaintiff has or seeks to have a relationship." Appel v. Schoeman Updike Kaufman Stern & Ascher L.L.P., No. 14-CV-2065 (AJN), 2015 WL 13654007, at *9 (S.D.N.Y. Mar. 26, 2015) (alteration and citation omitted); see also Valley Lane Indus. Co. v. Victoria's Secret Direct Brand, 455 Fed. App'x 102, 107 (2d Cir. 2012) (explaining that plaintiff had failed to allege a tortious interference with prospective business advantage claim because even if conduct was tortious, it was directed at plaintiff and thus plaintiff had not alleged that the tortious conduct "proximately caused [third party] to sever its business relationship with [plaintiff]").

"As a general rule, a defendant may be liable for interference with prospective business relations by wrongful means only where the conduct at issue amount[s] to a crime or an independent tort." GateGuard, Inc., 2023 WL 2051739, at *11 (quoting Stuart's, LLC v.

48

Edelman, 152 N.Y.S.3d 472, 476 (App. Div. 2021)) (internal quotation marks omitted, alteration in original); see also Carvel Corp. v. Noonan, 350 F.3d 6, 19 (2d Cir. 2003) (discussing requirement of "wrongful means"). "Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." Ray Legal Consulting Grp. v. DiJoseph, 37 F. Supp. 3d 704, 720 (S.D.N.Y. 2014). "There is a 'narrow' exception to this requirement, which applies when the defendant's conduct was not independently objectionable, but the defendant still acted wrongfully, 'for the sole purpose of inflicting intentional harm on plaintiffs.'" Panini Am., Inc. v. Fanatics, Inc., No. 23-CV-9714 (LTS) (VF), 2025 WL 753954, at 14 (S.D.N.Y. Mar. 10, 2025) (quoting 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015)); accord Valley Lane Indus., 455 Fed. App'x at 106. "When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown[.]" Panini Am., Inc., 2025 WL 753954, at *14 (emphasis and alterations in original); see also Friedman v. Coldwater Creek, Inc., 321 Fed. App'x 58, 60 (2d Cir. 2009) ("The New York Court of Appeals has never held that any misrepresentation to a third party is sufficient to sustain a claim for tortious interference with prospective economic relations.").

Coach and Case-Mate argue that Vinci has not sufficiently alleged that their actions were malicious or improper. ECF No. 220 at 20-22; ECF No. 126 at 18-19. In its reply brief, Vinci did not specifically respond to this argument, arguing generally that it had adequately pled all of its tortious interference claims. See ECF No. 235 at 15-16.

Vinci alleges that Case-Mate and Coach misappropriated Vinci's trade secrets and that Case-Mate also obtained Vinci's confidential information through fraudulent means. ECF No. 207-2 at Counterclaims ¶¶ 317-372, 383-406. Even if these allegations suffice to establish that

49

Coach and Case-Mate committed independent torts as is necessary to adequately allege "wrongful means," the wrongful conduct was not directed at Vinci's customers or suppliers.[11] See Valley Lane, 455 Fed. App'x at 106-07 (explaining that the alleged tortious conduct must be directed at the third party for the plaintiff to adequately plead that the wrongful means "proximately caused" the third party to sever its business relationship with the plaintiff).

To be sure, Vinci alleges that Coach communicated with Vinci's customers and suppliers. Vinci alleges that Coach issued a letter of authorization, "falsely" informing Vinci's customers and suppliers that Case-Mate was the exclusive authorized licensee. ECF No. 207-2 at Counterclaims ¶¶ 172-175. Vinci also alleges that Case-Mate communicated with Vinci's customers and suppliers, telling them that Case-Mate had signed an exclusive license at a time when Vinci was still the Coach licensee. Id. at Counterclaims ¶¶ 178-179. But these allegations form the basis for Vinci's counterclaims in Counts 5 and 7 for tortious inference with Vinci's clients and customers. They do not form the basis for the independent torts of misappropriation of trade secrets or fraud, both of which are based on Coach's and Case-Mate's theft of Vinci's trade secrets and the use of those trade secrets to assist Case-Mate in replacing Vinci and

---

[11] The independent tort necessary for this claim of tortious inference with prospective business advantage cannot be Vinci's other tortious interference claims, based on the Coach license agreement and the interference with Vinci's customers and suppliers. See Panini Am., Inc., 2025 WL 753954, at 15 n.12 ("While tortious interference claims may be pleaded in the alternative, [defendant's] alleged tortious interference with contract cannot also provide the basis for the 'wrongful means' necessary to state viable a claim for tortious interference with business relations, because a 'plaintiff may not recover on both claims.'") (citation omitted). Further, all of Vinci's allegations concerning the conduct underlying the claims for fraud and misappropriation of trade secrets point to Coach and Case-Mate having acted out of their own economic self-interest, suggesting that these torts may not suffice to establish wrongful means. See id. at 15 (concluding that complaint "does not allege facts suggesting that [defendant] interfered with [plaintiff's] relationships solely to harm [plaintiff]" rather than because defendant was acting out of "'normal economic self-interest'").

50

meeting the deadline for the iPhone launch. As to Vinci's trade secrets and fraud claims, Vinci makes no allegations that Case-Mate or Coach directed their conduct—the alleged tort—at Vinci's customers or suppliers. See Ray Legal Consulting Grp., 37 F. Supp. 3d at 719-21 (finding that tortious interference with prospective business relations was not adequately pled where complaint did not allege that defendants "acted solely out of malice" and even if allegations were sufficient, the conduct did not injure plaintiff's relationship with third party).

The same conclusion follows for the individual defendants. The only allegation involving an individual communicating with a customer or supplier is Vinci's allegation that a Case-Mate employee, who is not a named defendant, had a WhatsApp conversation with a former Vinci Vendor. ECF No. 207-2 at Counterclaims ¶¶ 150-51, 196-97. Vinci's allegations of communications with customers and suppliers all concern "Case-Mate" and "Coach" generally. See, e.g., id. at Counterclaims ¶ 148 ("Case-Mate used Vinci's customer lists and database of written orders for the purposes of inducing breaches of contract"); id. at Counterclaims ¶¶ 172-73 ("Coach issued a 'letter of authorization,' falsely stating that Case-[M]ate was the 'exclusive' authorized licensee for Coach" to Vinci's customers and suppliers); id. at Counterclaims ¶ 178 ("Case[-M]ate issued dozens of communications to Vinci's customers and suppliers that it has signed an 'exclusive license' to manufacture and produce Coach products."); id. at Counterclaims ¶ 186 ("Case-Mate also threatened suppliers and customers with legal repercussions if they continued to work with Vinci.").[12] There are no allegations that Warshaw, de Lagarde, Mehta, Pham, Reddy, Roney, or Marzio, even if they each engaged in an

---

[12] Vinci alleges that Warshaw and de Lagarde "conspired with the Case-Mate Parties to falsely inform Vinci customers," but does not allege that either engaged in a specific, direct communication with any customer. ECF No. 207-2 at Counterclaims ¶ 228.

independent tort, directed any conduct at a third party. See Appel, 2015 WL 13654007, at *9 (dismissing claim for tortious interference with prospective business advantage where plaintiff "does not allege that [defendants] directed any conduct toward third-party prospective employers, nor does she allege in anything other than conclusory terms that they acted for a wrongful purpose or used dishonest, unfair, or improper means"); Harding v. Dorilton Cap. Advisors LLC, 635 F. Supp. 3d 286, 305–06 (S.D.N.Y. 2022) ("Plaintiff's failure to allege that [defendants] interacted with any potential [third-party] sounds the death knell to his tortious interference claim.").

Thus, Vinci's tortious interference with prospective business advantage claim is futile as it concerns all defendants.

7. *Counterclaim 10: Warshaw and de Lagarde's Tortious Interference with Vinci's Customer and Supplier Contracts*

Vinci alleges that Warshaw and de Lagarde interfered with Vinci's customer and supplier contracts by "disseminating false information about Vinci's authority and ability to produce and sell Coach-branded merchandise." ECF No. 207-2 at Counterclaims ¶ 291. Coach argues that Warshaw and de Lagarde cannot be held liable for tortious interference as officers of Kate Spade. ECF No. 220 at 14 n.7; see also ECF No. 207-2 at Counterclaims ¶ 5 (alleging de Lagarde is Kate Spade's Vice President of Licensing); Kate Spade Action, ECF No. 8 at ¶ 1 (declaration of Charlotte Warshaw stating she is the Vice President of Americas Wholesale, Global Travel Retail, and Global Licensing of Kate Spade). For the same reasons discussed as to the Individual Case-Mate Defendants (see supra at § B.3), this claim is futile as to Warshaw and de Largarde. In short, Vinci makes no non-conclusory allegation that either officer acted out of personal gain.

8. *Counterclaims 11 through 14: Coach's and Case-Mate's Misappropriation of Vinci's Trade Secrets*

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." ExpertConnect, L.L.C. v. Fowler, No. 18-CV-4828 (LGS), 2019 WL 3004161, at *3 (S.D.N.Y. July 10, 2019) (citing 18 U.S.C. § 1836(b)(1)). Because a complaint that sufficiently alleges a claim under the DTSA will generally be found to sufficiently plead misappropriation of trade secrets under New York law, Kraus USA, Inc. v. Magarik, No. 17-CV-6541 (ER), 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (citation omitted), the claims will be analyzed together.

Both Coach and Case-Mate argue that Vinci has not adequately alleged what information it claims constitutes its trade secrets. ECF No. 220 at 23; ECF No. 225 at 17. Trade secrets include all types of financial, business, and technical information if "(A) the owner [ ] has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to . . . another person who can obtain economic value from the disclosure or use of the information." Kairam v. W. Side GI, LLC, 793 F. App'x 23, 27-28 (2d Cir. 2019) (citation omitted, cleaned up). Generally, a plaintiff need only "plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." ExpertConnect, L.L.C., 2019 WL 3004161, at *4 (citation omitted). A "relatively general description" of the "general contours" of the trade secret is sufficient at the motion to dismiss stage. PRCM Advisers LLC v. Two Harbors Inv. Corp., No. 20-CV-5649 (LAK), 2021 WL 2582132, at *15 (S.D.N.Y. June 23, 2021) (internal citations omitted).

54

Vinci has pled its alleged trade secrets with sufficient specificity for the pleading stage. For example, Vinci identifies specific categories of financial information it claims constitutes a trade secret: its total sales volume of Coach-branded products for 2022; its 2022 Year Gross Margin Report; and its Netsuite trial balance report, among other things. ECF No. 207-2 at Counterclaims ¶¶ 63-67. Vinci has also identified confidential information related to its customers and suppliers as part of its trade secrets, such as "its supplier and customer lists." Id. at Counterclaims ¶ 68. And Vinci has also identified its product-related research and development, such as its design, pricing, and marketing data for its Coach-branded products. Id. at Counterclaims ¶ 71. These allegations suffice at the pleading stage to plead the existence of a trade secret. See SS&C Techs. Holdings, Inc. v. Arcesium LLC, No. 22-CV-2009 (TMR) (OTW), 2024 WL 5186530, at *7 (S.D.N.Y. Dec. 20, 2024) (concluding that plaintiff had adequately pled its trade secrets "[e]ven though plaintiff does allege a lengthy list of general categories of information" because "plaintiff provides additional detail regarding the composition and functionality of each of the items listed"). Although Coach makes specific arguments as to why each of Vinci's alleged categories of information are not trade secrets (ECF No. 220 at 23-27), "the requirement of reasonable particularity does not create a procedural device to litigate the ultimate merits of the case." Uni-Sys., LLC v. U.S. Tennis Ass'n, No. 17-CV-147 (KAM) (CLP), 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017) (internal quotation marks and citation omitted).

Case-Mate separately argues that Vinci has not pled that its trade secrets have independent economic value. ECF No. 225 at 17. "Courts in this district have viewed as sufficient allegations as to a plaintiff's investment of resources, both in developing its alleged trade secrets and maintaining their secrecy, as well as allegations as to the value and competitive

advantage of those secrets." SS&C Techs. Holdings, Inc., 2024 WL 5186530, at *4 (internal

quotation marks and citation omitted). Vinci has alleged that it has "expended millions of dollars

over many years of operations developing and refining" its confidential information, and it

further alleges that revealing certain aspects of its confidential information, such as the terms of

its license agreement with Coach, can cause it competitive harm because it allows a competitor

to induce Vinci's licensors to breach or not renew their contractual agreements with Vinci. ECF

No. 207-2 at Counterclaims ¶¶ 64-72.[13] Thus, Vinci has adequately pled a misappropriation of

trade secrets claim.

9.  *Counterclaims 11-14: The Individual Coach and Case-Mate Defendants'*
    *Misappropriation of Trade Secrets under the DTSA and Common Law*

For the reasons discussed above, Vinci has adequately pled that it possessed a trade

secret. Thus, Vinci must allege that the individual defendants misappropriated Vinci's trade

secrets. "Under New York law, misappropriation occurs when a party obtains a trade secret in

breach of an agreement, confidential relationship or duty, or as a result of discovery by improper

means. Under the DTSA, the defendant misappropriates a trade secret (1) when it acquires a

trade secret by improper means, or (2) discloses or uses the trade secret without consent."

---

[13] Case-Mate also argues that Vinci has not established that Case-Mate misappropriated Vinci's trade secrets. ECF No. 225 at 17. A defendant misappropriates a trade secret if it 1) acquires a trade secret by improper means or 2) discloses the trade secret without consent. Medidata Sols., Inc., v. Veeva Sys. Inc., No. 17-CV-589 (LGS), 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018) (citing AUA Priv. Equity Partners, LLC v. Soto, No. 17-CV-8035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018)). This includes breaching a contractual agreement not to disclose trade secrets. Broker Genius, Inc. v. Zalta, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017). Vinci's amended counterclaims are replete with allegations that Case-Mate acquired Vinci's trade secrets by improper means (ECF 207-2 at Counterclaims ¶¶ 105, 107-16, 119-28, 129-45, 147-54, 193-200), breached agreements not to disclose those trade secrets (id. at Counterclaims ¶¶ 37-42, 82-87, 103), and disclosed Vinci's trade secrets without Vinci's consent (id. at Counterclaims ¶¶ 94-100).

<u>Medidata Sol., Inc. v. Veeva Sys., Inc.</u>, No. 17-CV-589 (LGS), 2021 WL 467110, at *11 (S.D.N.Y. Feb. 9, 2021) (internal quotation marks and citations omitted). Vinci has properly stated that each of the Individual Defendants misappropriated Vinci's trade secrets either by disclosing the information without consent or by acquiring the information through improper means.

As to Warshaw, Vinci alleges that during the visit to New York, "Roney and Marzio wrongfully obtained from Warshaw Vinci Confidential Information." ECF No. 207-2 at Counterclaims ¶ 94. Vinci alleges that Warshaw "disclosed via text message" to Roney on May 16, 2023, "Vinci's total sales volume of COACH-branded products for Year 2022." <u>Id.</u> at Counterclaims ¶¶ 95, 123. Vinci alleges that on May 19, 2023, Warshaw disclosed to Roney via text message certain provisions of the Vinci-Coach License Agreement.[14] <u>Id.</u> at Counterclaims ¶¶ 96, 127. Vinci alleges that on June 7, 2023, Warshaw disclosed to Roney via text message the total amount of minimum royalties that would be owed to Vinci. <u>Id.</u> at Counterclaims ¶ 99. As to de Lagarde, Vinci alleges that on May 25, 2023, de Lagarde disclosed to Roney via e-mail Vinci's packaging design files and customer lists. <u>Id.</u> at Counterclaims ¶¶ 97-98. Vinci alleges that Warshaw and de Lagarde's disclosures breached the Vinci-Coach License Agreement, which prohibited disclosure of confidential information. <u>Id.</u> at Counterclaims ¶¶ 38-40, 327.

As to Roney, Vinci alleges that Roney received Vinci's confidential business information from Warshaw as well as other Case-Mate employees on a number of occasions. <u>Id.</u> at Counterclaims ¶¶ 94-96, 99, 120, 127. Vinci alleges that Roney then improperly used that

---

[14] Vinci alleges that the Vinci-Coach License Agreement is a trade secret because certain terms of the agreement and "the total amount in general minimum royalties that would be owed to Coach as of June 30, 2023" derive "independent economic value to Vinci's competitors," including Case-Mate. ECF No. 207-2 at Counterclaims ¶ 69.

information to negotiate a new license agreement with Coach to replace Vinci. Id. at Counterclaims ¶¶ 122, 124, 126. As to Marzio, Vinci alleges that Marzio used information accessed from Vinci's data room and sent that information to Roney and other Case-Mate personnel in order to negotiate the license agreement between Case-Mate and Coach. Id. at Counterclaims ¶¶ 107, 112, 119-26. Additionally, as to Marzio and Roney, Vinci alleges that they sought and obtained Vinci's confidential information not only to replace Vinci as the Coach licensee, but to do so in time to make the Fall 2023 iPhone launch. Id. at Counterclaims ¶¶ 384-387.

As to Mehta, Pham, and Reddy, Vinci alleges that each "were given access to [Vinci's] data room, through which they were provided documents and materials embodying Vinci's Confidential Information." Id. at Counterclaims ¶ 107. Vinci alleges that on May 10, 2023, "Mehta requested, and Vinci thereafter provided" Vinci's financial information, design materials, loan agreements, and all liens on Vinci's assets. Id. at Counterclaims ¶ 110. Specific to Pham, Vinci alleges that Pham "requested Vinci's cash flow analysis" on May 13, 2023, which Vinci provided. Id. at Counterclaims ¶ 111. Vinci also alleges that Pham, Mehta, Marzio, and Reddy were in a group chat, where Pham sent a text message on May 16, 2023 that he "spent last week studying their [Vinci's] trial balance." Id. at Counterclaims ¶ 114 (alteration in original). Vinci also alleges Pham sent an e-mail to "his fellow Case-Mate principals" on May 15, 2023, stating that "[o]nce we [Case-Mate] are the senior lender, we must stop [all cash flow] asap." Id. at Counterclaims ¶ 139 (alterations in original). Vinci alleges that on May 16, 2023, Mehta, Marzio, Reddy, and Pham acquired the trade secrets by improper means to coerce "Vinci to accept a lowball price for the purchase of its assets" and to paralyze Vinci's assets by "direct[ing] Case-Mate to freeze Vinci's line of credit." Id. at Counterclaims ¶ 140.

57

Collectively, these allegations suffice to adequately plead a misappropriation claim against the Individual Coach and Case-Mate Defendants.

          10. *Counterclaim 15: Case-Mate's Breach of Contract*

Vinci asserts a breach-of-contract claim against Case-Mate based on Case-Mate's alleged breach of the non-disclosure agreement ("NDA") entered into by Case-Mate in 2023 in connection with its attempt to purchase Vinci's assets. ECF No. 207-2 at Counterclaims ¶¶ 82-86, 107-15, 373-82. Vinci alleges that Case-Mate breached the NDA by 1) disclosing to Coach the confidential information it learned during its due diligence of Vinci, 2) forcing Vinci to re-borrow funds to pay creditors and accept a low offer on Vinci's assets, 3) interfering with Vinci's customers and suppliers, and 4) misappropriating Vinci's competitive advantage. Id. at Counterclaims ¶¶ 116-54. In New York, the elements of a breach of contract claim are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Pinknews Media Grp. Ltd. v. Here Publ'g Inc., No. 19-CV-5609 (AT), 2021 WL 1199427, at *3 (S.D.N.Y. Mar. 30, 2021) (citation omitted).

Case-Mate argues that there was no breach because the scope of the NDA related to another one of Vinci's brands (Incase), and therefore the NDA did not include the information Vinci alleges Case-Mate gave to Coach. ECF No. 225 at 17. "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016) (citation omitted). In reviewing the NDAs filed in the Vinci Action (ECF Nos. 15-6, 15-7), the agreements only refer to "possible financial arrangement [ ] with Vinci Brands LLC" (Vinci Action, ECF No. 15-6 at 1) and a "possible financial arrangement [ ] with Project Shield" (Vinci Action, ECF No. 15-7 at 1). On their face, the agreements are not limited in scope in the way that Case-Mate suggests.

58

Case-Mate claims that "[b]efore Case-Mate executed the NDA, it specifically asked whether the NDA pertained only to Incase, which the parties referred to as 'Project Shield,' or if it extended to information about the entire company," which Vinci assured Case-Mate "that the scope of the NDA was limited only to the Incase brand." ECF No. 225 at 17. Case-Mate cites to extrinsic evidence, an e-mail from Austin Black of D.A. Davidson to Steve Marzio of Case-Mate, that states "[t]his NDA covers the Project Shield divestiture only, but we can also send a broader NDA should conversations head that direction." ECF No. 226-2 at 2. At this stage, the Court is limited to Vinci's answer and cannot consider extrinsic evidence in assessing the sufficiency of Vinci's allegations. See Nelson v. Argyropoulous et al., No. 18-CV-11413 (AT) (SDA), 2021 WL 4352326, at *1 n.1 (S.D.N.Y. Sept. 24, 2021) ("Because the Court cannot consider evidence outside the complaint on a motion to dismiss, the Court cannot take these extrinsic materials into account.") (citation omitted). Whether Case-Mate's conduct amounted to a breach of the NDA is a question that goes to the merits of Vinci's counterclaim and is not a question for this stage of the proceeding. See U.S. for Use of N. Maltese & Sons, Inc. v. Juno Const. Corp., 759 F.2d 253, 255 (2d Cir. 1985) ("It is hardly necessary to cite authority for the proposition that whether there has been a breach of contract is a question of fact."); XL Specialty Ins. Co. v. Lakian, 632 F. App'x 667, 670 (2d Cir. 2015) (summary order) ("Whether [a party] breached, however, is a merits question.").

In sum, Vinci has adequately alleged a breach-of-contract claim.

11. *Counterclaims 16, 17: Vinci's Fraud Claim against Coach, Case-Mate, and Case-Mate defendants Marzio, Mehta, Reddy, and Pham*

Vinci asserts a fraud claim against Case-Mate based on Case-Mate's attempt to purchase Vinci's assets. ECF No. 207-2 at Counterclaims ¶¶ 116, 384. "Officers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it[.]"

Koenig, 25 F.3d at 1173 (reversing district court's dismissal where "the amended complaint alleged that the [individual defendants] themselves made misrepresentations") (citations omitted). Also, a corporate officer may be held liable for fraud "even if they did not stand to gain personally," so long as they "participated in or had knowledge of the fraud." Nielsen Co. (US), LLC v. Success Sys., Inc., No. 11-CV-2939 (BSJ) (FM), 2012 WL 3526625, at *6 (S.D.N.Y. Aug. 13, 2012).

Vinci alleges that Case-Mate committed fraud by telling Vinci that Case-Mate intended to acquire the assets, while omitting that it instead intended to obtain Vinci's confidential information to destroy Vinci's business. Id. at Counterclaims ¶ 384. As it concerns Coach, Vinci alleges that Coach fraudulently induced Vinci to prepare for the Fall 2023 iPhone launch while failing to tell Vinci that it would not continue with Vinci as a licensee. Id. at Counterclaims ¶¶ 58-62, 89-93, 392. Vinci further alleges that Coach obtained Vinci's confidential information under false pretenses, to give that information to Case-Mate so that Case-Mate could take over the Fall 2023 iPhone launch. Id. Notably, Vinci alleged a similar fraud claim against Kate Spade in the Vinci Action and Judge Schofield held that Vinci's allegations there, which are similar to those made here, adequately pled a fraud by omission claim. ECF No. 920 at 17-21.

Coach and Case-Mate argue that Vinci has not pled a fraud claim based on an omission because Vinci has not alleged facts from which it can be plausibly inferred that Case-Mate, Coach, or any of the individual defendants owed a duty to Vinci. ECF No. 220 at 30-31; ECF No. 225 at 18. A claim of fraud based on an omission must allege "that the defendant had a duty to disclose material information and that it failed to do so." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 179 (2011). When the parties are engaged in a prospective transaction, the "special facts doctrine" may apply where "one party possesses superior

60

knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge[.]" Aetna Case. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 582 (2d Cir. 2005) (citation omitted). To plead the existence of the special facts doctrine, a party must allege that "the material fact was information peculiarly within the knowledge of one party and that the information was not such that could have been discovered by the other party through the exercise of ordinary intelligence." LMM Cap. Partners, LLC v. Mill Point Cap., LLC, 224 A.D.3d 504, 508 (1st Dep't 2024).

Vinci has adequately alleged that Case-Mate and Coach had material information peculiarly within their knowledge that Vinci could not have discovered through the exercise of ordinary intelligence. As it concerns Case-Mate, Vinci alleges that Case-Mate did not disclose that it was negotiating with Coach to replace Vinci as a licensee when Case-Mate and Vinci entered into the NDAs. ECF No. 207-2 at Counterclaims ¶¶ 56, 83, 86, 116-18. Pursuant to the NDA, Vinci provided Case-Mate with the Vinci-Coach License Agreement, which Vinci alleges Case-Mate used to negotiate the terms of its own license agreement with Coach. Id. at Counterclaims ¶ 112. Pursuant to the NDA, Vinci also provided information that Case-Mate knew was needed for it to meet the Fall 2023 iPhone launch. See id. at Counterclaims ¶ 110. As to Coach, Vinci alleges that Coach worked in coordination with Vinci on the Fall 2023 iPhone 15 launch, but during that time, Coach did not disclose that it intended to terminate the License Agreement and was in negotiations with Case-Mate to replace Vinci. Id. at Counterclaims ¶¶ 56-62, 100, 393.

As to the individuals, Vinci has also adequately alleged that Marzio, Mehta, Pham, and Reddy had superior knowledge that Vinci could not have gained through the exercise of due diligence, and that these individuals understood that Vinci was operating under a mistaken

impression. Beginning with Marzio, Vinci alleges that he misled Vinci into believing that Case-Mate intended to acquire Vinci in good faith, when in reality Case-Mate's "secret plan" was to replace Vinci as the Coach licensee and use Vinci's confidential information to make the Fall 2023 iPhone launch. ECF No. 207-2 at Counterclaims ¶ 384. More specifically, Vinci alleges that Marzio sought and obtained Vinci's confidential information, inducing Vinci to provide it as part of a due diligence process Vinci believed would result in Case-Mate's purchase of Vinci's business. ECF No. 207-2 at Counterclaims ¶¶ 57, 82-87, 106-17, 384-89. Vinci did not know that Coach and Case-Mate were in discussions concerning a license agreement and Vinci believed it would be the Coach licensee for the iPhone 15 launch, because it was coordinating designs and development with Coach and soliciting written orders from customers. Id. at Counterclaims ¶¶ 58-62. Marzio received information from Vinci such as the Vinci-Coach License Agreement (id. at Counterclaims ¶ 112) and Vinci's financial information (id. at ¶ 119), which Case-Mate used to obtain the license agreement with Coach (id. at Counterclaims ¶¶ 117, 119-26).

Vinci also alleges that Marzio, Mehta, Reddy, and Pham used the information obtained through the NDAs to "lowball" an offer for Vinci's assets, which "cut[] off Vinci's only source of funding, eliminat[ed] its credit line, and notic[ed] a forced article 9 liquidation of its assets." Id. at Counterclaims ¶¶ 129-146. Vinci alleges that Mehta, Pham, and Reddy were involved in the due diligence conducted on Vinci when Case-Mate offered to buy Vinci's assets and were each given access to the data room which contained Vinci's confidential information. Id. at Counterclaims ¶ 107. Vinci has specific allegations that Marzio, Mehta, and Pham requested certain information, such as the Vinci-Coach License Agreement (id. at Counterclaims ¶ 112), Vinci's financial information (id. at Counterclaims ¶¶ 110-11), design materials for the September 2023 iPhone launch (id.), and loan agreements with Siena (id.), which Vinci provided

62

(id.). Vinci also alleges that Marzio, Mehta, Reddy, and Pham had a conversation via a group chat, where Pham stated that he "spent last week studying" Vinci's "trial balance." Id. at Counterclaims ¶ 114. Additionally, Vinci alleges that Pham sent an e-mail to "his fellow Case-Mate principals" Mehta, Marzio, and Reddy on May 15, 2023, stating that once Case-Mate is "the senior lender, we must stop [all cash flow] asap." Id. at Counterclaims ¶ 139 (alteration in original). Vinci also alleges that Marzio sent e-mails to Vinci regarding the Article 9 sales of Vinci's assets. Id. at Counterclaims ¶¶ 143-44.

In short, these allegations suffice to adequately plead that Marzio, Mehta, Reddy, and Pham participated in the fraud with actual knowledge, and also had superior knowledge not known to Vinci that Case-Mate was replacing Vinci as the Coach licensee.

### 12. *Counterclaim 17: Fraud Claim against Warshaw and de Lagarde*

Vinci alleges that Coach's Warshaw and de Lagarde fraudulently induced Vinci to prepare for the Fall 2023 iPhone launch, failing to disclose that Coach would not continue with Vinci as a licensee. ECF No. 207-2 at Counterclaims ¶ 392. Vinci further alleges that Coach obtained Vinci's confidential information under false pretenses, omitting that they were sharing that information with Case-Mate so that Case-Mate could take over the Fall 2023 iPhone launch. Id. Coach argues that Vinci "impermissibly lumps together" Coach, Warshaw, and de Lagarde, thereby failing "to plead with any particularity who is alleged to have made any misrepresentation or to whom those misrepresentations were made." ECF No. 220 at 29.

Vinci sufficiently alleges that Warshaw and de Lagarde made misrepresentations to Vinci about Coach's intent to continue with its licensing relationship with Vinci. For example, Vinci points to a May 24, 2023 e-mail where it alleges that de Lagarde "falsely represented" Coach's intent to permit Vinci to manufacture Coach-branded products for the iPhone 15 launch. ECF No. 207-2 at Counterclaims at ¶ 396. As to Warshaw, Vinci claims that two other employees,

Sabrina Patrono and Savanah Hughes, falsely represented to Vinci Coach's intent "at the direction of de Lagarde and Warshaw." Id. at Counterclaims ¶¶ 397-98; see also id. at Counterclaims ¶¶ 101-02.  Additionally, Vinci alleges sufficient facts from which to infer that both Warshaw and de Lagarde were aware of the fraud. Vinci alleges that Warshaw and de Lagarde exchanged e-mails and text messages with Case-Mate employees where they shared Vinci's confidential information with Case-Mate to assist Case-Mate becoming the new licensee. ECF No. 207-2 at Counterclaims at ¶¶ 94-100, 123-28. For example, Vinci alleges that de Lagarde sent an e-mail to Roney on May 11, 2023, stating that she was "learning more and more about the state of [Vinci's] business hourly . . . hopefully I will know even more next week."). Id. at Counterclaims ¶ 115 (alterations in original).

In sum, Vinci has also adequately pled fraud claims against these defendants.

C. CM Brands

When Vinci moved to amend its answer in March 2024, Vinci added CM Brands LLC ("CM Brands") as a counterclaim defendant. ECF Nos. 70-74. On March 25, 2024, Vinci filed its amended answer (ECF No. 74), and on April 18, 2024, Vinci requested the issuance of a summons for Case-Mate (ECF No. 80). Vinci did not request a summons for CM Brands. To date, Vinci has not requested a summons for CM Brands, there is no evidence in the record that CM Brands has been served with Vinci's answer and counterclaims, and CM Brands has not appeared in this action.

Under Federal Rule of Civil Procedure 4(m), if a party is not served within 90 days after a complaint or counterclaims are filed, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). The filing of an amended pleading "does not restart the 90[-]day period for service under Rule 4(m)." Hernandez v. Lira of New York

64

Inc., No. 20-CV-4457 (RA), 2022 WL 280887, at *2 (S.D.N.Y. Jan. 31, 2022) (quoting Sikhs for Justice v. Nath, 893 F. Supp. 2d 598, 607 (S.D.N.Y. 2012)). Vinci is well outside of the 90 days required for service of its answer and counterclaims. See Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd., No. 94-CV-5620 (JFK), 1999 WL 64283, at *8 (S.D.N.Y. Feb. 8, 1999) (dismissing counterclaims against defendants where service was not effected within time period under Rule 4(m)).

Therefore, I recommend that CM Brands be dismissed from the action without prejudice. See, e.g., Maayah v. Fareva USA, Inc., No. 24-CV-4731 (CM) (SLC), 2024 WL 5679045, at *2 (S.D.N.Y. Oct. 25, 2024), adopted by, 2025 WL 1268867 (S.D.N.Y. May 1, 2025) (dismissing parties without prejudice when not served within 90 days); Peoples v. Fischer, No. 11-CV-2694 (SAS), 2012 WL 1575302, at *1 n.1 (S.D.N.Y. May 3, 2012), on reconsideration in part, 898 F. Supp. 2d 618 (S.D.N.Y. 2012) (similar).

65

## CONCLUSION

For the reasons stated herein, Vinci's motion for leave to file an amended answer is

**GRANTED in part and DENIED in part**. I further recommend that CM Brands be dismissed

from this action without prejudice. The Clerk of Court is respectfully directed to terminate the

motion at ECF No. 207.

**SO ORDERED.**

DATED:    New York, New York
          March 27, 2026

_____

VALERIE FIGUEREDO
United States Magistrate Judge

66